Brett Anderson (11809)
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
Email: bretta@blackburn-stoll.com

*Attorney for the Plaintiffs*

---

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| TOMAC TRUST; ROYAL WEST PROPERTIES, LLC; WAYNE B BULAU IRREVOCABLE TRUST; THE REVOCABLE TRUST AGREEMENT OF JAMES A HERBERT; JANICE YOUNG; THE J. LYNN KNEEDY TRUST; JOHN KURTZ; THE MARJORIE ANN REID TRUST; BENJAMIN ALLEN; ELIZABETH CARLSTON; JSGV PROPERTIES, LLC; MAXHAN HOLDINGS, LLC; WINDMILL PROPERTIES II, LLC; IVAN WARNER; GREEN COVE INVESTMENTS, LLC; QUAKING ASPEN PROPERTIES, LLC; JOAN ALICE BEFORT LIVING TRUST; JAYBIRD INTER VIVOS REVOCABLE TRUST, | **COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| MILLCREEK COMMERCIAL PROPERTIES LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1 a Utah limited liability company; 13 INVESTMENTS LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a business operating in Utah under a dba; JAMES YEATES, an individual; KEVIN LONG, an individual; BRENT SMITH, an individual; MARK MACHLIS, an individual; MICHAEL CRUZ, an individual; MICHAEL BERSIE, an individual; BRIAN MARTINEZ, an individual; ILLEANA STOCCO, an individual; SCOTT RUTHERFORD, an individual; EQUITY SUMMIT GROUP, a business operating in Utah; ELEVATED 1031, a business operating in Utah; | |

| STACIE STEWART, an individual; CONNIE GREENAWALT, an individual; EASTERN 1031 STARKER EXCHANGE, LLP, a business operating in Pennsylvania; GREEN IVY REALTY, INC., a Utah corporation; ASHLEY WOLOCATIUK, an individual, | |
| --- | --- |
| Defendants. | |

COMES NOW Plaintiffs, Tomac Trust (Cheryl Tomac, trustee); Royal West Properties, LLC (Willard Malmstrom); Wayne B. Bulau Irrevocable Trust (Colleen Overson, trustee); The Revocable Trust Agreement of James A Herbert (James Herbert, trustee); Janice Young; The J. Lynn Kneedy Trust (Lynn Kneedy, trustee); John Kurtz, The Marjorie Ann Reid Trust (Marjorie Reid, trustee); Benjamin Allen; Elizabeth Carlston; JSGV Properties, LLC (Jennifer Smith); MaxHan Holdings, LLC (Monika Hansen); Windmill Properties II, LLC (Simon DeJong); Ivan Warner; Green Cove Investments, LLC (James Tucker); Quaking Aspen Properties, LLC (Gerald Del Priore & Marisa Fontaine); Joan Alice Befort Living Trust (Joan Befort, trustee) and Jaybird Inter Vivos Revocable Trust (Thom Belchak, trustee), by and through the undersigned counsel, hereby complain, state, and allege against Defendants Millcreek Commercial Properties, LLC; Millrock Investment Fund 1, LLC; 13 Investments, LLC; Colliers International; James Yeates; Kevin Long; Brent Smith; Mark Machlis; Michael Cruz; Michael Bersie; Brian Martinez; Illeana Stocco aka Illeana La Ragione; Scott Rutherford; Equity Summit Group; Elevated 1031; Stacie Stewart; Connie Greenawalt; Eastern 1031 Starker Exchange, LLP; Green Ivy Realty, Inc; and Ashley Wolocatiuk, as follows:

## **INTRODUCTION**

1.     Defendants conspired with one another and with other individuals to engage in a massive scheme to defraud Plaintiffs and others (many retirees and elderly citizens) by inducing

them to invest in tenant-in-common ("TIC") interests in a commercial property in South Jordan, Utah (the "Property" or the "South Jordan Building"), which Property was bundled with a sham, long-term lease (the "Millcreek Scheme"). The Property was sold at 3-5 times more than the actual market value, to unsuspecting, often elderly or first-time investors. The inflated price was concealed by ensuring significant returns to investors through a purported guaranteed long-term lease with anchor tenant Neurogenex ("NGX"). Defendants knew the lessor was a start-up entity, yet they represented NGX as a "great tenant" and the "nation's fastest growing healthcare brand." Defendants knew there was no economic basis for the lease terms and that there was no reason to believe that the lessor would be able to perform on the lease. This information was hidden and concealed from the Plaintiffs.

2.      In addition, to support the fictitious lease, Defendants paid "rent" with investor money.

3.      NGX, however, did not pay any rent on the Property.

4.      Without using investor money to pay "rent" to new investors, the Millcreek Scheme would have immediately collapsed, and the fraud would have been revealed.

5.      The lease was executed and guaranteed by NGX, known to the Defendants to be incapable of performing under the terms of the lease.

6.      Based on the representations of the Defendants, Plaintiffs purchased the Property for $10,300,000. The purchase price was marketed as safe and reasonable based upon a 20-year, triple net ("NNN") lease agreement with NGX that would return between 6.5-9.87% on the invested money.

7.      The Defendants manipulated the property's sales price as each investor was added, ranging from $9.18m-$10.31m after commission and escrow fees were deducted, materially damaging every investor's share. This was hidden from investors.

8.      In fact, the Property was worth less than one third of the value represented by Defendants. Unknown to Plaintiffs, Defendants purchased the Property for $3,500,000 from a Colliers associate for a tidy commission exceeding the market rate and the builder's offer of $2,500,000. Immediately thereafter Defendants transferred the Property to a co-conspirator, 13 Investments ("13 Investments"), who also executed the NGX lease agreement as "Real Estate Broker," with no commencement date.  Defendants knew that in fact the lease was worthless.

9.      Defendants made monthly "rent" payments to Plaintiffs of $1,430-$8,170, depending on the owner's percentage. The rent payments were secretly made from money invested by the Plaintiffs. The payments lasted eleven (11) months for 8 investors (deeded Mar-Apr '23) and three (3) months or less for 9 additional investors (deeded Oct-Nov '23) before NGX filed for bankruptcy in January 2024.

10.      Despite first-hand knowledge of NGX's bankruptcy restructuring in October 2023, Millrock continued selling the Property, adding additional TIC investors through November 15, 2023.  This information was hidden from the TIC investors.

11.      On information and belief, the Property is currently worth roughly $2.6m. The $7.7million difference between the actual value of the Property and the purchase price paid by Plaintiffs was pocketed by Defendants in undisclosed commissions or simply taken as undisclosed "profits."

**PARTIES**

**Defendants**

12.     Defendant Millcreek Commercial Properties, LLC is a Utah limited liability company with its principal place of business in Pleasant Grove, Utah.

13.     Defendant Kevin G. Long ("Long") is an individual residing in Utah.

14.     Long was the Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

15.     After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

16.     Long founded Millcreek and affiliated commercial real-estate investment funds, including Millrock Investment Fund 1 LLC.

17.     At all material times, Long was an employee and agent of Millcreek Commercial and principal of Millrock Investment Fund 1.

18.     Defendant Brent Smith ("Brent Smith") is an individual residing in Utah.

19.     Smith was the CFO of Millcreek Commercial, primary contact for Slope Construction, and principal of Millrock Investment Fund 1.

20.     After NGX's bankruptcy, Smith served a dual CFO role with Millcreek and NextPain, Millcreek's purported NGX replacement anchor tenant. Further, Smith formed two limited liability companies (Sky High Capital Partners, LLC and SHC Management, LLC) in 2024, presumably to create distance from Millrock Investment Fund 1, LLC. On information and belief those new entities are mere continuations of Millrock Investment Fund 1, LLC and/or alter egos of the same.

21.     At all material times, Smith was an employee and agent of Millcreek Commercial and principal of Millrock Investment Fund 1.

22.     Defendant Michael Cruz ("Cruz") is an individual residing in Utah.

23.     At all material times, Cruz was an employee and agent of Millcreek.

24.     Defendant Brain Martinez ("Martinez") is an individual residing in Utah.

25.     At all material times, Martinez was an employee and agent of Millcreek.

26.     Defendant Michael Bersie ("Bersie") is an individual residing in Utah.

27.     At all material times, Bersie was an employee and agent of Millcreek.

28.     Defendant Illeana Stocco ("Stocco") is an individual residing in Utah.

29.     At all material times, Stocco was an employee and office manager of Millcreek.

30.     Defendant Stacie Stewart ("Stewart") is an individual residing in Utah.

31.     At all material times, Stewart was a broker and associate of Bersie of Millcreek.

32.     Defendant Connie Greenawalt ("Greenawalt") is an individual residing in Pennsylvania.

33.     Defendant Eastern 1031 Starker Exchange is a business operating in Lewisberry, Pennsylvania.

34.     At all material times, Greenawalt was an agent of Eastern 1031 Starker Exchange, LLC.

35.     Defendant Millrock Investment Fund 1, LLC is an equity fund that markets properties through Millcreek Commercial Properties, LLC.

36.     Defendant 13 Investments is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

37.     Defendant Mark Machlis ("Machlis") is an individual residing in Salt Lake County, Utah.

38.     Machlis is the registered agent of Green Ivy Realty and a development partner of Millrock Investment Fund 1.

39.     Machlis has continued assisting Kevin Long in the management of the TIC interests through the present time.

40.     At all material times, Machlis was an agent and development partner of Millcreek Commercial

41.     Defendant Green Ivy Realty, Inc is a Utah company.

42.     Defendant Ashley Wolocatiuk ("Wolocatiuk") is an individual residing in Utah

43.     At all material times, Wolocatiuk was an agent and employee of Green Ivy Reality, Inc.

44.     Defendant Scott Rutherford ("Rutherford") is an individual residing in Utah.

45.     Defendant Equity Summit Group is a Utah company.

46.     Defendant Elevated 1031 is a Utah company.

47.     At all material times, Rutherford was an agent and representative of Millcreek, Equity Summit and Elevated 1031.

48.     At all material times, Long, Machlis, and Smith acted as close business associates of one another, including through joint marketing, communications, construction planning, equipment purchases, social media, and transactional commission and rent payments.

49.     At all material times, Millcreek and 13 Investments acted as close business associates of one another, including through property ownership exchanges, joint marketing, communications, property management, transactional commission and rent payments.

50.     Collectively, Millcreek, Long, Machlis, and Brent Smith are referred to herein as the "Tort Feasors."

51.     Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting and investment services company that was at all relevant times registered to do business in the State of Utah.

52.     Colliers maintains four offices in Utah. Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek Commercial Properties, LLC and directed towards transactions having a nexus in Utah.

53.     Defendant James Yeates ("Yeates") is an individual residing in Utah.

54.     At all material times, Yeates was an agent at Colliers.

**Plaintiffs**

55.     Plaintiff Cheryl Tomac (age 75) is an individual residing in California. She was 74 years old at the time she purchased TIC ownership in South Jordan. Tomac, was forced to retire from being a family law attorney after suffering from a debilitating stroke. She invested $325,800 in a 1031 exchange.  Losing over $20,000 a year ($1,500 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

56.     During all material times herein, Cheryl Tomac suffered from a disability associated with a prior massive stroke and supports a spouse with Alzheimer's whose financial needs will continue to increase as his disease progresses.

57.     Plaintiff Willard Malmstrom (age 86) is an individual residing in Davis County, Utah and principal of the Royal West Properties, LLC entity. He was 84 years old at the time he purchased TIC ownership in South Jordan property. Malmstrom, a retired social worker and member of the National Guard, invested $650,800 in a 1031 exchange for the South Jordan Property. Losing nearly $38,000 a year ($3,000 from loss of monthly NGX rent and attorney fees)

will harm his and his family's wellbeing. Further, Malmstrom invested in a second NGX Utah property, suffering similar losses on a $157,000 investment.

58.    Plaintiff Colleen Overson (age 66) is an individual residing in Green Isle, Minnesota. She was 65 years old at the time she purchased TIC ownership in South Jordan. She invested $350,800 in a 1031 exchange. Losing over $22,000 a year ($1,600 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

59.    Plaintiff James Herbert (age 83) is an individual residing in Dunkirk, Maryland. He was 82 years old at the time he purchased TIC ownership in South Jordan. He invested $271,468.46 in a 1031 exchange. Losing over $16,000 a year ($1,200 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

60.    Plaintiff Janice Young (age 70) is an individual residing in Southern Pines, North Carolina. She invested $358,923.70 in a 1031 exchange. Losing over $23,000 a year ($1,650 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

61.    Plaintiff Lynn Kneedy (age 74) is an individual residing in Davis County, Utah. He was 73 years old at the time he purchased TIC ownership in South Jordan. He invested $1,127,917.50 in a 1031 exchange. Losing over $65,000 a year ($5,300 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

62.    Plaintiff John Kurtz (age 71) is an individual residing in Lancaster, Pennsylvania. He was 70 years old at the time he purchased TIC ownership in South Jordan. He invested

$493,688 in a 1031 exchange. Kurtz relies on this income source to supplement social security. Losing over $30,000 a year ($2,300 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

63.    Plaintiff Marjorie Ann Reid (age 82) is an individual residing in Wasatch County, Utah. She was 80 years old at the time she purchased TIC ownership in South Jordan. She invested $981,134.20 in a 1031 exchange. Losing over $57,000 a year ($2,320 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

64.    Plaintiff Benjamin Allen is an individual residing in Salt Lake County, Utah.

65.    Plaintiff Elizabeth Carlston is an individual residing in Salt Lake County, Utah.

66.    During all material times herein, Benjamin Allen and Elizabeth Carlston are a married couple and first-time investors needing to place a schoolteacher parent's inheritance of $300,800 as a passive way to help provide for their child with special needs. Losing over $18,000 a year ($1,390 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect their household.

67.    Plaintiff Jennifer Smith is an individual residing in Salt Lake County, Utah and principal of the JSGV LLC entity. She invested $490,557 in a 1031 exchange. Losing over $29,000 a year ($2,300 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

68.    Plaintiff Monika Hansen is an individual residing in Salt Lake County, Utah and principal of the Maxhan Holdings LLC entity. She is a school bus aid for special needs students and invested $456,217 in a 1031 exchange. Losing over $27,000 a year ($2,145 from loss of

monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

69.     Plaintiff Simon deJong is an individual residing in Nampa, Idaho and principal of the Windmill Properties LLC entity. He invested $345,258.40 in a 1031 exchange. Losing over $21,000 a year ($1,620 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

70.     Plaintiff Ivan Warner is an individual residing in Utah County, Utah. He invested $294,334.20. Losing over $18,000 a year ($1,384 from loss of monthly NGX rent and paying attorney fees to recover) will affect his household's ability to meet basic financial needs.

71.     Plaintiff James Tucker (age 68) is an individual residing in East Texas and principal of Green Cove Investments, LLC. He was 67 years old at the time he purchased TIC ownership in South Jordan. He invested $1,250,800 in a 1031 exchange. Losing over $73,000 a year ($5,880 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

72.     Plaintiffs Gerry Del Priore and Marisa Fontaine are married individuals residing in New Jersey and principal of the Quaking Aspens Properties LLC. They invested $559,471.66 in a 1031 exchange. Losing over $33,000 a year ($2,575 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect their household's ability to meet basic financial needs.

73.     Plaintiff Joan Befort (age 76) is an individual residing in Orange County, California. She was 75 years old at the time he purchased TIC ownership in South Jordan. She invested $412,161.59 in a 1031 exchange. Losing over $25,000 a year ($1,960 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect her household's ability to meet basic financial needs.

74.    Plaintiff Thom Belchak (age 73) is an individual residing in Salt Lake County, Utah. He was 72 years old at the time he purchased TIC ownership in South Jordan. He invested $1,500,800 in a 1031 exchange. Losing over $85,000 a year ($6,920 from loss of monthly NGX rent and paying attorney fees to recover) will greatly affect his household's ability to meet basic financial needs.

75.    Together, Tomac, Malmstrom, Overson, Herbert, Young, Kneedy, Kurtz, Reid, Allen, Carlston, Smith, Hansen, DeJong, Warner, Tucker, Del Priore, Fontaine, Befort and Belchak will be referred to as "Plaintiffs."

## JURISDICTION AND VENUE

76.    Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

77.    The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

78.    Venue is appropriate in this forum pursuant to 28 U.S.C § 1391 (b)(2) and 15 U.S.C. § 78aa.

79.    In connection with the conduct alleged in this Complaint, Defendants directly and indirectly used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

**THE MILLCREEK TIC SCHEME**

80.    Millcreek Commercial Properties, LLC ("Millcreek") and its agents have conspired with third parties in a sophisticated scheme to fraudulently induce vulnerable, often elderly investors to purchase TIC investments in commercial properties located throughout the United States at grossly inflated prices (the "Millcreek Scheme").

81.    Millcreek actively markets TIC interests as safe and secure investments offering a guaranteed source of long-term income. Millcreek marketed its properties over the internet, through mail and using other means of interstate communication.

82.    Frequently, Millcreek pitched the TIC investments to potential buyers in need of a way to utilize the tax benefits of an exchange under IRS Section 1031. Purchases in a 1031 exchange are ideal marks for unscrupulous sellers as they are under strict time constraints when identifying and buying the exchange property.

83.    Millcreek, along with its co-conspirators including Millrock Investment Fund 1, LLC ("Millrock"), 13 Investments, LLC ("13 Investments") and Colliers, would purchase commercial properties and then enter into long-term lease agreements at highly inflated prices. Millcreek would then market the properties to potential investors with sham, long-term leases falsely representing that the leases provided a safe and secure source of passive income.

84.    Millcreek marketed NGX TIC interests in real properties at multiple locations, including: South Jordan, Utah; Cottonwood Heights, Utah; Bluffdale, Utah; Lehi, Utah; Romeoville, Illinois and 5+ other locations.

85.    Millcreek and its affiliate, Millrock Investment Fund 1, LLC, which is managed and operated by Kevin Long, Thomas Smith, and Brent Smith, entered agreements with developers

ADP, Slope Construction, and 13 Investments to make renovations on the building at South Jordan located at 3583 W 9800 S. South Jordan, UT 84095, the location at issue in this complaint.

86.    The Tort Feasors represented to the Plaintiffs that they had already secured a paying anchor tenant with sufficient revenue to service their long-term lease.

87.    This tenant was identified as Neurogenex ("NGX").

88.    NGX is an Arizona corporation that purportedly had aggressive plans to expand nationwide.

89.    Will Bozeman ("Bozeman") acted as the CEO and signer of NGX lease agreements.

90.    Eric Speer acted as the CFO and signer of NGX equipment agreements.

91.    NGX bankruptcy filings indicate NGX received a "rebate" in the form of a 50% kickback on equipment invoices from vendor KKM.

92.    While not named as defendants in this lawsuit, collectively, NGX, Bozeman, and Speer are referred to herein as the "NGX Parties."

93.    The NGX Parties or their affiliates entered long-term leases to operate Utah, Illinois, and Georgia Properties as pain care centers.

94.    These leases were bundled with the sale of tenant-in-common interests in each property.

95.    Millcreek represented to the Plaintiffs and other tenant-in-common investors that this would result in investors receiving a return on their investment in the range of 6-9% over the term of each lease.

96.    Millcreek represented to the Plaintiffs and other tenant-in-common investors that this would result in a steady stream of income along the way.

97.     The Millcreek Parties represented to the Plaintiffs and other tenant-in-common investors that the rent payments on the lease were backed by two failsafe mechanisms to protect investors from potential losses.

98.     The first of these was a corporate guarantee backing the lease.

99.     The corporate guarantor for all investors was NGX.

100.    The second of these was a "Sellers performance guarantee" in some investor's purchase and sale agreements.

101.    The Seller for tenant-in-common investors was Millrock Investment Fund 1, LLC.

102.    To locate potential investors and induce their investments, Millcreek and its agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents to locate and refer potential investors to them.

103.    While not all are named as defendants in this lawsuit, these referring parties are described collectively herein as "Advisors" and allegations regarding them are added to provide context to Plaintiffs' claims.

**Millcreek Parties Jointly Target Retirement Investors**

104.    In 2017, Long founded Millcreek Commercial, LLC and affiliated commercial real estate funds, including Millrock Investment Fund 1 of Utah ("Millrock").

105.    At all material times, Defendants Long, Machlis, Rutherford, Cruz, Martinez, Bersie, Stocco and other agents of Millcreek and 13 Investments were close business associates, including through joint marketing, communications, social media, and transactional commission payments.



106.    In or about February 2023, Millcreek and its agents Cruz, Rutherford and Martinez, under Long's leadership, began marketing and selling TIC interests at the South Jordan Property.

107.    The Millcreek Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

108.    A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"—i.e., property of the same nature or character as the sold property.

## ON THE BLOG

A tired landlord may feel burnt out and ready to cash out of their investments; however, the prospect of paying high capital gains taxes on the sale of their properties can be a significant barrier to retiring comfortably. This is where a 1031 exchange can be a valuable tool for those looking to sell their properties and defer tax burden.

109.    1031 exchanges must take place over a constrained time frame, by law.

110.    From the date the original property is sold, the purchase of the new property must be completed within 180 days.

111.    Millcreek "markets to middle class retirement investors", as shown in this excerpt from the Frequently Asked Questions page of Millcreek's website:

**What is the exit strategy?**

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and ==markets to middle class retirement investors== we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market. Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

112.    The tax-deferral advantages of a 1031 exchange are appealing to retirees, particularly when such an exchange came with a promise of large monthly returns on which they could rely during their final years.

113.    Millcreek marketed that "Millcreek Commercial generates passive income for you."

114.    Typically, the Millcreek Parties bundled long-term, triple net leases with the sale of TIC interests.

115.    That is, they offered TIC interests in properties that purportedly already had leases in place with tenants.

116.    The lease connected with each TIC property was designed to be the income stream for the Millcreek Parties' targeted investors.

117.    Millcreek marketed their properties as a way to "leave the headaches of being a landlord behind."

118.    Millcreek marketed their properties naming Colliers as a reputable, national entity to gain investor confidence:



119.    Millcreek also coaxed possible investors by saying "Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer," as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange":

## Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

120.    In fact, Millcreek's leases were often with shell entities without real ability to pay the inflated rents.

121.    One "strong tenant" working with Millcreek was Neurogenex ("NGX"). Millcreek and its co-conspirators represented that NGX was "the nation's most rapidly growing healthcare

brand and platform, poised to expand from its current 15 operating locations to an impressive 56 within the next year."

> **Neuragenex** stands as the nation's most rapidly growing healthcare brand and platform, poised to expand from its current 15 operating locations to an impressive 56 within the next year. Founded by medical professionals, Neuragenex Treatment Centers was established to provide patients with access to pain relief without surgery, drugs or invasive treatments through high pulse external electrical stimulation and specialized hydration therapy.

122.    Millcreek stated that "with 15 locations and growing, Neuragenex is a strong tenant and great option for your next real estate investment":

> With 15 locations and growing, Neuragenex is a strong tenant and great option for your next real estate investment.

## NEURAGENEX PROPERTIES

> Our Neuragenex properties all feature a NNN lease, personal guarantee, prime location, great cap rate, and annual rent increases. Contact us today to discuss opportunities with our Neuragenex inventory!

123.    In reality, NGX was a mere start-up that burned through cash reserves to fund an aggressive expansion and relied on cash flow funded by backdoor deals with medical equipment vendors. NGX was forced into involuntary bankruptcy in January of 2024, citing "large number of leases of commercial real property that have rental rates which are grossly above market rental rates." Arizona Bankruptcy Court, Case No. 2:24-BK-00631-EPB

124.    Millcreek represented to the Plaintiffs that the South Jordan Property was a recently constructed building completed in 2019.

125.     According to Millcreek's marketing, the South Jordan Property was under long-term leases to three tenants: NGX (anchor), Elison Orthodontics and P4 Pharmacy.

126.     Many of the Plaintiffs in this action purchased TIC interests for the desired purpose of deferring capital gains tax and to obtain a passive income-generating property.

127.     As part of many of the Plaintiffs' purchases of TIC interests in the South Jordan Property, Millcreek and other brokers acted as the agent and received commission payments on the grossly inflated sales price.

**The Advisor Parties' Role in the Millcreek TIC Program**

128.     Before learning of Millcreek's TIC offerings, few of the Plaintiffs knew much about the 1031 exchange process and so they sought guidance from investment and real estate advisors or 1031 exchange specialists (collectively, the "Advisors").

129.     Not all Advisors are parties in this action, but allegations regarding them are included as context for claims against Defendants, specifically Rutherford, Greenawalt, and Stewart.

130.     Prior to purchasing their TIC interests, none of the Plaintiffs had ever heard of Millcreek.

131.     Advisors recommended to Plaintiffs a TIC investment through the Millcreek TIC Program and assured them that Millcreek had great TIC investment opportunities.

132.     Each of the Advisors counseled the respective Plaintiff with whom they were dealing that a TIC investment through Millcreek partnered with Colliers would provide the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiffs were seeking.

133.     None of the Advisors mentioned that they would receive a commission or a similar type of compensation from the Millcreek Parties for the referral, all based on the grossly inflated price of the building.

134.     Yet Millcreek marketed commissioned deals to refer investors to their scheme.

## COMMISSION OPPORTUNITY

Know of an investor who may need to identify a 1031 exchange property soon? Forward this email to them! We'd love to work together.

Millcreek Commercial pays a generous commission to **procuring brokers**, paying up to 3%. Sound like a good fit? Our upcoming webinar might be a great place to start!

135.     Millcreek sales agents represented to advisors that the South Jordan property was at a 6.5% cap NNN presale availability:

**From:** Michael Cruz <michael.cruz@millcreekcommercial.com>
**Sent:** Saturday, February 11, 2023 2:07 PM
**To:** Rick Chatham <rchatham@lee-associates.com>
**Subject:** RE: 1031 exchange properties for identification

Hi Rick,

Thank you for sharing that with me. I'd love to be an option for your client. I have a few options that they might like:

This SLC MSA MOB at a 6.5% cap NNN just about sold out presale within a week--never even hit our website nor was it marketed anywhere. We have about $500K in available room for investment through our presale--we're paying rent to investors until the tenant improvements are finished (probably no later than May):

Millcreek - Neuragenex - South Jordan - One Pager.pdf

## The Millcreek NGX TIC Program Sales Pitch

136.     Plaintiffs communicated directly with representatives of Millcreek, including Long, Cruz, Martinez, Bersie, Stocco and Rutherford.

137.    Each of the Millcreek representatives with whom Plaintiffs talked strongly recommended they invest in one of a portfolio of TIC properties sold by Millcreek.

138.    Each of the Plaintiffs was informed that a Millcreek TIC was a great investment because Millcreek always "hand-select[s] the best properties," as shown in this excerpt from Millcreek's promotional materials:

**Removing Barriers to Investing in Commercial Real Estate**
First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

139.    Each Plaintiff was reassured by Defendants to rely on the Defendant's industry expertise to guide them:



140.    Each Plaintiff was told by the Millcreek Parties that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors," as shown in this excerpt from Millcreek's website:

**Choosing a bad investment**

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

141.    Moreover, the Millcreek Parties represented to Plaintiffs that they had already secured a "great" tenant for the South Jordan Property, leading early investors to believe NGX took occupancy.

142.    According to representations made by the Millcreek Parties, the tenant [NGX] had signed a 20-year lease with 2-3% annual increases and an average return on investment over that period of 6-9%.

143.    Millcreek represented the NGX lease was triple-net ("NNN") – meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

144.    Millcreek stated to the Plaintiffs that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors.  Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income," as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

145.    Millcreek Commercial stated that "our acquisition team only purchases properties that our principals want to hold in our portfolios," that "we would sell this to our mother,

grandmother, best friend or son" as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

146.    Millcreek fluctuated and manipulated the South Jordan Property's purchase price as TIC investors were added and commissions, fees, etc. deducted. This was not disclosed to investors at the time:

| TIC Owner | %share | $ sent | est sales price | Date | Source |
|---|---|---|---|---|---|
| Investor #1 | 2.9328% | $300,800.00 | $9,493,133.14 | 3/3/23 | Settlement |
| Investor #2 | 4.8880% | $500,800.00 | $9,299,290.49 | 3/3/23 | Settlement |
| Investor #3 | 9.7142% | $1,000,800.00 | $9,633,356.82 | 3/28/23 | Settlement |
| Investor #4 | 4.8570% | $500,800.00 | $10,310,971.20 | 3/31/23 | Settlement |
| Investor #5 | 6.3141% | $650,800.00 | $10,292,216.87 | 3/31/23 | Settlement |
| Investor #6 | 4.5170% | $465,800.00 | $10,261,172.43 | 4/5/23 | Settlement |
| Investor #7 | 3.5019% | $350,800.00 | $9,894,307.50 | 4/6/23 | Settlement |
| Investor #8 | 3.4184% | $345,400.00 | $10,092,630.00 | 4/14/23 | Settlement |
| Investor #9 | 2.9142% | $300,800.00 | $10,143,595.17 | 10/6/23 | Settlement |
| Investor #10 | 12.3854% | $1,250,800.00 | $10,092,625.00 | 10/6/23 | Settlement |
| Investor #11 | 3.1571% | $325,800.00 | $10,247,033.96 | 10/6/23 | Settlement |
| Investor #12 | 4.1239% | $412,961.59 | $9,847,303.23 | 10/6/23 | Settlement |
| Investor #13 | 14.5711% | $1,500,800.00 | $9,985,665.00 | 10/20/23 | Settlement |
| Investor #14 | 5.4270% | $559,471.66 | $9,184,761.97 | 10/27/23 | Settlement |
| Investor #16 | 3.5537% | $366,635.45 | $10,191,898.56 | 11/8/23 | Settlement |
| Investor #17 | 11.1675% | $1,150,423.08 | $10,239,705.97 | 11/15/23 | Settlement |

147.    For some Plaintiffs, including Allen, Carlston, Smith, and Overson, Millcreek issued an addendum after their money was wired to the title company, unilaterally changing their ownership share from what was stated in the purchase and sale agreement ("PSA").

148.    Varying versions of Millcreek's NGX sales sheet provided to investors showed an approximate $10,300,000.00 purchase price with 6.5-9.87% returns.



149.     Plaintiffs relied on each of these representations when each eventually purchased a TIC interest in the South Jordan Property.

150.     For some Plaintiffs, including Allen, Carlston, Kurtz, Reid, Jennifer Smith, Malmstrom, Overson, Hansen and deJong, Millcreek represented that NGX occupancy was imminent, with rent commencing "mid-May 2023," inducing and enticing these Plaintiffs to quickly close on their purchase of the South Jordan Property.

## Lease Abstract

| Tenants | Neuragenex (Anchor Tenant), Elison Orthodontics, P4 Pharmacy |
|---|---|
| Guarantor | Neuragenex Treatment Centers, LLC |
| Address | 3583 W 9800 S, South Jordan, UT |
| Building Size (SF) | 13,526 Square Feet |
| Year Built | 2019 |
| Rent Commencement | mid-May 2023 |

151.    Upon closing, rent payments were prorated and paid by the title company, but more specifically, from investor's own funds.

152.    The property's grossly inflated pricing valuations began a month before TIC investors were sold by Millcreek.

153.    Millcreek acquired the building from Collier's agent James Yeates, representing Hobble Creek, for $3,500,000 in late January 2023.  This purchase price eclipsed the builder Tim Elison's $2,600,000 market-based offer that was under consideration.



154.    Salt Lake County Assessor records show market values for the property as $1,320,000 in 2021, $2,400,000 in 2022 and $2,890,000 in 2023.

155.    Further, Plaintiffs didn't know at the time that Millcreek's equity arm, Millrock, had transferred the property to Machlis' 13 Investments LLC. Machlis simultaneously functioned as the lease management company Green Ivy for the South Jordan property.

156.    Plaintiffs began receiving full monthly "rent" payments from Machlis and Green Ivy with "NGX TIC" or "NGX Utah" on the memo line. This falsely suggested to Plaintiffs that NGX was operating and paying rent.

157.    A true and correct copy of the one of the checks is copied below:

GREEN IVY REALTY NGX UTAH PPD ID:          ACH credit          $1,635.34
1204927560

**The Developer Parties' Role**

158.    American Development Partners ("ADP") is a Tennessee company with its principal place of business in Franklin, Tennessee.

159.    Emanuel Butera ("Butera") is an individual residing in Tennessee.

160.    At all material times, Butera acted as the owner and operator of ADP.

161.    At all material times, Machlis acted as the principal of 13 Investments which Kevin Long referred to as South Jordan's developer.

162.    Slope Construction LLC is a Utah company with its principal place of business in Pleasant Grove, Utah.

163.    Brent Smith ("Smith") is an individual residing in Utah.

164.    At all material times, Smith acted as the CFO of Millcreek Commercial, principal of Millrock Investment Fund 1 LLC and manager for Slope Construction.

165.    ADP, 13 Investments, and Slope Construction will be referred to as 'Developer Parties."

166.    Not all Developer Parties are named as defendants in this action, but allegations regarding them are included as context for claims against Defendants.

167.    Millcreek and its affiliates entered a series of contracts with one or more of the Developer Parties wherein the Developer Parties would develop and make renovations, improvements, and construction on the South Jordan Property.

168.    In approximately 2022, "Millcreek Commercial signed a development agreement with American Development Partners" to improve NGX earmarked multi-tenant triple-net lease assets throughout the US.

169.    Millcreek [served] as the capital partner for American Development, which [would] build multiple multi-tenant properties, including Lehi (1014 S 1100 WEST), Bluffdale (497 W 14600 S), Cottonwood Heights (2277 Fort Union Blvd) and South Jordan, Utah facilities for NGX.

170.    Along the way, Millcreek re-assigned developer work to 13 Investments and Slope Construction to manage NGX construction upgrades at the South Jordan Property.

171.    The City of South Jordan issued a January 27, 2023 permit to primary contact Brent Smith of Slope Construction, listing Hobble Creek Holdings (Collier affiliate) as the property owner.



**City of South Jordan**
Building and Safety Division

SOUTH JORDAN
U T A H

### *Certificate of Occupancy*

This certificate issued pursuant to the requirements of the International Building Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following address.

Building Address:    3583 W 9800 S South Jordan, UT 84095

Project Number:    PRCR202300104

Permits:    PRCR202300104-BD1                Permit Issued:    01/27/2023

Contact Name:    Slope Construction, LLC
Contact Address:    1064 S North Country Blvd Ste 350 Pleasant Grove, 84062

Description:    TI/NEURAGENEX
ELISON MEDICAL BUILDING/SUITES 102 & 202
MAX OCCUPANT LOAD SUITE 102: 27
MAX OCCUPANT LOAD SUITE 202: 33

172.   Although Plaintiffs did not know it at the time, Plaintiffs have since discovered that many of the Defendants, as well as several of the Advisor parties, have previously been involved in similar TIC investment schemes, fraudulent activity, and SEC investigations.

173.   Scott Rutherford was identified as a member of a principal party that operated a similar TIC investment scheme in Case No. 2:19-cv-00277 in the United States District Court for the District of Utah, and he was named as an individual defendant in another fraud case alleging a similar TIC investment scheme in Case No. 2:20-cv-00004 in the United States District Court for the District of Utah.

174.   On information and belief, Plaintiffs allege that the Millcreek Parties knew or should have known that Scott Rutherford was named as a defendant in two similar TIC investment schemes.

175.   In or about October of 2006, Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee Nashville Division, a breach of lease agreement case.

176.   On information and belief, the Millcreek Parties knew or should have known that Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee.

177.   In or about July 2022, Butera and his associated entity Redstone, LLC were named as defendants in a similar real estate investment scheme in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

178.   On information and belief, the Millcreek Parties knew or should have known that Butera was named as a defendant in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

179.    In or about April 2020, Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside, a breach of contract and fraud real estate investment scheme.

180.    With respect to this information, Plaintiffs allege that Millcreek Parties knew or should have known that Butera was named as a defendant in Case No. 5:20- cv-00826 in the Superior Court of the State of California County of Riverside. Case 2:23-cv-00407 Document 1 Filed 06/21/23.

<u>MISREPRESENTATIONS AND OMISSIONS</u>

**Misrepresentations and Omissions to All Plaintiffs**

181.    Long, Cruz, Martinez, Rutherford, Stocco and Bersie provided written marketing materials, including materials in electronic form to all of the Plaintiffs.

182.    These materials included Offering Memoranda for the South Jordan Property, and property descriptions on their website.

183.    Together, these materials are referred to herein as the "Marketing Materials."

184.    The Millcreek Parties developed the Marketing Materials with input from the Developer Parties and the NGX Parties, and the Developer Parties and NGX Parties were aware of and approved, either expressly or tacitly, all of the content of the Marketing Materials.

185.    Long, Cruz, Martinez, Rutherford, Stocco and Bersie reviewed and were made aware of the information contained in the Marketing Materials.

186.    Long, Cruz, Martinez, Rutherford, Stocco and Bersie distributed the Marketing Materials to many of the Plaintiffs with whom they had contact by means including but not limited to: (a) Emailing the Marketing Materials and/or (b) Directing Plaintiffs to the Marketing Materials through the Millcreek website.

31

**Misrepresentations in Marketing Materials to All Plaintiffs**

187.    The Marketing Materials provided by the Millcreek Parties represented that tenant (NGX) was an operating medical company focused on providing pain relief with non-surgery and therapeutic tools, as shown in this excerpt from the South Jordan Offering Memorandum:

**Neuragenex Company Overview**

Neuragenex stands as the nation's most rapidly growing healthcare brand and platform, poised to expand from its current 15 operating locations to an impressive 56 within the next year. Founded by medical professionals, Neuragenex Treatment Centers was established with the sole purpose of providing patients access to pain relief without resorting to surgery, pharmaceuticals, or invasive procedures. Remarkably, an astounding 90% of Neuragenex clients experience a substantial 50% reduction in pain after just a single round of treatment.

188.    With respect to this misrepresentation, Plaintiffs allege as follows:

189.    The representation is false and known by Defendants to be false because NGX is a shell company with little or no revenue, business operations, or assets.

190.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial solvency of the purported tenant.

191.    The Millcreek Parties knew or should have known that NGX Parties did not have the capital or the cashflow to service rent payments on leases at the South Jordan Property.

192.    The representations made by Defendants occurred during the marketing of the TIC interest between February 2023 and November 2023. Certain dates and representations were set forth herein. Furthermore, given the number of Plaintiffs and that most communication with the individual Plaintiffs was done by telephone, it is currently difficult to pinpoint with exact specificity when each representation was made to each Plaintiff. Nevertheless, as noted above and as described herein, the representations were made as part of on-going marketing scheme, which transpired from February 2023 to November 2023.

193. On August 29, 2023, Bersie sent an email quoting Long to a Plaintiff citing "the lease is fully enforceable as drafted."

"We inherited this lease from our development partner 13 Investments. When executing they omitted Exhibits that did not apply - SDNA because there is no lender, Site plan because there were no revisions or improvements to the existing site. And Addendums that will be executed once the Certificate of Occupancy is issued - Rent Commencement and Memorandum of Lease. These will be executed and added to the document once the CO is issued.

I asked our inhouse attorney about these omissions and he indicated that the lease is <span style="color:red">fully enforceable</span> as drafted.

You also asked about the UDOT easement.  This easement involves .04 of an acer and has no functional impact on the property."

194. With respect to this misrepresentation, Plaintiffs allege as follows:

195. Defendants' representation is patently false because the NGX lease had no commencement date, no rent schedule and blank exhibits.

196. Defendants' representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company and the Property's purchase price.

197. Millcreek Parties knew or should have known that NGX was unable to make good on this representation.

198. The Marketing Materials provided by Millcreek represented that NGX signed a 20-year NNN lease with 2-3% rent escalations annually," as shown in this excerpt from the Millcreek's Offering Memorandum:



199.    With respect to this misrepresentation, Plaintiffs allege as follows:

200.    Defendants' representation is false because Defendants knew or should have known that NGX did not have the financial ability to commit to a 20-year NNN lease with 2-3% rent escalations annually.

201.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of the investment and the viability of the tenant.

202.    Millcreek Parties knew or should have known that NGX did not have the financial ability to commit to and service 20-year NNN leases with 2-3% annual rent escalations.

203.    The Marketing Materials provided by Millcreek to the Plaintiffs represented that the South Jordan NGX Lease was "all backed by an NGX corporate guarantee."

204.    With respect to this misrepresentation, Plaintiffs allege as follows:

205.    This representation by Defendants was false, because neither NGX nor any of the NGX Parties had the financial capability to fulfill this obligation.

34

206.    Furthermore, Millrock attorneys from Buchalter, Miller and Tarazi acted in Millrock's interest, not the South Jordan TIC owners in forfeiting this corporate guarantee to settle NGX's bankruptcy claims.  This was a clear conflict of interest and the actions were undertaken to the detriment of the Plaintiffs.

207.    This representation by Defendants concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial viability of the tenant and the risk profile of the investment.

208.    Millcreek Parties knew or should have known that NGX was incapable of providing a reliable corporate guarantee.

**<u>Omissions of Material Fact to all Plaintiffs</u>**

209.    In addition to the false representations, Millcreek made the following omissions of material fact:

210.    Millcreek omitted to timely disclose that its affiliate entity Millrock Investment Fund 1, LLC, not Millcreek Commercial itself, held TIC interests in the South Jordan Property and would sell their TIC interests to Plaintiffs.

211.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, Millcreek's risk profile and incentives in its own TIC investments.

212.    Millcreek omitted to disclose Millrock's transfer of TIC ownership in the South Jordan Property to 13 Investments in February 2023.

213.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, Millcreek's risk profile in its own TIC investments.

214.    Further, Millcreek omitted to disclose their sale of their remaining TIC ownership

in the South Jordan Property to most Plaintiffs, even though they represented to Plaintiffs that they

would before an amended October 2023 TIC agreement was issued:



Kevin Long <kevin@millcreekcommercial.com>    Mon, Oct 2, 2023, 9:12 PM    ☆    ☺    ↩    ⋮
to carol, kurtzelect, me, jdunn, jennygsmith1, colaleen, monikahansen36, heritagequality, Mark, Ileana, Brent ▾

Team South Jordan,
Ileaa sent each of you a Docusign copy of an amended TIC agreement. The only change is the addition of Section 8.5.

      ***8.5.    Special Exemption.** The Millcreek Investment Fund 1, LLC and affiliated development partners are specifically exempted from the requirements of Sections 8.3 and 8.4. for interests in the Property they currently hold or may acquire at any time in the future.*

This section exempts us from providing each of you with notice prior to selling the remainder of the building. If you have any questions please reach out to me or Ileana.

We are making this change to all of our future TIC agreements. In the past the title company has always assumed that we have this property publicly available on our website that each of you could purchase more if you desired to. A new underwriter is requiring us to adhere to this section on our existing TIC agreements. By making this one change you will not be bothered each time we bring on new owners.

Thank you in advance for your quick response.

Kevin G. Long

President and CEO
Mobile +1 801 400-2080
kevin@millcreekcommercial.com

**Millcreek Commercial**
1064 S North County Blvd | Suite 350
Pleasant Grove, UT 84062 | United States

215.    This omission concerned an issue of material fact, in that it altered the mix of

information available to Plaintiffs in making their investment decisions, including, specifically,

decision making in leasing the South Jordan Property.

216.    Millcreek omitted to disclose to South Jordan owners that the tenant (NGX) was

late to pay October 2023 rent at other Utah locations, due to a catastrophic system and business

failures.

217.    This omission concerned an issue of material fact, in that it altered the mix of

information available to Plaintiffs in making their investment decisions, including, specifically, the

reliability and financial viability of the tenant.

218.     Millcreek omitted to disclose that NGX never took occupancy at the South Jordan property, yet Green Ivy issued full rent payments as if NGX was doing business on site.

219.     This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

220.     The Marketing Materials provided by the Millcreek Parties represented to Plaintiffs that the South Jordan Property's fair market value was as much as $10,300,000.00, but always more than $3,500,000.00, depending on the version of the Offering Memorandum given to each Plaintiff.

221.     With respect to this misrepresentation, Plaintiffs allege as follows:

222.     This representation was false because the South Jordan Property is likely worth only approximately $2,500,000.00, but in any case much less than $10,300,000.00, which was based on a grossly inflated and commercially unrealistic NGX lease.

223.     This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the South Jordan Property.

224.     Millcreek Parties knew or should have known that the actual value of the South Jordan Property was substantially lower than $10,300,000.00.

225.     Millcreek represented to Plaintiffs that the renovations on the building on the South Jordan Property were nearly complete and NGX move-in ready.

226.     With respect to this misrepresentation, Plaintiffs allege as follows:

227.     This representation was false, because eventual renovations were so extensive that, left uncompleted, the units would be unfit for occupation by any tenant.

228.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment.

229.    Millcreek represented to Plaintiffs that NGX needed equipment to operate, and its "difficult to remove from the premises" nature requiring construction renovations.

230.    With respect to this misrepresentation, Plaintiffs allege as follows:

231.    This representation was false because the only equipment, delivered by Neuromed and unboxed, can easily be rolled inside a standard doorway on a hand dolly.



232.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment, and a false impression as to the nature of the equipment.

233.    Millcreek represented to Plaintiffs that a Cost Segregation Study would be completed in the purchase and sales agreement.

234.    With respect to this misrepresentation, Plaintiffs allege as follows:

235.    This representation was false because no study was ever completed or was intended to be completed.

236.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment, and the ongoing analysis for Plaintiffs' investment.

237.    Millcreek represented to Plaintiffs that a Bill of Sale would be provided in the purchase and sales agreement.

238.    With respect to this misrepresentation, Plaintiffs allege as follows:

239.    This representation was false because no Bill of Sale was ever provided or intended to be provided.

240.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment, and the creation of customary transaction documents.

## PLAINTIFFS INVEST IN THE MILLCREEK TIC PROGRAM

241.    Relying on the misrepresentations, omissions, and general deception of the Millcreek Parties, their Advisors, the NGX Parties, the Developer Parties, and their principals, the Plaintiffs invested into the South Jordan Property.

242.    The Plaintiffs invested a total of approximately $10,300,000.00 in the South Jordan Property, which was actually valued at approximately $2,500,000.00.

## COMMISSIONS

243.    In connection with the Plaintiffs' Allen, Carlston, Kurtz, Reid, Jenny Smith, Del Priore, Fontaine and Kneedy's purchases in the South Jordan Property, commissions and similar compensation payments were made to third parties in each transaction.

244.    Plaintiffs did not know about these commissions and similar compensation payments until they were issued final settlement statements for their respective transactions.

245.    Millcreek's commissions varied anywhere from 2% to 6% of total purchase amount.

246.    Brokers' commissions varied anywhere from 5% to 10% of total purchase amount.

247.    All of these commissions were obtained due to the knowingly inflated purchase price and the scheme involving NGX.

**FAILURE OF SOUTH JORDAN INVESTMENT**

248.    In or about January 2024, NGX declared bankruptcy.

249.    However, before the filing date, in or about October 2023, NGX disclosed to Millcreek that they needed "cash flow relief." These problems with cash flow caused NGX to be late with rent payments at the Bluffdale and Lehi, Utah locations.

250.    NGX never paid rent on the South Jordan Property.

251.    Green Ivy did not disclose to Plaintiffs the NGX's rent interruption, instead they manipulated rent payments to accommodate a UDOT easement transaction.

252.    Despite this knowledge that NGX was financially insolvent, Millcreek continued selling South Jordan TIC interests to additional investors until the final investor closed on November 15, 2023.

253.    In or about September 2024, Green Ivy finally disclosed that purported NGX rent payments were actually "rent contribution[s] by Millcreek" with the last payment made on or around January 11, 2024 per the Defendant's reconciliation statement.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8-Dec | | RENT CONTRIBUTION BY MILLCREEK | | | X | $ | 55,762.37 | $ 57,240.79 |
| 8-Dec | | TIC DISTRIBUTIONS FOR DECEMBER | $ | 10,653.89 | X | | | $ 46,586.90 |
| 8-Dec | | TIC DISTRIBUTIONS FOR DECEMBER | $ | 45,108.48 | X | | | $ 1,478.42 |
| 13-Dec | | TIC DISTRIBUTIONS FOR DECEMBER | $ | 1,981.55 | XX | $ | 1,981.55 | $ 1,478.42 |
| 21-Dec | | TRANSACTION FEES | $ | 37.70 | X | | | $ 1,440.72 |
| | | **Monday, January 01, 2024** | | | | | | $ 1,440.72 |
| 11-Jan | | RENT CONTRIBUTION BY MILLCREEK | | | X | $ | 55,821.65 | $ 57,262.37 |
| 11-Jan | | TIC DISTRIBUTION FOR January | $ | 8,124.89 | x | | | $ 49,137.48 |
| 11-Jan | | TIC DISTRIBUTIONS FOR JANUARY | $ | 36,983.59 | X | | | $ 12,153.89 |
| 11-Jan | | TIC DISTRIBUTIONS FOR JANUARY | $ | 10,653.89 | X | | | $ 1,500.00 |
| 22-Jan | | SERVICE AND TRANSACTION FEES | $ | 44.24 | x | | | $ 1,455.76 |
| 9-Feb | | TRANSFER OF DEPOSITS FROM PURCHASE OF sojo | | | X | $ | 31,000.00 | $ 32,455.76 |
| 2/9/2024 | | TIC DISTRIBUTIONS FEB | $ | 6,778.37 | x | | | $ 25,677.39 |
| 2/9/2024 | | TIC DISTRIBUTIONS FEB | $ | 1,601.01 | x | | | $ 24,076.38 |
| 10-Feb | | ellison rent for february | | | x | $ | 7,345.09 | $ 31,421.47 |
| 14-Feb | | P4 Pharmacy | | | x | $ | 8,181.29 | $ 39,602.76 |

254.     Even at the time of this filing (October 2024), Millcreek continues marketing NGX

as a viable tenant (*see* https://www.millcreekcommercial.com/neuragenex-romeoville-il/)(visited

on October 10, 2024):



255.    For months after their purchase, all Plaintiffs did not suspect anything had gone wrong with their TIC investments.

256.    Plaintiffs received the purported "NGX rent" payments and were led by Defendants to believe that NGX either had or imminently would occupy the building.

257.    Ultimately, on January 31, 2024, the TIC owners of the South Jordan Property were informed by the lease administrator Ashley Wolocatiuk of Green Ivy that NGX had filed for bankruptcy.

258.    NGX had defaulted on all three of the Utah properties in the Millcreek TIC Program.

259.    Long and the other Millcreek Parties knew or should have known that NGX was a shell company with insufficient revenue or business operations and that NGX was unable to service its rent obligations under the leases, including the South Jordan Property lease.

260.    In fact, Defendants were notified by NGX's Chief Restructuring Officer Don Hultz, that as early as March 2023, NGX struggled processing patient claims:

In March and April of 2023, NXG experienced disruptions and issues related to Novo and consequently, to multiple other integrated systems and its operations. On April 4, 2023, certain creditors of Novo filed an involuntary bankruptcy petition. On May 2, 2023, Novo consented and an order for relief was filed. On or about July 13, 2023, as a consequence of Novo's bankruptcy, NXG received notice that it would no longer have access to the critical systems and data on the servers operated by Novo by the end of July. Accordingly, on August 1, 2023, NXG moved from digital files to paper files as a stop gap measure to ensure it could continue to operate if it lost access to its data and patient files. Moving to paper files, although necessary, led to substantial disruptions to operations and resistance from NXG providers and employees because paper files substantially increase the time required to document clinical care and process patient claims, and is more susceptible to human error and claim rejections. Concurrently, NXG moved to identify and transition to equivalent service providers. Changing PM, EHR, and data systems is one of the most difficult, expensive, and operationally disruptive initiatives a healthcare practice can undertake, and even when planned, it generally takes between six to twelve months to complete.

261.    Kevin Long acknowledged NGX's restructuring in an October 19, 2023 email to Lehi and Bluffdale TIC owners, but omitted sharing with South Jordan TIC investors until after NGX's bankruptcy:

**From:** Kevin Long <kevin@millcreekcommercial.com>
**Sent:** Thursday, October 19, 2023 11:18 PM
**To:** Sylvia Skean <sskean23@outlook.com>
**Cc:** MICHAEL THEOLOGOS <arionapolon@yahoo.com>; Mary Street <mstreet@mtnwest.com>; stanggirlnj <stanggirlnj@aol.com>; Brandon Frandsen <bpfrandsen801@gmail.com>; kchatfield32958@yahoo.com <kchatfield32958@yahoo.com>; Raymond Bomben <2014rayben@gmail.com>; burkestaheli@gmail.com <burkestaheli@gmail.com>; drewgyn@yahoo.com <drewgyn@yahoo.com>; glwarnick@aol.com <glwarnick@aol.com>; gpalescaa@gmail.com <gpalescaa@gmail.com>; lddancing@aol.com <lddancing@aol.com>; lgroetsch@yahoo.com <lgroetsch@yahoo.com>; rellacvetican@gmail.com <rellacvetican@gmail.com>; robert.wren@gmail.com <robert.wren@gmail.com>; Aubs <aubreylshelton@gmail.com>; barudisill@aol.com <barudisill@aol.com>; bryson.ockey@outlook.com <bryson.ockey@outlook.com>; carol@malmstrom.org <carol@malmstrom.org>; christina.digiacomo@gmail.com <christina.digiacomo@gmail.com>; clgriffin200@gmail.com <clgriffin200@gmail.com>; Bruce Frandsen <frandsenb@gmail.com>; Jake Frandsen <jakefrandsen@gmail.com>; kenhorning@gmail.com <kenhorning@gmail.com>; murray.low@comcast.net <murray.low@comcast.net>; patra43@gmail.com <patra43@gmail.com>; returnershop@hotmail.com <returnershop@hotmail.com>; Brent Smith <brent@millcreekcommercial.com>
**Subject:** Re: Neuragenex Rent for October - Update

NGX owners.
I know this is nerve wracking not hearing from NGX and not getting paid. When we spoke to them last week they asked for two weeks to report to us. I plan to follow up with them tomorrow. That is only one work day short of two weeks.

In the interim I have been in touch with a couple other NGX developers. They both remain optimistic. I spoke at length today with the largest NGX developer out of Chicago. He flew to Arizona to meet  personally with NGX executives and the consultant. He is very optimistic that we will be getting rent well before the 3 month period passes. He indicated that he was working on an interim fix with NGX in order to get the existing landlords (of which he is the largest) current, and keep them current on rent.

He is also optimistic about the long term company financial strength that would protect against an event like this in the future.

I remain optimistic that this is a terrible event that this company WILL overcome.

262.    Brent Smith acknowledged NGX's financial trouble in an October 25, 2023 email to Lehi and Bluffdale TIC owners, but misrepresented that NGX had never taken occupancy at the South Jordan location:

**From:** Brent Smith <brent@millcreekcommercial.com>
**Sent:** Wednesday, October 25, 2023 7:28 AM
**To:** kchatfield32958@yahoo.com <kchatfield32958@yahoo.com>
**Cc:** Burke Staheli <burkestaheli@gmail.com>; Mary Street <mstreet@mtnwest.com>; MICHAEL THEOLOGOS <arionapolon@yahoo.com>; 2014rayben@gmail.com <2014rayben@gmail.com>; drewgyn@yahoo.com <drewgyn@yahoo.com>; glwarnick@aol.com <glwarnick@aol.com>; gpalescaa@gmail.com <gpalescaa@gmail.com>; iddancing@aol.com <iddancing@aol.com>; lgroetsch@yahoo.com <lgroetsch@yahoo.com>; rellacvetican@gmail.com <rellacvetican@gmail.com>; robert.wren@gmail.com <robert.wren@gmail.com>; aubreylshelton@gmail.com <aubreylshelton@gmail.com>; barudisill@aol.com <barudisill@aol.com>; bpfrandsen801@gmail.com <bpfrandsen801@gmail.com>; bryson.ockey@outlook.com <bryson.ockey@outlook.com>; carol@malmstrom.org <carol@malmstrom.org>; christina.digiacomo@gmail.com <christina.digiacomo@gmail.com>; clgriffin200@gmail.com <clgriffin200@gmail.com>; frandsenb@gmail.com <frandsenb@gmail.com>; jakefrandsen@gmail.com <jakefrandsen@gmail.com>; kenhorning@gmail.com <kenhorning@gmail.com>; murray.low@comcast.net <murray.low@comcast.net>; patra43@gmail.com <patra43@gmail.com>; returnershop@hotmail.com <returnershop@hotmail.com>; sskean23@outlook.com <sskean23@outlook.com>; stanggirlnj@aol.com <stanggirlnj@aol.com>; Kevin Long <kevin@millcreekcommercial.com>
**Subject:** Re: Neuragenex Rent for October - Update

Good morning. All locations are still operational and growing. We are working to get on a call with Don and CEO of NGX tomorrow morning.


Brent Smith
Investor Relations | Partner
Millcreek Commercial
Office: 385.248.0613
Direct: 951.691.9788
1064 S North County Blvd, Suite 350
Pleasant Grove, UT 84062

263.    Additional Plaintiffs were deeded South Jordan TIC shares between October 20 – November 15, 2023.

264.    Machlis represented to some of the Plaintiffs that NGX paid "no rent" during the "construction phase," which directly contradicts Green Ivy's ACH rent distributions.

5. Kevin referenced that NGX notified Millcreek/Green Ivy of trouble last September, maybe sooner. Will you share that communication? I attached the email that we sent to NGX in Mid November that we were still under the impression that they were still signing up with us. We had no indication that they were not going to perform.
6. Reviewing Illeana's folder, one of the files indicated NGX didn't pay rent (which jives with Mark's note that they never entered our space). Since not NGX, what source(s) funded rent payments Mar 1, 2023 - Jan 31, 2024? That was during construction phase, no rent is paid during construction. You received payments because we were always receiving rents from the other 2 tenants.

GREEN IVY REALTY NGX UTAH PPD ID:        ACH credit        $1,635.34
1204927560

265.    Further, Machlis told Plaintiffs that NGX never occupied the South Jordan Property implying none of the purported rent payments were from the tenant.



**Mark Machlis** <Mark@greenivyrealty.com>                    Thu, Aug 15, 11:57 AM
to me, Ileana, Brent, Ashley ▾

One update is that NGX never entered our space, just signed a lease.

Ashley and I will address your other questions.

Ashley, can you email Kevin and find out if the is a replacement portal or a google link to get to information for specifically SOJO?

Mark

266.    Long, when asked for a refund by one of the Plaintiffs on a phone call, replied, "I don't have your money, the developer 13 Investments does."

267.    Long further informed Plaintiffs that NGX—the corporation that purportedly signed a guarantee on the lease—was unable or unwilling to make good on that guarantee.

268.    In February of 2024, Long informed Plaintiffs that Millrock retained Arizona based Buchalter attorneys Miller and Tarazi to quickly fight NGX's bankruptcy filing on behalf of South Jordan TIC owners (the Plaintiffs).

269.    Long purposefully misled the Plaintiffs by implying the South Jordan property could not be re-leased until after NGX's bankruptcy was settled; however, NGX rejected the South Jordan Property lease in its first day bankruptcy filings—meaning there was nothing to settle. The lease was being rejected by the bankrupt debtor.

270.    In May of 2024, Millrock and other landlords including SARC and Sixty West settled their claims against NGX, all in an effort to conceal their misrepresentations that led to forfeiture of NGX's guarantee for South Jordan TIC owners (the Plaintiffs).

271.    Further, in June 2024, Long revealed Millcreek's landlord conspiracy to create an NGX replacement tenant, NextPain, stating "[i]n December, the major landlords came together and started talking. One hired a consultant who "said this is a goldmine that is mismanaged, but

pain clinics will make a lot of money." When this all fell apart and filed bankruptcy, a large Millrock investor threw in millions. Millcreek sold to you/owners, we feel like we need to make payments to maintain rents."

272.    In July 2024, Long emailed South Jordan TIC owners (the Plaintiffs), "[t]he stated purpose of NextPain Care is to create a successful business to fill your real estate (and that of the other major developers) and replace the rent that NGX was paying," even though NGX never paid any rent.

273.    No viable business exists for the purpose of paying 3-5x higher than market rent to landlords.

**PLAINTIFFS DISCOVER KKM EQUIPMENT INVOICES WERE PAID FOR, BUT NEVER SHIPPED**

274.    As alleged previously, the Millcreek Parties represented that the South Jordan Property was outfitted with expensive medical equipment for NGX's use.

275.    Machlis shared a 'Bill to SARC UT' equipment invoice from Neuromed for the South Jordan Property that Green Ivy paid for $871,465.

276.    Machlis shared two equipment invoices from KKM for the South Jordan Property that Green Ivy had paid, one for $875,589 and the second for $685,952.00 (totaling $1,561,541).

277.    KKM has not shipped any of that equipment and their agent, Patrick Dell, represents it being tied up with their legal team.

278.    NGX's bankruptcy filing refers to 50% rebates or kickbacks with equipment vendors.

279.    Upon information and belief, no KKM medical equipment has yet been installed at the South Jordan Property, despite South Jordan investors via Green Ivy footing the bill with the Plaintiff's investment.

**PLAINTIFFS DISCOVER THE SOUTH JORDAN PROPERTY VALUE IS OVERINFLATED**

280.   As these events were unfolding, Plaintiffs were further distraught to discover that the South Jordan Property was worth a fraction of what Defendants had repeatedly represented.

281.   In the Offering Memorandum that Millcreek Parties gave to Plaintiffs during the sales process, the value of the South Jordan Property was represented by Defendants to be $10,300,000.00.

282.   But according to the Salt Lake County Tax Assessment, the value of the South Jordan Property is approximately $2,800,000, which Machlis and others have since confirmed.

283.   Indeed, Millrock purchased the South Jordan Property in January of 2023 for approximately $3,500,000 from a Colliers associate James Yeates.

284.   Millcreek's email marketing stated the South Jordan property's value at $3,500,000, rather than the inflated $10,300,000.00 value shown in Millcreek's offering memorandum:



**South Jordan, UT**

**$3.5M**

*Available for TIC*

**PLAINTIFFS DISCOVER THE SOUTH JORDAN LEASE RATES ARE INFLATED**

285.   Millcreek Parties assured the South Jordan owners, including Plaintiffs, that they could simply find a new tenant.

286.    However, Plaintiffs discovered that the lease terms that the NGX Parties agreed to pay under the South Jordan leases were wildly overvalued compared to accurate market rates.

287.    Depending on the specific representations made by the Millcreek Parties, the rent per square foot in the lease bundled with the sale of the South Jordan Property was between $85-$90 per square foot.

288.    Plaintiffs have learned that the actual market rates for medical facilities in the area are typically between $20-25 per square foot.

289.    Millcreek Parties knew or should have known that re-tenanting the Property with the same lease rate that the NGX parties had agreed to would be impossible.

290.    Not only were Plaintiffs stuck without a tenant and with endless empty promises from the Millcreek Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the South Jordan Property or selling their TIC ownerships is simply not feasible.

291.    Plaintiffs lost the expected value of their investment—a reliable tenant, a 20-year lease backed by a guarantee, a monthly stream of income, the value of the property itself, the scheduled rent increases over the term of the lease, the 6-9% capitalization rate over the term of the lease, and the "safe, secure, and stable" investment they were repeatedly promised.

## HARMS TO PLAINTIFFS' HEALTH

292.    Many Plaintiffs suffer from illnesses or chronic illnesses, and other debilitating and painful medical conditions.

293.    After being defrauded by Defendants, many symptoms of Plaintiffs' previously existing illnesses and conditions have intensified.

294.    After being defrauded by Defendants, many Plaintiffs began to suffer new physical, mental, and emotional symptoms of distress and illness.

295.    Many Plaintiffs have suffered extreme stress and anxiety, feelings of guilt, depression, sleeplessness, social isolation, and excessive worry.

296.    Many Plaintiffs have suffered excessive strain on and harm to their familial relationships.

297.    In some cases, Plaintiffs' emotional and psychological suffering has been so acute as to drive them to seek and obtain professional treatment and medication.

298.    Many Plaintiffs have suffered physical manifestations of their emotional and psychological distress, including elevated blood pressure, head and muscle aches, loss of appetite, unhealthy weight loss, low energy, listlessness, insomnia, increased danger of heart attack or stroke, digestive distress, and more.

299.    In many cases, Plaintiffs' physical suffering has been so acute as to drive them to seek professional treatment and medication.

300.    All Plaintiffs have suffered severe physical, emotional, and/or psychological injury and distress stemming from Defendants' wrongful actions.

## FIRST CAUSE OF ACTION
### (Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against All Defendants)

301.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

302.    Investment in TIC interests in the South Jordan Property was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, the NGX Parties as tenants, guarantor, and affiliated entities.

303.    Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

304.    The material misrepresentations and omissions were made in connection with the offer to sell a security.

305.    Such material misrepresentation and omissions include:

a.    The risk analysis of the South Jordan Property,
b.    The average capitalization rate of 6-9% over the initial 20-year lease term,
c.    That Millcreek Commercial transferred ownership interest in the South Jordan Property to non-TIC investors,
d.    That the tenant was a "strong tenant",
e.    That the guarantor was a solvent company,
f.    That the South Jordan Property was finished or nearly finished and would be operational by mid-May of 2023, and
g.    That Millcreek's TIC offerings did not constitute securities and federal and state laws regulating the sale of securities did not apply.

306.    Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with the Plaintiffs, or through the marketing materials.

307.    Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

308.    Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

309.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase interests in the South Jordan Property. The Plaintiffs would not have invested had they known the true facts.

310.    Plaintiffs justifiably relied on the foregoing misrepresentations.

311.    The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to this action because no meaningful cautionary statements were made regarding material risks and facts known by Defendants.

312.    The foregoing misrepresentations and omissions caused the owners to suffer extensive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Sale of Unregistered Securities Against All Defendants)

313.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

314.    Investment in TIC interests in the South Jordan Property was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, the Millcreek Parties.

315.    The TIC interests in the South Jordan Property which is the subject of this Complaint were not registered by the filing of a registration statement.

316.    During the time in which the Millcreek Parties marketed TIC interests in the South Jordan Property, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in the South Jordan Property, in violation of Section 5 (a) and 5(c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

317.    Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security. For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in the South Jordan Property to Defendants upon receipt of the amount specified in this paragraph, as may be proven at trial.

318.    In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

319.    In either case, Plaintiffs are further entitled to an award of pre and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

### THIRD CAUSE OF ACTION
### (Control Person Liability Under the Securities Exchange Act Against Long/Smith/Rutherford/Bersie/Cruz/Martinez/Machlis/Stocco)

320.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

321.    Millcreek Commercial and Colliers International, named as Defendants in Plaintiffs' First and Second Causes of Action, are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons." At all times relevant to this Complaint, the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

a.  Defendants were officers, directors, agents, or other control people of entities that are Liable Persons.
b.  Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.
c.  Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.
d.  Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.
e.  Defendants participated in the business operations of the Liable Persons generally.

322.    Defendants had power over the specific transactions and activities at issue in this Complaint.

323.    With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith and the acts of

Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the First Cause of Action.

324.    Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's First Cause of Action.

325.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FOURTH CAUSE OF ACTION
### (State Law Securities Fraud Against All Defendants)

326.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

327.    The investments in Millcreek TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law.

328.    Under applicable provisions of state securities laws Defendants[1] were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

329.    In connection with the Defendants' sale and the Plaintiffs' purchase of investments in the South Jordan Property, Defendants made untrue statements of material fact; omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

---

[1] Applicable state law regarding securities fraud includes at least the following statutes: California, § 25401; Pennsylvania, 70 Pa. Stat.§ 1-401; Texas, §4007.203; New Jersey, §49:3-71; North Carolina, §78A; Minnesota, §80A.68; Maryland §11-302(c); and Utah Code Ann. § 61-1-1 et seq.

which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of state law.

330.    The defendants engaged in the conduct violating the applicable laws with knowledge of their failure to make a full and fair disclosure to Plaintiffs.

331.    Plaintiffs did not know that Defendants' misrepresentations were false and were not aware of the material facts that Defendants omitted to disclose in connection with their purchase of securities.

332.    By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

333.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

### FIFTH CAUSE OF ACTION
### (Materially Aiding State-Law Securities Fraud Against
### Long/Smith/Rutherford/Cruz/Martinez/Bersie/Stocco/Machlis)

334.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

335.    The Defendants identified in Plaintiffs' Third and Fourth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

336.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

a. Defendants were officers, directors, agents, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

b. As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

c. Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

337.    Defendants did not act in good faith, and Defendants knew or acted in reckless disregard of the facts in carrying out their conduct relating to the sale of securities to the Defendants.

338.    Pursuant to applicable state law relating to those who materially aid securities violations, Defendants[2] are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of Action.

339.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### SIXTH CAUSE OF ACTION
### (Fraud Against All Defendants)

340.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

341.    As explained above, Defendants made false statements about vital facts regarding the South Jordan Property, including the representations within the Marketing Materials and the

---

[2] Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following: California, § 25403; Pennsylvania, 70 Pa. Stat. § 1-503; Texas, §4008; New Jersey, § 49:3-71; North Carolina, G.S. 78A-56; Minnesota, § 80A.76; Maryland §8-301(g)(4); and Utah Code Ann. § 61-1-1 et seq.

representations made to each individual Plaintiff (often over the phone) between February 2023 and November 2023.

342.    Defendants made the statements knowing that they were false and the statements were in fact false.

343.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

344.    Defendants intended that the Plaintiffs would rely on the statements.

345.    Plaintiffs reasonably relied on the statements by investing in the South Jordan Property.

346.    As a result of Defendants' conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation Against All Defendants)

347.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

348.    Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affected or related to the condition of the South Jordan Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

349.    Defendants made false representations to Plaintiffs as detailed above.

350.    Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

351.    Defendants knew such representations were false or were negligent in making such representations.

352.    Defendants were negligent in investigating the tenant and the corporate guarantor.

353.    Defendants knew or should have known the misrepresentations were false.

354.    The Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing the South Jordan Property for a grossly inflated price.

355.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase the South Jordan Property.

356.    Plaintiffs would not have invested in the South Jordan Property had they known the true facts.

357.    Plaintiffs justifiably relied on the foregoing misrepresentations.

358.    As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against All Defendants)

359.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

360.    Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the South Jordan Property.

361.    Defendants expected that Plaintiffs would put particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the South Jordan Property.

362.    The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, inter alia, Plaintiffs' age, experience, abilities, disabilities as applicable, and the fact that the Plaintiffs were prohibited from actively managing their investments.

363.    Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

364.    Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

365.    Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

366.    Defendants accepted that trust and confidence from Plaintiffs.

367.    Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

368.    Defendants were also Plaintiffs' agents.

369.    Defendants also had access to superior and exclusive knowledge about the South Jordan investment opportunity, such as information about the financial performance of the tenants, Millcreek Parties, their affiliate entities, and the flow of funds to and from those entities.

370.    Defendants breached their fiduciary duties to Plaintiffs by, inter alia, failing to do any investigation into the legitimacy of the tenant and guarantor or else concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

371.    Defendants' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

372.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against All Defendants)

373.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

374.     In performing the acts described in this Complaint, including specifically inducing Plaintiffs' investment, in making false representations and material omissions to induce their investment, in failing to properly vet or investigate the Millcreek Parties, in misappropriating Plaintiffs' funds, in conspiring to defraud Plaintiffs, and other acts described herein, Defendants acted intentionally or recklessly.

375.     In performing the acts described in this Complaint, including specifically inducing investment from vulnerable and often elderly adults upon the basis of false representations and material concealments and omissions and thereby defrauding them, Defendants' conduct was extreme or outrageous.

376.     Defendants' conduct described in this Complaint has resulted in emotional distress to Plaintiffs so severe that it has caused physical and behavioral symptoms as more fully alleged in this Complaint.

377.     By reason of Defendants' intentional infliction of emotional distress upon Plaintiffs, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but not less than the total of Plaintiffs' tangible or economic damages.

378.     Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### TENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress Against All Defendants)

379.     Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

380.     Defendants owed Plaintiffs a duty to refrain from conduct that would reasonably and foreseeably result in inflicting severe emotional distress upon Plaintiffs.

381.    In performing the acts described in this Complaint, including specifically inducing investment from vulnerable and often elderly adults upon the basis of false representations and material concealments and omissions and thereby defrauding them, Defendants breached their duty.

382.    Defendants' conduct described in this Complaint has resulted in emotional distress to Plaintiffs so severe that it has caused physical and behavioral symptoms and manifestations as more fully alleged in this Complaint.

383.    By reason of Defendants' negligent infliction of emotional distress upon Plaintiffs, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but not less than the total of Plaintiffs' tangible or economic damages.

384.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### ELEVENTH CAUSE OF ACTION
**(Elder Abuse/Abuse of Vulnerable Adults By Plaintiffs John Kurtz, Marjorie Ann Reid, Willard Mahlstrom, Colleen Overson, Jim Tucker, Cheryl Tomac, Joan Befort, Thom Belchak, Janice Young, James Herbert and Lynn Kneedy Against All Defendants)**

385.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

386.    Plaintiffs John Kurtz, Marjorie Ann Reid, Willard Mahlstrom, Colleen Overson, Jim Tucker, Cheryl Tomac, Joan Befort, Thom Belchak, Janice Young, James Herbert and Lynn Kneedy were 65 or older at the time their investments were induced.

387.    Plaintiff Cheryl Tomac suffers from a disability stemming from a stroke.

388.    At all relevant times herein, Plaintiffs John Kurtz, Marjorie Ann Reid, Willard Mahlstrom, Colleen Overson, Jim Tucker, Cheryl Tomac, Joan Befort, Thom Belchak, Janice

Young and Lynn Kneedy were "vulnerable adults" as that term is defined in Utah Code § 76-5-111

[3]and is therefore entitled to the protections provided under Utah Law.

389.    Defendants were in a position of trust and confidence or had a business relationship with these vulnerable adults, who put substantial trust and confidence in Defendants.

390.    Defendants knowingly, by deception, obtained or used these vulnerable adult's funds, credit, assets, or other property.

391.    Defendants intended to temporarily or permanently deprive the vulnerable adults of the use, benefit, or possession of the Plaintiffs' property, for their own benefit.

392.    Defendants were aware of and exploited Plaintiffs' dependency upon Defendants' purported knowledge, skills, and expertise.

393.    To sell the TIC investments to Plaintiffs, Defendants made misrepresentations of material facts as alleged herein. Defendants were motivated by greed and intended to generate fees and commissions for themselves by causing Plaintiffs to invest while exposing Plaintiffs to an unreasonable risk of harm.

394.    Defendants received commissions, fees, and other benefits on the sale of the TICs to Plaintiffs.

395.    Oftentimes, these commissions were not disclosed to Plaintiffs.

396.    Defendants have made written and oral misrepresentations of material facts in connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs to invest.

---

[3] Applicable state law regarding elder abuse includes at least the following: California, §368; Pennsylvania, 18 Pa. Stat. §2713; Texas §22.04; North Carolina, G.S. 14-112.2; Minnesota, §626.5572; Maryland, § 3-604; and Utah Code §§ 26B-6-201, 62A-3-301, & 76-5-111.

397.    In engaging in such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest.

398.    In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

399.    Under applicable state statutes and related tort principles, including the doctrine of prima facie tort or negligence per se, Defendants' conduct constitutes abuse of vulnerable persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable under other claims asserted herein, together with additional general damages as may be determined at trial.

400.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## TWELTH CAUSE OF ACTION
### (Civil Conspiracy Against All Defendants)

401.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

402.    Defendants combine and conspired with the purpose to induce the purchase of the South Jordan Property based upon fraud, concealment, material misrepresentations, and omissions to Plaintiffs, and violations of securities laws and elder abuse laws.

403.    Defendants further conspired to mislead Plaintiffs and other investors as to the nature of their investment by cooperating with a shell entity who would commit to back long-term leases which Defendants knew had no economic value.

404.    On information and belief, all Defendants agreed orally, in writing, or implied through their conduct to a scheme whereby property would be sold at highly inflated prices based

upon agreements with coconspirators to implement sham long term leases that were only supported through the use of investor money to pay the "rents" on the leases until the scheme inevitably collapsed.

405.    As described above, through this conspiracy Defendants sold investments to Plaintiffs at highly inflated prices, based on sham and commercially unreasonable leases, with the object of skimming profits from these sales and deceiving investors, at least until the scheme collapsed.

406.    As a result of this civil conspiracy, Plaintiffs sustained and will continue to sustain substantial injury, loss, and damages in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION
### (Civil Conspiracy to Engage in Tortious Conduct Against All Defendants)

407.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

408.    With respect to the tortious conduct alleged herein, the Millcreek Parties entered into a combination with the NGX and KKM Parties and Developer Parties to accomplish the object of the tortious behavior, namely fraudulently inducing Plaintiffs' investment in the South Jordan Property, from approximately February 2023 to November 2023.

409.    Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the allegations herein and the causes of action set forth above, and was reached expressly in communications between the parties regarding the Millcreek TIC Program, or was tacit or implied in the parties' intent as evidenced by their conduct.

410.    In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful acts, including the acts described in the allegations herein and causes of action set forth above.

411.    By reason of Defendants' participation in the civil conspiracy, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of property that Plaintiffs actually received.

412.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FOURTEENTH CAUSE OF ACTION
### (Aiding and Abetting Tortious Conduct Against All Defendants)

413.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

414.    As set forth in herein, certain Defendants have engaged in conduct constituting a tort or illegal conduct for which Plaintiffs are entitled to recover damages.

415.    The Millcreek Parties knowingly aided and abetted the underlying tortious conduct by distributing sales materials concerning the Millcreek TIC properties, recommending investment in Millcreek TIC properties, selling and closing sales of investment transactions, causing a substantial portion of Plaintiffs' investment funds to be diverted to the payment of excessive commissions or other compensation to the Millcreek Parties and the referring Advisor parties, and making the remaining proceeds of Plaintiffs' investments freely available to the Developer Parties and/or the NGX Parties without restriction as to use.

416.    The Millcreek/Colliers Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were intimately familiar with the NGX Parties, their operations, their financial weakness, and their failing business based on frequent and on- going

communication with the Millcreek Parties and their principals, negotiations of loans and other inter- party transactions, and receipt of financial information.

417.    The Millcreek Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the South Jordan Property.

418.    The Millcreek Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the South Jordan Property.

419.    The Developer Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the South Jordan Property.

420.    The Developer Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the South Jordan Property.

421.    By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs'

total investment, together with interest, less the value of the property that Plaintiffs actually received.

422. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FIFTEENTH CAUSE OF ACTION
### (Unjust Enrichment of Defendants – All Defendants)

423. Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

424. Plaintiffs conferred a benefit on the Defendants by making their investment in Millcreek TIC Properties.

425. Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

426. Defendants appreciated, acknowledged, or had knowledge of the benefits incurred upon them as they directly received money from the proceeds of the Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Millcreek TIC Program, obtain, and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiffs.

427. Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

428. By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

429.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

### SIXTEENTH CAUSE OF ACTION
### (Common Law Fraud – All Defendants)

430.    Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

431.    Defendants made false statements about vital facts regarding the South Jordan Property, including the representations within the marketing materials and the representations made to each of the named Plaintiffs that (1) due diligence was performed on the tenants for the properties, (2) that the rents would be paid by the tenants even where, in the instance of the property in South Jordan, the tenant was not yet occupying the space, (3) that the tenants agreed to pay rent, and (4) that the tenant (NGX) did in fact pay rents.

432.    Between February 2023 and November 2023 (as described herein), Defendants made the statements knowing that they were false. Defendants, including Machlis, knew that the tenant was a sham company and did not have the ability to pay rent. Therefore, to conceal this from Plaintiffs, Defendants caused a combination of Millrock, Millcreek, and American Development Partners to pay rents at the various properties – with investors' money, which fact was not disclosed to Plaintiff.  They payments were not rent payments by the tenant, but were made to give the appearance that the tenant was paying rent.  It was a ruse.

433.    Millcreek omitted to disclose to the Plaintiffs that the tenant NGX never took occupancy nor actually paid rent at the South Jordan Property, and instead Millcreek covered the rents for the non-paying tenant—thereby creating an illusion that NGX was paying rent and preparing to occupy the space.

434.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

435.    Defendants intended that Plaintiffs would rely on the statements and Plaintiffs did, in fact, rely on the false statements and omissions in entering into transactions to purchase TIC shares in the South Jordan Property.

436.    Plaintiffs reasonably relied on the statements by investing in the TIC shares in the Millcreek Properties.

437.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

438.    Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

1.    An award of actual damages, damages for pain and suffering, consequential damages, treble damages under applicable statutes, and punitive damages, attorney fees and costs, plus interest.

2.    Pre-judgment interest, attorney fees, and costs of suit.

3.    If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance and/or tortious conduct.

4.    Such other relief as may be just and equitable.

## DEMAND FOR RECISSION AND JURY TRIAL

Plaintiffs hereby demand a recission on all claims so triable in this case.

RESPECTFULLY SUBMITTED this 14th day of October 2024

BLACKBURN & STOLL, LC

/S/ Brett N. Anderson
Brett Anderson
*Attorney for Plaintiffs*