Brett Anderson (11809)
**Blackburn & Stoll, LC**
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

A. Lee Rigby (*pro hac vice*)
David C. Lawrence (*pro hac vice*)
William A. Duncan (*pro hac vice*)
Braden N. Anderson (*pro hac vice*)
**Rigby Slack, PLLC**
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHERYL TOMAC, an individual and trustee of the Tomac Trust; WILLARD MALMSTROM, an individual and manager of Royal West Properties, LLC; COLLEEN OVERSON, an individual and trustee of the Wayne B Bulau Irrevocable Trust; JAMES HERBERT, an individual and trustee of The Revocable Trust Agreement of James A Herbert; JANICE YOUNG, an individual; J. LYNN KNEEDY, an individual and trustee of The J. Lynn Kneedy Trust; JOHN KURTZ, an individual; MARJORIE REID, an individual and trustee of The Marjorie Ann Reid Trust; ELIZABETH CARLSTON, an individual and BENJAMIN ALLEN, an individual and managers of Glenwood Ventures LLC; JENNIFER SMITH, an individual and manager of JSGV Properties, LLC; MONIKA HANSEN, an individual and manager of Maxhan Holdings, LLC; IVAN WARNER, an individual; SIMON DEJONG, an individual and manager of Windmill Properties II, LLC; JAMES TUCKER, an individual and | **SECOND AMENDED COMPLAINT**<br><br>Case No. 2:24-cv-00774-DBP |

1

manager of Green Cove Investments, LLC; GERALD DEL PRIORE, an individual and MARISA FONTAINE, an individual and managers of Quaking Aspen Properties, LLC; JOAN BEFORT, an individual and trustee of The Joan Alice Befort Living Trust,

      Plaintiffs,

vs.

COLLIERS INTERNATIONAL GROUP, INC.; KEVIN LONG; LEW CRAMER; BRANDON FUGAL; JAMES YEATES; JERALD ADAM LONG; BRIAN MARTINEZ; EQUITY SUMMIT GROUP P.C.; SCOTT RUTHERFORD; and DOES 1-10, individuals or entities,

      Defendants.

Plaintiffs Cheryl Tomac, trustee of the Tomac Trust; Royal West Properties, LLC (Willard Malmstrom, manager); Colleen Overson, trustee of the Wayne B. Bulau Irrevocable Trust; James Herbert, trustee of the Revocable Trust Agreement of James A. Herbert; Janice Young; J. Lynne Kneedy, trustee of the J. Lynn Kneedy Trust; John Kurtz; Marjorie Reid, trustee of the Marjorie Ann Reid Trust; Glenwood Ventures LLC (Elizabeth Carlston and Benjamin Allen, managers); JSGV Properties, LLC (Jennifer Smith, manager); MaxHan Holdings, LLC (Monika Hansen, manager); Ivan Warner, Windmill Properties II, LLC (Simon DeJong, manager); Green Cove Investments, LLC (James Tucker, manager); Quaking Aspen Properties, LLC (Gerald DelPriore and Marisa Fontaine, managers), and Joan Befort, trustee of the Joan Alice Befort Living Trust, through undersigned counsel, hereby complain, and allege against Defendants Colliers International Group, Inc., Kevin Long, Lew Cramer, Brandon Fugal, James Yeates, Jerald Adam Long, Brian Martinez, Equity Summit Group P.C., Scott Rutherford, and Does 1-10 as follows:

## INTRODUCTION AND BACKGROUND

**"Beautiful. Let's make some money."  - Colliers**



1.      In concert with known bad actors, Defendants orchestrated, facilitated, and aided the promotion of nationwide fraudulent investment scheme in collaboration with a syndicate of commercial real estate "developers" (the "Colliers/Millcreek Scheme"). This scheme involved promoting investments in tenant-in-common ("TIC") interests tied to commercial properties ("Millcreek Properties") that were purportedly encumbered with fictitious long-term leases. Defendants assisted in the brokering and marketing of these Millcreek Properties and TIC interests at prices significantly exceeding their true market value, targeting unsuspecting investors, many of whom were elderly. The artificially inflated property valuations were concealed by offering investors seemingly secure returns through guaranteed long-term leases. However, the tenants purportedly obligated under these leases were shell companies lacking assets and the financial capacity to fulfill lease obligations. Defendants knew of these deficiencies and failed to disclose this critical information to the investors.

2.      To perpetuate the illusion of legitimate leases, Defendants and others, acting in concert, used investor funds to pay rent back to the very investors who contributed the funds. Without this deception—disguising the true source of rent income—the Colliers/Millcreek scheme

3

would have unraveled immediately, exposing the fraud, corruption and deceit and avoiding the millions of dollars in damages suffered by Plaintiffs.

3.    Defendants knew "the shell-entity tenants" lacked the capacity to fulfill their contractual obligations under the leases touted to Plaintiffs. Defendants—themselves and through their myriad array of affiliated real estate representatives and entities ("Agents")—expressly affirmed that each Millcreek-listed property was prepped to host a long-term tenant, requiring no hands-on involvement from investors—a passive investment fully secured by triple-net leases with zero maintenance or management obligations. Moreover, Defendants falsely asserted that these leases were backed by a meaningful corporate enterprise (Neuragenex ("NGX")) and its CEO, Will Bozeman—representations that investors relied upon when deciding to invest. Investors were told by Defendants and their representatives that the investments would have risk-free returns of between 6% and 9%. In fact, Defendants were fully aware that investors' capital would be diverted through undisclosed fees and kickbacks.

4.    Plaintiffs relied on Defendants' false representations and purchased TIC interests in commercial properties in Lehi and South Jordan, Utah. Plaintiffs' investments totaled at least $10,412,170.24.  As a result of Defendants' illegal conduct, Plaintiffs are the "owners" of TIC interests that are worth a paltry fraction of the value represented.

**PARTIES**

5.    Plaintiff Cheryl Tomac is an individual residing in San Diego, California. At all relevant times, Cheryl Tomac was Trustee of The Tomac Trust (the "Tomac Trust").  She was 74 years old at the time she purchased a 3.1571% TIC interest in South Jordan for $325,000 through a 1031 exchange. Tomac was forced to retire from being a family law attorney after suffering from a debilitating stroke. In reliance on Defendants' and their Agents' representation that she would

receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Tomac invested the entire proceeds of the sale of her rental property with Millcreek. As a direct result of the Defendants' misconduct, Tomac (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment, which greatly affects her household's ability to meet basic financial needs. During all material times herein, Tomac suffered from a disability associated with a prior massive stroke, macular degeneration and supports a spouse with Alzheimer's whose financial needs will continue to increase as his disease progresses. Together, Cheryl Tomac and the Tomac Trust will be referred to singularly as "Tomac" or "Plaintiff Tomac."

6.      Plaintiff Willard Malmstrom is an individual residing in Davis County, Utah. At all relevant times, Willard Malmstrom was a manager of Royal West Properties, LLC. He was 84 years old at the time he purchased 6.3141% TIC interest in South Jordan for $650,000 and a 2.7220% TIC interest in Lehi for $157,000. Malmstrom is a retired social worker and member of the National Guard. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5% paid each month at South Jordan and 6% paid per month at Lehi, along with assurances that his investment would be a safe, secure, and stable source of income, Malmstrom invested the entire proceeds of the sale of his family property with Millcreek. As a direct result of Defendants' misconduct, Malmstrom (i) lost substantial investment funds through the induced overpayment for his TIC interests, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investments, which greatly affects his household's ability to meet basic financial needs. In or around April 2025, Malmstrom was able to sell his interest in the Lehi property for $32,000 to fellow TIC owners ($125,000 loss) who

required his voting share so that they could extend a lease to NextPain, the Defendants' replacement tenant for NGX. Together, this entity and Willard Malmstrom will be referred to singularly as "Malmstrom" or "Plaintiff Malmstrom."

7.    Plaintiff Colleen Overson is an individual residing in Green Isle, Minnesota. At all relevant times, Colleen Overson was Trustee of The Wayne B Bulau Irrevocable Trust (the "Overson Trust"). She was 65 years old at the time she purchased a 3.5019% TIC interest in South Jordan for $350,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Overson invested the entire proceeds of the sale of her family property with Millcreek. As a direct result of Defendants' misconduct, Overson (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment, which greatly affects her household's ability to meet basic financial needs. Together, Colleen Overson and the Overson Trust will be referred to singularly as "Overson" or "Plaintiff Overson."

8.    Plaintiff James Herbert is an individual residing in Dunkirk, Maryland. At all relevant times, James Herbert was Trustee of The Revocable Trust Agreement of James A Herbert (the "Herbert Trust").  He was 82 years old at the time he purchased a 2.5567% TIC interest in South Jordan for $271,468.46 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure, and stable source of income, Herbert invested the entire proceeds of the sale of his rental property with Millcreek. As a direct result of Defendants' misconduct, Herbert (i) lost substantial investment funds through the induced

overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet basic financial needs. Together, James Herbert and the Herbert Trust will be referred to singularly as "Herbert" or "Plaintiff Herbert."

9.      Plaintiff Janice Young is an individual residing in Southern Pines, North Carolina. She was 69 years old at the time she purchased a 3.5537% TIC interest in South Jordan for $365,835.45 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Young invested the entire proceeds of the sale of her rental property with Millcreek. As a direct result of Defendants' misconduct, Young (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment, which greatly affects her household's ability to meet basic financial needs. Hereafter, Janice Young will be referred to singularly as "Young" or "Plaintiff Young."

10.      Plaintiff J. Lynn Kneedy is an individual residing in Davis County, Utah. At all relevant times, J. Lynn Kneedy was Trustee of The J. Lynn Kneedy Trust (the "Kneedy Trust"). He was 71 years old at the time he purchased a 11.1675% TIC interest in South Jordan for $1,149,623.08 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure, and stable source of income, Kneedy invested the entire proceeds of the sale of his apartment complex property and personal life savings with Millcreek. As a direct result of Defendants' misconduct, Kneedy (i) lost substantial investment

7

funds through the induced overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet basic financial needs. Together, J. Lynn Kneedy and the Kneedy Trust will be referred to singularly as "Kneedy" or "Plaintiff Kneedy."

11.    Plaintiff John Kurtz is an individual residing in Lancaster, Pennsylvania. He was 70 years old at the time he purchased a 4.880% TIC interest in South Jordan for $500,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure, and stable source of income, Kurtz invested the entire proceeds of the sale of his rental property with Millcreek. As a direct result of Defendants' misconduct, Kurtz (i) lost substantial investment funds through the induced overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet basic financial needs. Hereafter, John Kurtz will be referred to singularly as "Kurtz" or "Plaintiff Kurtz."

12.    Plaintiff Marjorie Reid is an individual residing in Heber City, Utah. At all relevant times, Marjorie Reid was Trustee of The Marjorie Ann Reid Trust (the "Reid Trust"). She was 80 years old at the time she purchased a 9.7142% TIC interest in South Jordan for $1,000,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Reid invested the entire proceeds of the sale of her family property with Millcreek. As a direct result of Defendants' misconduct, Reid (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment,

which greatly affects her household's ability to meet basic financial needs. Together, Marjorie Reid and the Reid Trust will be referred to singularly as "Reid" or "Plaintiff Reid."

13. Plaintiffs Elizabeth Carlston and Benjamin Allen are individuals and a married couple residing in Salt Lake County, Utah. At all relevant times, Elizabeth Carlston and Benjamin Allen were members/managers of Glenwood Ventures, LLC. They are first-time commercial real estate investors seeking to place a schoolteacher parent's inheritance to purchase a 2.9328% TIC interest in South Jordan for $300,000. In reliance on Defendants' and their Agents' representation that they would receive a guaranteed return of 6.5%, paid each month, and assurances that their investment would be a safe, secure, and stable source of income, they invested with Millcreek. As a direct result of Defendants' misconduct, Carlston and Allen (i) lost substantial investment funds through the induced overpayment for their TIC interest, and (ii) are not receiving lost rent that they were promised and relying on when Defendants induced their investment, which greatly affects their household's ability to meet basic financial needs. Together, this entity, Elizabeth Carlston and Benjamin Allen will be referred to singularly as "Carlston" or "Plaintiff Carlston."

14. Plaintiff Jennifer Smith is an individual residing in Salt Lake County, Utah. At all relevant times, Jennifer Smith was the principal of JSGV Properties, LLC. She purchased a 4.8570% TIC interest in South Jordan for $500,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Jennifer Smith invested the entire proceeds of the sale of her family property with Millcreek. As a direct result of Defendants' misconduct, Smith (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment, which greatly affects her

household's ability to meet basic financial needs. Together, this entity and Jennifer Smith will be referred to singularly as "Jennifer Smith" or "Plaintiff Jennifer Smith."

15.     Plaintiff Monika Hansen is an individual residing in Salt Lake County, Utah. At all relevant times, Monika Hansen was the member of Maxhan Holdings, LLC. She is a school bus aid for special needs students and purchased a 4.5170% TIC interest in South Jordan for $465,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure, and stable source of income, Hansen invested the entire proceeds of the sale of her family property with Millcreek. As a direct result of Defendants' misconduct, Hansen (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment, which greatly affects her household's ability to meet basic financial needs. Together, this entity and Monika Hansen will be referred to singularly as "Hansen" or "Plaintiff Hansen."

16.     Plaintiff Ivan Warner is an individual residing in Utah County, Utah. He purchased a 2.9142% TIC interest in South Jordan for $300,000 through a self-directed IRA. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure, and stable source of income, Warner invested a substantial portion of his IRA with Millcreek. As a direct result of Defendants' misconduct, (i) lost substantial investment funds through the induced overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet basic financial needs. Hereafter, Ivan Warner will be referred to singularly as "Warner" or "Plaintiff Warner."

17.     Plaintiff Simon DeJong is an individual residing in Nampa, Idaho. At all relevant times, Simon DeJong was the principal of Windmill Properties, LLC. He purchased a 3.4184% TIC interest in South Jordan for $345,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure, and stable source of income, DeJong invested the entire proceeds of the sale of his rental property with Millcreek. As a direct result of Defendants' misconduct, DeJong (i) lost substantial investment funds through the induced overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet basic financial needs. Together, this entity and Simon DeJong will be referred to singularly as "DeJong" or "Plaintiff DeJong."

18.     Plaintiff James Tucker is an individual residing in Shelby County, Texas. At all relevant times, James Tucker was the principal of Green Cove Investments, LLC. He was 67 years old at the time he purchased a 12.385% TIC interest in South Jordan for $1,250,000 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that he would receive a guaranteed return of 6.5%, paid each month, and assurances that his investment would be a safe, secure and stable source of income, Tucker invested the entire proceeds of the sale of his rental property with Millcreek. As a direct result of Defendants' misconduct, Tucker (i) lost substantial investment funds through the induced overpayment for his TIC interest, and (ii) is not receiving lost rent that he was promised and relying on when Defendants induced his investment, which greatly affects his household's ability to meet charitable giving plans. Tucker is also the assignee of the claims previously held by Thom Belchak, trustee of the Jaybird Inter Vivos Revocable Trust.

Together, this entity and James Tucker will be referred to singularly as "Tucker" or "Plaintiff Tucker."

19.     Plaintiffs Gerald DelPriore and Marisa Fontaine are individuals and a married couple residing in New Jersey. At all relevant times, Gerald DelPriore and Marisa Fontaine were managers of Quaking Aspens Properties, LLC. They purchased a 5.4270% TIC interest in South Jordan for $559,471.66 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that they would receive a guaranteed return of 6.5%, paid each month, and assurances that their investment would be a safe, secure and stable source of income, they invested the entire proceeds of the sale of their rental property with Millcreek. As a direct result of Defendants' misconduct, Del Priore and Fontaine (i) lost substantial investment funds through the induced overpayment for their TIC interest, and (ii) are not receiving lost rent that they were promised and relying on when Defendants induced their investment, which greatly affects their household's ability to meet basic financial needs. Together, this entity, Gerald DelPriore and Marisa Fontaine will be referred to singularly as "DelPriore" or "Plaintiff DelPriore."

20.     Plaintiff Joan Befort is an individual residing in Orange County, California. At all relevant times, Joan Befort was Trustee of The Joan Befort Living Trust (the "Befort Trust"). She was 75 years old at the time she purchased a 4.1239% TIC interest in South Jordan for $412,161.59 through a 1031 exchange. In reliance on Defendants' and their Agents' representation that she would receive a guaranteed return of 6.5%, paid each month, and assurances that her investment would be a safe, secure and stable source of income, Befort invested the entire proceeds of the sale of her rental property with Millcreek. As a direct result of Defendants' misconduct, Befort (i) lost substantial investment funds through the induced overpayment for her TIC interest, and (ii) is not receiving lost rent that she was promised and relying on when Defendants induced her investment,

which greatly affects her household's ability to meet basic financial needs. Together, Joan Befort and the Befort Trust will be referred to singularly as "Befort" or "Plaintiff Befort."

21.    Together, the above-listed parties, Tomac, Malmstrom, Overson, Herbert, Young, Kneedy, Kurtz, Reid, Carlston, Jennifer Smith, Hansen, Warner, DeJong, Tucker, DelPriore and Befort will be referred to as "Plaintiffs."

22.    Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting, and investment services company that was at all relevant times registered to do business in the State of Utah.  Colliers has waived and accepted service in the instant action.

23.    Defendant Kevin Long ("Kevin Long") is an individual resident of the State of Utah. At all material times, Kevin Long was an owner and agent of Millcreek, an owner and shareholder of Millrock, and an employee and agent of Colliers, serving as Senior Vice President of Colliers' Utah division. Kevin Long has waived and accepted service in the instant action.

24.    Defendant Lew Cramer ("Cramer") is an individual resident of the State of Utah. At all material times, Cramer was an employee and agent of Colliers and Millcreek, including serving as CEO of Colliers' Utah division. Cramer has waived and accepted service in the instant action.

25.    Defendant Brandon Fugal ("Fugal") is an individual resident of the State of Utah. At all times, Fugal was an employee and agent of Colliers and Millcreek. Fugal has waived and accepted service in the instant action.

26.    Defendant James Yeates ("Yeates") is an individual resident of the State of Utah. At all times, Yeates was an employee and agent of Colliers, and in the operative period, served as Vice President of the Utah division of Colliers. Yeates has waived and accepted service in the instant action.

13

27. Defendant Jerald Adam Long ("Adam Long") is an individual residing in Massachusetts. At all material times, Adam Long was an owner, agent and Chief Operating Officer of Millcreek, a shareholder of Millrock, and an employee and agent of Colliers. Adam Long has waived and/or accepted service in the instant action.

28. Defendant Brian Martinez ("Martinez") is an individual residing in Utah. At all material times, Martinez was an employee and agent of Millcreek and Colliers.

29. Defendant Equity Summit Group P.C. ("Equity Summit") is a Utah professional corporation with its principal place of business in Utah that is registered to do business in Utah. At all material times, Equity Summit operated as an agent and d/b/a of Millcreek and Colliers.

30. Defendant Scott Rutherford ("Rutherford") is an individual residing in Utah. At all material times, Rutherford was a licensed real estate agent with Equity Summit and representative of Millcreek and Colliers.

31. Defendants DOES 1-10 are the real estate agents and brokers who facilitated the scheme fostered by Colliers.

### JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 of the claims arising under federal law including 15 U.S.C. §78j(b), 15 U.S.C. §78t(a) and 15 U.S.C. §77l.

33. The Court has supplemental jurisdiction over state law claims asserted pursuant to 28 U.S.C. §1367, because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

34. Venue is appropriate under 28 U.S.C. 1391(b)(2) and 15 U.S.C. 78aa.

35.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

## FACTUAL BACKGROUND

**The Players: The Colliers/Millcreek Partnership and Its Web of Agents**

36.     Millcreek Commercial Properties, LLC ("Millcreek") and Millrock Investment Fund 1, LLC ("Millrock") are/were real estate development companies operating in Utah County, Utah

37.     Millrock provided the capital used to acquire properties later marketed by Millcreek ("Millcreek Properties") in direct collaboration with Colliers, an international real estate and investment services company that served as a "brokerage partner" for the Millcreek Properties. Central to the web of deceit was Kevin Long, the founder, president, and a principal of the Millcreek and Millrock entities, and—importantly—a highly-successful broker for Colliers.

38.     Kevin Long founded and ran the Millcreek and Millrock partnership with Colliers, and, as a result of his various roles across the three entities, Colliers provided various services for the TIC transactions, including as serving as broker.  Long was the Senior Vice President of the Utah division of Colliers,[1] and the "President of Millcreek with Colliers": Long was "President of Millcreek with Colliers":



---

[1] From 2013 to 2016, Long was the Principal Broker and COO of CBC Advisors, a real estate company acquired by Colliers.

39.     Similarly, Adam Long (Kevin Long's son) also had roles spread across Millrock (where he was an owner and shareholder), Millcreek (where he was also an owner and Chief Operating Officer) and Colliers (where he was employed in a management role).  It was this comingling of agents and roles—by Kevin Long, Adam Long, Brian Martinez and others—that ultimately provided the means by which Defendants could (i) enlist and train a team of agents and (ii) create the allure of legitimacy necessary to peddle the Millcreek TIC interests to Plaintiffs and other Defendants. Indeed, at all material times, Defendants Kevin Long, Lew Cramer, Brandon Fugal, James Yeates, Adam Long, Brian Martinez, Rutherford and other agents of Millcreek and Colliers were close business associates, including through joint marketing, communications, social media, and transactional commission payments. And as detailed herein, they jointly profited from the fraudulent scheme through undisclosed kickbacks, commissions, and "profits."

40.     Key to the scheme were a variety of intertwined players serving at the direction of Colliers, Millrock and Millcreek, including a network of individuals—including brokers, real estate agents, and sales representatives ("Agents")—responsible for marketing the Millcreek Properties to investors and transmitting the misrepresentations necessary to further the scheme. Some wore the "Millcreek" hat, others wore the "Colliers" hat, others wore the "Equity Summit" hat, and others wore the hat of Green Ivy Realty ("Green Ivy")—a separate broker entity participating in the scheme. Indeed, many of the agents wore more than one hat. As an example, Scott Rutherford ("Rutherford") was an agent and representative of Equity Summit, Millcreek and Colliers, whose expertise was touted in relation to the Colliers/Millcreek Scheme:

> In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

16

Rutherford was ultimately responsible for many of the communications and representations that induced Plaintiffs' purchases.

41.     In addition to Rutherford—and his affiliated entity, Equity Summit—Colliers and Millcreek enlisted, employed and/or trained a group of agents and entities for this specific purpose, including Green Ivy, Martinez, Brent Smith,[2] Tom Smith,[3] Spencer Taylor,[4] Mike Bersie,[5] Ileana Stocco,[6] Michael Cruz,[7] Nicholas Ledbetter,[8] Jamie Anderson,[9] Mark Machilis,[10] and Ashley Wolocatiuk[11] (collectively "Agents").[12] Indeed, Colliers (specifically Kevin Long, Cramer, Fugal, and Adam Long) conducted a recruitment and training program specifically for the purpose of enabling the Agents to market the TIC transactions. Collectively, Defendants and their Agents are referred to herein as the "Defendants' Syndicate," and Defendants and their Agents served as the collective "mouthpiece" necessary to induce Plaintiffs' TIC transactions (Defendants in red):

---

[2] Brent Smith ("Smith") served as an owner and agent of both Millcreek and Millrock during all material times, actively participating in the fraudulent scheme.  In June 2024, Smith created a SHC Management, LLC ("Sky High"), presumably as an alter ego for Millrock to shelter funds. Millrock's 2025 annual report filed with the state of Utah lists Sky High as the active principal.

[3] Tom Smith ("Tom Smith") was an employee and agent of Millcreek and Colliers who trained Millcreek sales representatives. He was also Millrock's largest shareholder and financier.

[4] Spencer Taylor ("Taylor") was an owner and agent of Millcreek and an agent of Colliers. He was also a Millrock shareholder.

[5] Mike Bersie ("Bersie") was an employee and agent of Millcreek and Colliers.

[6] Ileana Stocco ("Stocco") was an employee and agent of Millcreek and shareholder of Millrock.

[7] Michael Cruz ("Cruz") was an employee, agent and representative of Millcreek and Colliers.

[8] Nicholas Ledbetter ("Ledbetter") was an employee, agent and representative of Millcreek and Colliers.

[9] Jamie Anderson ("Anderson") was an employee and agent of Millrock, Millcreek and Colliers.

[10] Mark Machlis ("Machlis") was an employee, agent and representative of Millcreek, Colliers and Green Ivy.

[11] Ashley Wolocatiuk ("Wolocatiuk") was an employee, agent and representative of Millcreek, Colliers and Green Ivy.

[12] Colliers had actual and/or constructive notice of the actions and conduct of these individuals with respect to the TIC sales discussed herein.

17



**The Scheme: Millcreek/Colliers TIC Program and Colliers' Primary and Integral Role from the Property's Purchase to Sale**

42.     Colliers was involved in (and profited from) the Millcreek Properties' scheme from the beginning. Colliers' James Yeates and Colliers'/Millcreek's Kevin Long were the agents and brokers when Millrock purchased the South Jordan property (with involvement from Machlis and Smith) that is central to Plaintiffs' claims. Both Colliers and Millcreek collected commissions from the onset:



From: Jamie Anderson <jamie@millcreekcommercial.com >
Sent: Tuesday, January 10, 2023 3:28 PM
To: Mary Young <mary@prospectut.com >
Cc: Kevin Long <kevin@millcreekcommercial.com >; Brent Smith <brent@millcreekcommercial.com >; Mark Machlis <Mark@greenivyrealty.com >
Subject: Re: Closing - 3583 West 9800 South, South Jordan, UT 84095

Hi Mary,

James Yeates will be receiving his commission through Colliers, Millrock Investment Fund 1, LLC will be receiving their commission portion through Millcreek Commercial.

--

**Jamie J. Anderson**

---

Seller's Agent, ____James Yeates , represents [ X ] Seller [ ] Buyer [ ] both Buyer and Seller as a Limited Agent;
Seller's Brokerage, Colliers International , represents [ ] Seller [ ] Buyer [ X] both Buyer and Seller as a Limited Agent;
Buyer's Agent, _____Kevin Long , represents [ ] Seller [X ] Buyer [ ] both Buyer and Seller as a Limited Agent;
Buyer's Brokerage, Colliers International , represents [ ] Seller [ ] Buyer [ X ] both Buyer and Seller as a Limited Agent;

43.     After Millrock provided the capital to acquire the Millcreek Properties—*i.e*, South Jordan—Millcreek and Colliers were engaged to market and sell the TIC interests. At his recent deposition (in a separate matter), Kevin Long succinctly testified:

> that Millrock "would acquire or develop triple-net leased properties and ***would list them with Colliers***, and Millcreek would market them as a brokerage team ***through Colliers for sale with buyers***."

Long further testified that Colliers—with its extensive marketing department, resources and expertise—developed marketing materials and a website for the Millcreek Properties.

44.     Defendants' team of Agents was necessary to induce Plaintiff's TIC transactions because TIC interest sales require more hands-on involvement of agents and direct outreach to potential investors, Millrock paid Millcreek to support Kevin Long's Collier's brokerage team with its sales. As Kevin Long explained, Millrock paid Millcreek directly so that it could directly engage with and "hire employees [for the Millcreek project] that otherwise Colliers would hire." As such, Millcreek was a "d/b/a for the brokerage team at Colliers," and it "functioned under the Colliers umbrella to market the [Millcreek Properties] and sell the properties that Colliers listed

19

with the fund. Colliers provided the office space for both its own team and the Millcreek team for much of the operative time period.[13]

45.     In 2020, Colliers, Millcreek, and their agents formalized their efforts to market and sell TIC interests in several properties, including the two sold to Plaintiffs. Kevin Long sent the memo to Lew Cramer, CEO of Colliers Utah ("Cramer"). Cramer, on Colliers' behalf, approved terms by which Colliers was expected to transact $100,000,000 in annual volume through the Kevin Long Team. This "perpetual standing listing agreement" states that Colliers owned the listing on Millcreek's deals, received commissions and participated in joint sales training and marketing efforts:

---

**MEMORANDUM OF UNDERSTANDING**

**TO:**        LEW CRAMER

**FROM:**    KEVIN G. LONG

**SUBJECT:**  MILLROCK INVESTMENT FUND 1, LLC & MILLCREEK COMMERCIAL
                   PROPERTIES

**DATE:**     SEPTEMBER 18, 2020

**CC:**        BRENT SMITH, J. ADAM LONG

---

## Basic Concepts

- We (the Smith family and the Long family) have formed a company to invest in quality long term debt free STNL properties (Millrock Investment Fund 1, LLC – "The Fund").
- Based on current fund capital the projected annual transaction volume to be processed through Colliers would be approximately $100 million.
- The fund acquires or develops real estate assets with the intent to market them for resale by syndicating them as real estate investments that fit a market need for

---

*See* Exhibit A.

---

[13] Upon information and belief, Rutherford and his affiliated Equity Summit entity utilized Colliers' office space to market Millcreek's TIC interests.

46.    The memo further stated that "Colliers provides standard support for all acquisition activities, including the development of due diligence packages." Kevin Long testified that the memorandum was intended to formalize and sanction Millcreek's TIC sale activities and the ongoing relationship between the Parties in relation to the Colliers/Millcreek Scheme that had been occurring since 2017. Long testified that Cramer approved the memo and, "Acknowledged it verbally. Their actions acknowledged it by increasing my allowance for them, continuing to pay under these terms and increase our support."[14]

47.    Consistent with the memo, Defendants listed, promoted, and sold the Millcreek Properties to retail investors. Defendants' formal responsibilities included preparing and distributing marketing materials and due diligence documents, such as the Offering Memorandum for the securitized real estate units, providing GIS, graphic design, and general administrative support, issuing pre-negotiated commissions to new agents selling Millcreek Properties, offering office space and direct assistance to sales agents, and supporting a mentoring program for new agents initiated by Kevin Long. These activities were designed to boost sales of the Properties. As part of the arrangement, Colliers further agreed to pay the salary of certain Millcreek Agents. Colliers and various of the other Defendants—including Cramer, Adam Long, and Brandon Fugal—also directly trained the Agents responsible for marketing the Millcreek Properties, and even offered to employ them once their tenure with "Millcreek" had been completed. In exchange for their involvement in the Colliers/Millcreek Scheme, Defendants, including Kevin Long's Colliers team (working as "Millcreek") and Rutherford's Equity Summit (also working as "Millcreek" and in coordination with Colliers), were paid commissions on each TIC sale to

---

[14] Kevin Long further testified, "I have a very deep and abiding relationship with both Brandon and Lew. I ran that company [CBC Advisors] before Colliers took it over. My son was instrumental in running it while I stayed there."

Plaintiffs, as shown, for example, by the Settlement Statement associated with Kurtz's purchase of his TIC interest:

| Buyer Charge | Buyer Credit | Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **Seller:** Millrock Investment Fund 1, LLC 7613 South Prospector Drive, Salt Lake City, UT 84121 | | |
| | | Consideration | | |
| 500,000.00 | | Total Consideration | | 500,000.00 |
| | | | | |
| | | Commission | | |
| | | **Broker: Equity Summit Group** | | |
| | | Real Estate Commission | 15,000.00 | |
| | | **Broker: Millcreek Commercial** | | |
| | | Real Estate Commission | 25,000.00 | |

In this way, Colliers and Defendants profited on the Properties' initial purchase and each TIC sale thereafter.

48.    Marketing materials used to induce TIC sales, including a 2020 Marchant Real Estate Group ("MREG") webinar, spotlighted Colliers' leadership, oversight and "adult supervision" of Millcreek's deals. These deals were financially backed by Tom Smith, who was Millrock's largest shareholder and a purported "world-renown consultant on corporate accountability":





49.     Unfortunately, the marketing materials and sales pitch developed by Defendants did not reflect the truth. In reality, Millcreek and Millrock purchased commercial properties and then entered into long-term lease agreements at above market rates. Colliers would then enlist Millcreek to market the properties to potential investors representing that the leases provided a safe and secure source of passive income. Defendants stated that investors could "enjoy monthly passive income" because "we hand-select the best properties" that are "thoroughly examined and vetted." They represented that they sold only properties with tenants who can "survive economic storms." But in fact, the leases were often with shell entities with no real assets.

50.     Defendants knew the lease terms never could be met from the outset, but (as described in more detail below) concealed these facts from Plaintiffs. Moreover, to hide the scheme and gain Plaintiffs' trust and investment, members of Defendants' Syndicate paid rents to the investors from invested money, thereby postponing the collapse of the scheme while Millcreek continued to defraud new investors.

51.     Pursuant to this scheme, from 2020-2022, Millcreek, with Defendants' engagement, knowledge, assistance, and consent, marketed TIC interests in real properties at

multiple locations, including: Draper, Utah; Bluffdale, Utah; Keller, Texas; Crockett, Texas; Blytheville, Arkansas; Pine Bluff, Arkansas; Naperville, Illinois; and Kennesaw, Georgia.

52.     In late 2022, per witness testimony, Cramer, Tom Smith, Kevin Long, Rutherford, Taylor, Brandon Fugal, and Adam Long personally attended Millcreek meetings and trained and on-boarded Millcreek's sales representatives and Agents, in order to enable them to solicit investments with respect to the Millcreek Properties in South Jordan, Utah and Lehi, Utah. More specifically, in the words of Kevin Long, Colliers would "acquire young agents," and Kevin Long, Cramer, Adam Long, Fugal and others would train and mentor these Millcreek agents and provide them with a "product to sell." Among these trainees was Michael Cruz ("Cruz"), who was ultimately the Agent used by Defendants' Syndicate to induce the TIC investments from several Plaintiffs.[15] This Colliers-led training was documented in Millcreek's contemporaneous social media posts, and ultimately, Colliers and Millcreek were essentially one and the same with respect to the South Jordan and Lehi TIC investments that were sold to Plaintiffs.



---

[15] Cruz has since submitted a declaration stating that he was part of the sales team that was trained by the Colliers team and tasked by the Colliers and Millcreek team to sell the South Jordan TIC interests. He said he and other trainees ultimately sold the TIC interests based on information he and other agents were provided by Kevin Long and others.



**<u>The Targets</u>: Defendants and Millcreek Jointly Target Retirement Investors**

53.     Colliers sponsored and marketed the South Jordan[16] and Lehi[17] TIC interests as a low-risk investment promising stable returns and a high-quality tenant under a "perpetual standard listing agreement" from February - November 2023.

54.     Defendants marketed the Millcreek TIC interests—including those related to the South Jordan and Lehi properties—to potential buyers (largely recent retirees) who wished to take advantage of the IRS Section 1031 exchange program—by promising risk-free passive income. The TIC interests were not registered as securities, nor were they exempt under the 1933 Securities Act.[18]

55.     Millcreek "markets to middle class retirement investors," as shown in this excerpt from the Frequently Asked Questions page of Millcreek's website:

---

[16] 3583 W 9800 S, South Jordan, Utah 84095.

[17] 1010 S. 1100 West Lehi, Utah 84043.

[18] These TIC securities sales were not registered with the SEC or under any state exemption. Both Long and Smith have testified that no registration was filed with the SEC. TIC interests in this case were investments in a common enterprise with an expectation of profits dependent primarily on the efforts of others, implicating federal securities law.

> ## What is the exit strategy?
>
> Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.
>
> Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market. Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

56.     The Millcreek/Colliers Syndicate promoted the low-risk nature of TIC interests by highlighting that the properties already secured long-term, triple net leases with solvent corporate guarantors.  For example, in an email to Plaintiff Kurtz, Rutherford—one of Defendants' primary Agents—stated that:

> I am confident you will find the properties available from Millcreek to rank among the finest real estate experiences available. To summarize in a little more detail, here are just a few of the benefits of Millcreek's properties: 100% debt-free commercial properties (no mortgage, no debt service, no risk of bank foreclosure, etc.). Flexible to perfectly match desired purchase amount for self-directed IRA, cash, 1031 exchange, etc. High-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow.  NNN leases (no landlord responsibilities) with 10- to 25-year initial lease term plus option terms. Proven track record and customizable approach (co-purchase, split between properties, etc.). As you would expect, these properties provide cash flow immediately upon closing, so you are able to put your funds to work as quickly as possible. Millcreek's mantra of "safety, security, and stability" (and I would add "simplicity") is the priority with each property, with strong returns and some of the most attractive lease terms in decades. Millcreek's goal is to…provide great asset value and cash flow.

As with many of the communications by Defendants, Rutherford's email signature referenced his roles at Millcreek, Equity Summit and other entities interchangeably.

Sincerely,
Scott Rutherford, Agent, MBA

Elevated 1031 / Millcreek Commercial Properties
Direct: (801) 949-1100
Office: (619) 436-1031
Scott@Elevated1031.com
www.Elevated1031.com
Licensed Real Estate Agent with Equity Summit Group

57.    Defendants represented to Plaintiffs that the triple net lease made the investment entirely "passive" with no need for the investor to have any management responsibility. This pitch was targeted at—and appealing to—middle class, less sophisticated retirees, as the success of the investment did not require their input, and instead, was entirely dependent upon the actions of the tenant and/or Millcreek's administration and management.

**The Means: The Sales Pitch of Lies, Misrepresentations and Omissions by Defendants and Their Agents in Order to Induce Plaintiffs' Transactions**

58.    Defendants and their Agents putatively offered TIC interests only in properties that already had guaranteed leases in place with operating tenants. Rutherford, Martinez, Taylor, Bersie, Cruz and others made these representations to Plaintiffs in 2023 and in each instance they knew the representations were false.

59.    Defendants, through Millcreek's website, also coaxed possible investors by saying, "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer," as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange." Kevin Long, Rutherford, Smith, Martinez, Bersie, Cruz and Taylor each made this false representation to Plaintiffs during the sales period from the end of 2022 to late-2023.

60.    Of course, to give credence to the scheme, Colliers and its Agents represented Colliers' "partner" role in the venture. As one example, it was represented to Plaintiffs that the

27

Millcreek/Colliers partnership extended internationally because Colliers was Millcreek's "global partner", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

61.    Defendants and their Agents communicated with Plaintiffs, speaking directly with investors repeating the misrepresentations contained in the offering materials.

62.    Colliers' logo was prominently placed right next to Millcreek's logo on the pages of the Lehi property offering memorandum:



63.    Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Agents.:



64.     Colliers used its email servers to push the TIC sales. Indeed, using his kevin.long@colliers.com, Kevin Long uploaded an NGX financial file to Millcreek's South Jordan due diligence folder on February 14, 2023, just two weeks after TIC sales began on the South Jordan property.



29

65.    Investors were provided with as many as eight different versions of the South Jordan Offering Memorandum that individually and collectively were filled with misrepresentations:

    a.    The first line read:  **"Tenant – Neuragenex (Anchor Tenant)."[19]**

    b.    The stated **Purchase Price** varied from $10,689,131.40, $10,300,000.00 (approx.), $10,294,362.96 and $10,294,251.69.

    c.    The Offering Memorandums started out at just one page in length, but over time grew to 10-pages.  All of them showed **Year One combined rents**, but the amount of that rent ranged from $708,973 to $669,500.

    d.    Not disclosed in the Offering Memorandum was that Neuragenex was taking 6,164 square feet of the building for a starting annual rent of $534,370.50, or $86.69 per square foot (some 4.56x of the rent for the other two tenants in the building).

    e.    The **Tenant** description for Neuragenex in the Offering Memorandums, which varied:

        i.    "Neuragenex is the nation's fastest growing healthcare brand and platform, consisting of multiple avenues of care and expanding across the nation…" (for an early investor).

        ii.    "Neuragenex stands as the nation's most rapidly growing healthcare brand and platform, poised to expand from its current 15 operating locations to an impressive 56 within the next year."  (for a later investor).

*See* <u>Exhibit B</u>. These statements were demonstrably false.[20]

66.    Colliers' logo is prominently featured on the second page of the Lehi Property Offering Memorandum:

---

[19] NGX was <u>never</u> a tenant in the building.  The lease was never finalized, NGX never moved in, and never paid a penny in rent.  If Defendants had been honest, the Offering Memorandum would have read: "<u>Potential</u> Tenant – Neuragenex (Anchor Tenant)."

[20] Smith has now testified that Millcreek did not hire third party professionals, such as CPAs or lawyers, to evaluate the business operation of NGX – they relied solely on Millcreek employees who were presumably trained with the Colliers training program.



67.     Induced by the Defendants misrepresentations and omissions, Plaintiffs entered purchase and sales agreements ("PSA") for the South Jordan property, as shown below:[21]

---

[21] The same means of misrepresentations and omissions were also utilized to induce Plaintiff Malmstrom's Lehi TIC investment.

| TIC Owner | Millcreek contact(s) | PSA signed | Improvement Status | PSA seller | % TIC Interest | Actual Closing | $ sent | Sales price (per %/$) |
|---|---|---|---|---|---|---|---|---|
| *As of this date*: Defendants knew that NGX was not a tenant at the property and falsely stated otherwise | | | | | | | | |
| Kurtz | Rutherford | Feb 9, 2023 | As Is | Millrock | 4.8880% | 3/3/23 | $500,800 | $10,245,366.40 |
| Smith | Martinez | Feb 17, 2023 | In Progress | Millrock | 4.8570% | 3/31/23 | $500,800 | $10,310,971.20 |
| Carlston/ Allen | Cruz, Taylor | Feb 22, 2023 | In Progress | Millrock/ assign | 2.9328% | 3/3/23 | $300,800 | $10,256,678.40 |
| Malmstrom | Martinez | Mar 15, 2023 | In Progress | Millrock | 6.3141% | 3/31/23 | $650,800 | $10,306,719.60 |
| Reid | Martinez | Mar 17, 2023 | In Progress | Millrock | 9.7142% | 3/28/23 | $1,000,800 | $10,302,235.20 |
| Overson | Bersie, Taylor | Mar 24, 2023 | As Is | Millrock/ assign | 4.5170% | 4/6/23 | $350,800 | $10,017,094.00 |
| deJong | Martinez | Apr 4, 2023 | In Progress | Millrock | 3.4184% | 4/14/23 | $345,400 | $10,104,331.60 |
| Hansen | Martinez | Apr 5, 2023 | In Progress | Millrock | 3.5019% | 4/5/23 | $465,800 | $10,311,880.40 |
| *As of this date*: OM Falsely Stated May '23 Rent Commencement by NGX | | | | | | | | |
| Befort | Cruz | Jun 21, 2023 | As Is | Millrock/ assign | 4.1239% | 10/6/23 | $412,961.59 | $10,014,318.56 |
| Warner | Ledbetter | Jun 28, 2023 | As Is | Millrock/ assign | 2.9142% | 10/6/23 | $300,800.00 | $10,321,651.20 |
| Tomac | Cruz | Jul 13, 2023 | As Is | Millrock/ assign | 3.1571% | 10/6/23 | $325,800.00 | $10,320,040.80 |
| Tucker | Bersie, Kevin Long | Sept 15, 2023 | As Is | Millrock/ assign | 12.3854% | 10/6/23 | $1,250,800.00 | $10,099,084.28 |
| *As of this date*: NGX Insolvency Known by Defendants and that information is withheld as sales continue | | | | | | | | |
| Belchak | Bersie, Kevin Long, Taylor | Oct 10, 2023 | As Is | Millrock/ assign | 14.5700% | 10/20/23 | $1,500,800.00 | $10,299,990.40 |
| Herbert | Rutherford | Oct 10, 2023 | As Is | Millrock/ assign | 2.5567% | 10/27/23 | $271,478.46 | $10,617,794.05 |
| DelPriore/ Fontaine | Rutherford | Oct 16, 2023 | As Is | Millrock/ assign | 5.4270% | 10/27/23 | $559,471.66 | $10,308,824.81 |
| Young | Cruz, Taylor, Stocco | Nov 1, 2023 | As Is | Millrock/ assign | 3.5537% | 11/8/23 | $366,635.45 | $10,317,121.56 |
| Kneedy | Bersie | Nov 6, 2023 | As Is | Millrock/ assign | 11.1675% | 11/14/23 | $1,150,423.08 | $10,302,038.68 |

68.    Defendants represented the tenant NGX was "financially strong" when, in fact, they were wholly aware of an equipment rebate program to temporarily finance the start-up medical tenant before its impending bankruptcy proceedings.

69.    Moreover, Defendants' property acquisition prices (purchases that were in some cases made months before the TIC sales) were not disclosed to Plaintiffs at the time of sale. Upon information and belief, Defendants withheld this information because it would have clearly demonstrated that Defendants' Syndicate was selling the TIC interests—at the South Jordan and

Lehi properties, as well as others—to Plaintiffs and other investors at prices that were multiples of what Defendants knew to be the fair market value.

| Property[22] | Purchase price (nondisclosure) | TIC sale price |
| --- | --- | --- |
| South Jordan, UT (existing building, 2 existing tenants, 2 units improved for NGX) | $3,500,000 (Sale price from James Yeates/Colliers to Kevin Long) $2,500,000 (builder offer) | $10,300,000 (NGX) |
| Naperville, IL (new build for HSH, adapted for NGX) | $750,000 (Purchase price from Steve Caton/SARC) | $5,078,231.42 (HSH) $7,002,492 (NGX) |
| Lehi, UT (new build for HSH, adapted for NGX) | $607,000 (Assessor value 2022) | $5,767,890 (NGX) |
| Bluffdale, UT (new build for HSH, adapted for NGX) | $426,600 (Assessor value 2022) | $6,286,782 (NGX) |
| Draper, UT (existing building, improved for HSH, pitched as NGX - TIC owners declined) | $4,475,460 (Kevin Long declaration) | $22,000,000 (HSH) |

70.     Defendants knew that these properties had recently been purchased[23] for a fraction of the prices ultimately charged to investors, but Defendants concealed the inflated sales prices[24] to ensure significant returns for themselves and catastrophic losses for investors, built upon a purported guaranteed long-term lease with anchor tenant NGX.

71.     In addition, although the sales materials had represented to Plaintiffs that Mary Street of Commercial Asset Management ("CAM"), a reputable third party would be responsible for management and administration of the Property, Defendants instead enlisted their co-

---

[22] Similar purchases and TIC sales were executed in at least 15 properties in other states, and as shown, Defendants regularly used sham leases to immediately inflate the purported value of the respective property for the purposes of TIC sales. Ten active lawsuits against Defendants and other actors represent more than $50,000,000 in damages to various investors, including Plaintiffs.

[23] Upon information and belief, in some cases, the same property had been sold multiple times (with Defendants' assistance) in rapid succession to conceal the profits Millrock skimmed before selling to Plaintiffs.

[24] Included in the price of the building, according to the Plaintiff's Purchase and Sale Agreement, was "valuable medical equipment" that would be used by NGX.

conspirators, Green Ivy, Machlis and Wolocatiuk to manage the property as well as the communications and rent payments to Plaintiffs.

72. Ultimately, the reason for that 180-degree switch was clear. NGX never paid rent in South Jordan. Kevin Long, Rutherford, Smith, Machlis and the other Agents lied to Plaintiffs about this. Colliers knew that the representations were false and remained silent to profit thereby.

73. Of course, these representations are only examples. To further the scheme, Kevin Long, Smith and other agents of Millcreek, Millrock and Colliers, also misrepresented that the South Jordan property had or was about to get a certificate of occupancy. Colliers knew that the representations were false and remained silent to profit thereby. Indeed, Hobble Creek Holdings, LLC, owned by Colliers' Yeates was listed as owner of the Property on the application to begin tenant improvement work for NGX when it was submitted on January 27, 2023, and that permit application to begin construction was not even granted until April 17, 2023. This too was hidden from investors at the time of their TIC purchases.[25]

74. Perpetuating the scheme, Martinez, in a February 2, 2023 email told Plaintiff Hansen:

> **From:** Brian Martinez <brian.martinez@millcreekcommercial.com>
> **Sent:** Thursday, February 2, 2023 2:00:32 PM
> **To:** monikahansen36@hotmail.com <monikahansen36@hotmail.com>
> **Subject:** Passive Income via Commercial Real Estate
>
> Hello Monika,
>
> I wanted to share with you a great property we are just getting ready to market. It's located in South Jordan, UT. It pays a 6.5% return, and there are 3 medical tenants there. A pharmacy, dentist, and pain treatment center. Let me know what you think. We could line this up with your family's property sale so that you don't miss a single day of rent.
>
> --
>
> **Brian Martinez**
> Sales Associate

---

[25] For example, Overson's PSA stated the purchase and transfer of property was occurring in 'As Is' condition. In fact, tenant improvements had not begun, and in fact, South Jordan City inspections did not begin until April 20, 2023 for construction work.

This was a false statement as NGX—the touted anchor tenant—was not "there."

75.     Defendants knew that the representations were false and remained silent to profit thereby. At the very same time, Martinez sent an email to his colleague, Spencer Strong, a senior associate in Investment Sales at Colliers, he shared a one-page version of South Jordan's Offering Memorandum which garnered the response, "Beautiful. Let's make some money."



76.     Martinez followed up with a handwritten note:



Colliers and the other Defendants knew that the representations in the Offering Memorandum were false, and yet, Colliers remained silent to profit thereby.

77.     In a March 23, 2023 email from Martinez to Plaintiff DeJong, Martinez misrepresented that "right now, we have about 4M available in South Jordan. We have sold 6M." This was a false statement used to manipulate the investor. As of March 23, 2023 only $3,300,000

had been sold to Plaintiffs. Again, Colliers and the other Defendants knew that the representations were false and remained silent to profit thereby.

78.     Kevin Long and Machlis represented to Tucker and other Plaintiffs that the lease rate at South Jordan was "market" and fair. In fact, Kevin Long, Smith, Rutherford and Machlis knew that the lease rate was up to three times the market rate and was artificially inflated by Millcreek, i.e., Kevin Long, Smith, and Rutherford, to support a fraudulent sales price. Again, Colliers and the other Defendants knew that the representations were false and remained silent to profit thereby.

79.     In reality, NGX—like the other tenants—was not paying the promised rent, and instead, Defendants and their Agents engaged in schemes to keep the rent "flowing" in an effort to try to keep the scheme afloat so they could dupe more investors. Indeed, in response to an October 2023 email from Anderson (a paralegal representative of Colliers, Millcreek and Millrock who utilized both Colliers and Millcreek email addresses) regarding the imminent "closing on new tenant-in-common owners … for the South Jordan NGX property," Machlis, Wolocatiuk and Kevin Long emailed as to the fact that "[t]here is no chance that rent will magically appear before we make distributions to TIC owners." Nonetheless, while they knew the NGX "ship was sinking," this information was deliberately intentionally withheld from the Plaintiffs and other investors knowing it would be material to investors. Simply put, Colliers and the team of Defendants' Agents had enlisted to manage the property knew that the material facts, and they chose to withhold the information, remain silent, and profit from additional TIC sales, including those of Plaintiffs Young and Kneedy.

80.     Unable to pay Plaintiffs with actual rent payments that had been represented as the basis for the TIC sales, upon information and belief, Defendants, Green Ivy and others used

investor funds to issue "rent" checks to the very investors who contributed the funds. Upon information and belief, this feature of the scheme was used by Defendants and their co-conspirators to (i) provide time to solicit the final TIC investments and (ii) cover up their tracks as they searched for actual tenants that might implausibly agree to the inflated lease terms that had been pitched to investors.

81.    For the avoidance of doubt—and in addition to the misleading Offering Memoranda, marketing materials, and websites reviewed by Plaintiffs—each Plaintiffs investment was solicited by at least one—and in many cases numerous—numerous direct communications containing misrepresentations or omissions from either Defendants and/or their Agents as part of the inducement of their purchases:[26]

---

[26] To be clear, these are just singular examples of the misrepresentations, as many Plaintiffs received a deluge of direct misrepresentations as part of Defendants' inducement.

| TIC Owner Plaintiff | Date | Means | Agent | Direct Misrepresentation |
|---|---|---|---|---|
| Kurtz | Late Jan '23 | Call | Rutherford | "3 tenants there, paying rent" |
| Smith | 1/25/23 | Email | Martinez | Representing NGX as "the tenant", attaching OM and representing 6.5% returns |
| Carlston/ Allen | 2/18/23 2/22/23 | Email Call | Cruz | "Safety and simplicity you see in single tenant property." "NGX just signed the lease, imminent move-in" |
| Malmstrom | 1/19/23 2/2/23 | Call Email | Martinez | Lehi: "Backed by Colliers, great tenant, stable returns." South Jordan: Referencing Neuragenex as tenant, attaching OM |
| Reid | 3/4/23 Early Mar '23 | Email Call | Martinez | "3 tenants, 6.5% returns" "NGX there, paying rent, great tenant" |
| Overson | 2/17/23 | Email | Bersie | "We have 500k signed contract that will perform at COE in mid-May" |
| deJong | 3/23/23 | Email | Martinez | "We have sold 6M" |
| Hansen | 2/2/23 Mid-Feb '23 | Email Call | Martinez | "6.5& return, 3 medical tenants there." "NGX there, paying rent" |
| Befort | 6/13/23 | Email Call | Cruz | "Rent will go up 2-3% ever year." Representing May 23 rent commencement |
| Warner | 6/15/23 | Email | Ledbetter Taylor | "NGX SoJo ready to close in August when CO is issued." "6.5% cap rate" |
| Tomac | 6/23/23 6/29/23 | Email Text | Cruz | "No vacancy factor" Confirming that NGX was occupying property and paying rent |
| Tucker | 8/29/23 8/30/23 | Email | Bersie Kevin Long | Lease "approved by NGX" |
| Belchak | 5/3/23 10/13/23 | Email Call | Bersie Kevin Long | "6.5 NNN" Representing NGX was a great tenant and was paying rent and occupying property |
| Herbert | Early Oct '23 | Call | Rutherford | "NGX paying rent, operating in the space, solid, stable cash-flow" |
| DelPriore/ Fontaine | Sep-Oct '23 | Calls | Rutherford | "NGX paying rent, occupying the space" |
| Young | 11/1/23 | Email | Smith Kevin Long | Copied to emails regarding Young's PSA premised on OM with known uncorrected representations regarding NGX's tenancy and solvency status |
| Kneedy | 11/3/23 | Call | Bersie | Representing that TIC interest/lease was backed by solvent guarantors that will back contract and pay promised returns if NGX fails |

82.    As shown, Defendants' and their Agents misrepresentations ran the gamut, and involved everything from (1) the promised returns, (2) the value and security of the investment, (3) the date of NGX's move in and rent commencement, (4) the status of repairs to the building, (5) whether NGX had signed the lease and started paying rent, (6) the volume and percent of TIC interests that had already been sold, and (7) even whether guarantors existed to protect the promised rent returns when potential buyers, such as Kneedy, inquired about NGX's financial

38

status.  Indeed, depending on what the given investor needed to hear, some Agents highlighted the existence of three tenants whereas others touted the benefits of a "single tenant property".

83.     Simply put, each of the TIC transactions was induced by Defendants' myriad of untrue claims about the Millcreek investments, and Defendants, Colliers and their trained Agents knew they were not true. Nonetheless, Defendants materially aided, abetted and controlled Millcreek's efforts, and Defendants and their Agents concealed the misrepresentations and omitted the truth in various Offering Memoranda, email communications and other marketing materials. The TIC investments were misrepresented as stable, safe, and worry-free, and Colliers provided the marketing materials—and the scheme—with its seal of approval, giving an air of legitimacy to the sham transactions.

84.     Ultimately, Colliers and Defendants only had one focus: to "make some money" as the recipients of the commissions obtained through each inflated TIC sales. And over the course of a few years, Colliers and Defendants used the Colliers/Millrock Scheme to swindle a windfall from Plaintiffs and other investors.

**The Cover Up Continued: To Conceal Their Misdeeds, Defendants Continue The Scheme**

85.     As each of the Millcreek Properties' purported anchor (sham) tenants failed and filed for bankruptcy (first HSH, then NGX and Next Pain), Defendants were forced—by their own prior deceit—to continue their misrepresentations in order to prevent the rapid unravelling of the scheme. And perhaps more than any other of the misrepresentations, it was these continued marketing efforts—after the wheels were falling off and NGX and NextPain had filed for bankruptcy and closed—the best evidence of Defendants' intent and commitment to the web of lies.

86.     As an example, nearly a year after NGX filed bankruptcy (January 26, 2024), Defendants and their Agents remarkably continued marketing NGX as a viable tenant (*see* https://www.millcreekcommercial.com/neuragenex-romeoville-il/):



87.     In July 2024, Kevin Long emailed all Plaintiffs stating: "[t]he stated purpose of NextPain Care is to create a successful business to fill your real estate (and that of the other major developers) and ***replace the rent that NGX was paying.***" This was a blatant lie. NGX never paid rent for the South Jordan property. Colliers knew that the representations were false and remained silent to profit thereby.

88.     Ultimately, Defendants' Scheme unraveled beyond Defendants' ability to continue the cover up, and in or around December 2024, Millcreek Commercial's website millcreekcommercial.com stated: "Millcreek Commercial has ceased operations. Our friends at KGL Advisors have agreed to assist Millcreek Commercial clients. The Millcreek agents that moved to KGL Advisors can assist you with Tenant in Common Investments from that brokerage." Plaintiffs received emails from Kevin Long (kevin@kgladvisors.com) confirming that KGL Advisors LLC is a new entity taking over operations of Millcreek with the same employees (Kevin Long, Mike Bersie, Ileana Stocco).

89.     Upon information and belief, KGL Advisors was established to conceal Millcreek's assets from ongoing litigation while continuing similar business activities, and from all apparent indication, KGL Advisors is a mere continuation of Millcreek Commercial under a different name.

90.     Tellingly, despite KGL Advisors not being formed or registered until November 11, 2024, its website—including a version of the "7 Reasons to Consider KGL Advisors" article—identifies Colliers as its brokerage partner. Based on information and belief, KGL Advisors operated and is operating as yet another alter ego of Millcreek—and remarkably, even to this day, Colliers continues to broker Kevin Long's placements.

## CAUSES OF ACTION

91.     By this reference, Plaintiffs incorporate all of the foregoing paragraph set forth in this Complaint.

92.     Colliers and its Agents directed and engaged in the TIC transactions at issue—or at minimum willingly permitted its imprimatur to be placed on the transactions—so that they each could profit from the inflated TIC sales to Plaintiffs and others.  Colliers was aware of the actions described herein, performed the actions, consented to the actions, conspired with, aided and abetted

41

the actions, ratified the actions, and profited by the actions; thus, all of the foregoing is imputed to Colliers and its Agents.

93.     Each of the herein discussed Colliers affiliates are alter egos of each other, partners, joint venturers and co-conspirators such that it is reasonable and appropriate to pierce the corporate veil and to hold the Defendants jointly and severally liable for all the misconduct alleged herein

**FIRST CAUSE OF ACTION**
**(Violations of Section 10(b) of the Securities Exchange Act**
**and Rule 10b-5 – Against All Defendants)**

94.     By this reference, Plaintiffs incorporate all of the foregoing paragraph set forth in this Complaint.

95.     Plaintiffs' investment in Millcreek properties, paired with guaranteed leases, qualifies as a security under Section 2(a)(1) of the Securities Act (15 U.S.C. § 77b(a)(1)), as it involved an investment in a common enterprise with returns dependent primarily on the efforts of others (i.e., an "investment contract").

96.     Defendants' and Defendants' Agents made materially false statements and omitted critical facts necessary to prevent misleading impressions—conduct prohibited under SEC Rule 10b-5(b), which bars misrepresentations or omissions in connection with the purchase or sale of a security.

97.     Those material misrepresentations and omissions occurred in direct connection with the offer to sell a security, satisfying another core element of a Rule 10b-5 claim

98.     Such material misrepresentations and omissions include, in addition to those previously alleged and incorporated herein:

a.  That Millcreek, Colliers and their Agents had conducted due diligence on the tenants for the Millcreek Properties;

42

b.  The risk analysis of the Millcreek Properties;

c.  The condition and status of the Millcreek Properties;

d.  The rent that was being paid and received at the Millcreek Properties by NGX or other sham tenants;

e.  That NGX remained solvent and growing;

f.  The average capitalization rate over the lease term;

g.  The TIC interests that had been purchased to date;

h.  That the tenants for the Millcreek Properties were strong tenants; and

i.  That leases were secured by solvent, financially viable guarantors.

99.     Defendants and Defendants' Agents all made the material misrepresentations and omissions either through verbal or written correspondence with Plaintiffs or through their marketing materials.

100.    Defendants' and their Agents' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

101.    Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with reckless disregard for their truth.

102.    Defendants directed and controlled all statements made by their Agents and aided and abetted the Defendants' Syndicate in making the representations.

103.    Plaintiffs justifiably relied on the foregoing misrepresentations and omissions.

104.    Plaintiffs suffered substantial injury as a result of Defendants' misrepresentations and omissions in an amount to be proven at trial.

43

## SECOND CAUSE OF ACTION

**(Control Person Liability Under the Securities Exchange Act – Against Kevin Long, Adam Long and Lew Cramer)**

105.    By this reference, Plaintiffs incorporate all other allegations in this Complaint.

106.    Millcreek, Colliers and Millrock are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

107.    At all times relevant to this Complaint, Defendants Lew Cramer, Kevin Long and Adam Long ("Controlling Defendants") controlled the Liable Persons as follows:

a.  Controlling Defendants were officers, directors, agents, or other control people of entities that are Liable Persons;

b.  Controlling Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood;

c.  Controlling Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position;

d.  Controlling Defendants willingly submitted to and complied with the instruction, direction, or authority of Defendants; and

e.  Controlling Defendants participated in the business operations of the Liable Persons generally.

108.    Controlling Defendants had power over the specific transactions, communications and activities at issue in this Complaint.

109.     With respect to their conduct and control of the Liable Persons relating to the matters addressed in the Factual Background and First Cause of Action, Controlling Defendants did not act in good faith, and the acts of Controlling Defendants did directly or indirectly induce the acts of the Liable Persons.

110.     Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Controlling Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Controlling Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under any other applicable cause of action.

### THIRD CAUSE OF ACTION
**(Negligent Misrepresentation – Against All Defendants)**

111.     By this reference, Plaintiffs incorporate all other allegations in this Complaint.

112.     Defendants had a duty to determine and disclose fully and fairly all facts that materially affected or related to the condition of the Millcreek Properties, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

113.     Defendants made false representations to Plaintiffs as detailed above.

114.     Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

115.     Defendants knew such representations were false or were negligent in making such representations.

116.     Defendants were negligent in investigating the tenant, representing the tenants' strengths and/or their corporate guarantors.

117.     Defendants knew or should have known the misrepresentations were false.

118. Defendants made the misrepresentations and or aided and abetted the making of the misrepresentations to induce Plaintiffs into purchasing the shares of the Millcreek Properties for a grossly inflated price.

119. The foregoing misrepresentations and omissions were not only material, but the information was critical to Plaintiffs' evaluation of whether to purchase the TIC shares of the Millcreek Properties.

120. Plaintiffs would not have invested in the Millcreek Properties had they known the true facts.

121. Plaintiffs justifiably relied on the foregoing misrepresentations.

122. As a result of Defendants' tortious conduct, Plaintiffs have been damaged in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment of Defendants – Against All Defendants)**

123. By this reference, Plaintiffs incorporate all other allegations in this Complaint.

124. Plaintiffs conferred a benefit on the Defendants by making investments in the Millcreek Properties.

125. Defendants received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sales or transactions; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

126. Defendants knowingly benefitted from the proceeds of the Millcreek Properties' transactions and diverted invested money to purposes not benefiting Plaintiffs.

127. Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs.

128.   By reason of Defendants' unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants, together with all other applicable relief at law or in equity, including but not limited to a constructive trust requiring to hold funds for Plaintiff's benefit and return them as ordered by the Court.

129.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or by law, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CAUSE OF ACTION
### (Common Law Fraud, Fraudulent Nondisclosure and Breach of Honesty – Against All Defendants)

130.   Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

131.   Defendants made false statements about vital facts regarding the South Jordan Property, including the representations within the marketing materials and the representations or omissions made to each of the named Plaintiffs, including:

    a.   That Millcreek, Colliers and their Agents had conducted due diligence on the tenants for the Millcreek Properties;

    b.   The risk analysis of the Millcreek Properties;

    c.   The condition and status of the repairs at the Millcreek Properties;

    d.   The rent that was being paid and received at the Millcreek Properties by NGX or other sham tenants;

    e.   That NGX remained solvent and growing;

    f.   The average capitalization rate over the lease term;

    g.   The TIC interests that had been purchased to date;

    h.   That the tenants for the Millcreek Properties were strong tenants; and

i.  That the guarantor was a solvent company.

132.    Defendants made the statements knowing that they were false. The Defendants' agents knew that NGX was a sham company and did not have the ability to pay rent. Therefore, to conceal this from Plaintiffs, the Defendant's agents paid rents at the various properties – with investors' money, which fact was not disclosed to Plaintiffs.

133.    Defendants omitted to disclose to the Plaintiffs that the tenant NGX never took occupancy nor actually paid rent at the Millcreek Properties, and instead Millcreek covered the rents for the non-paying tenant—thereby creating an illusion that NGX was paying rent and preparing to occupy the space.

134.    Alternatively, Defendants made the aforementioned statements recklessly and without regard for their truth.

135.    Defendants knew these material facts, had a duty to disclose these material facts, and failed to do so.

136.    Similarly, Defendants had a duty to be honest, ethical, and competent with regards to Plaintiffs and the transactions. *See Hermansen v. Tasulis*, 2002 UT 52, ¶ 22, 48 P.3d 235, 241. Defendants violated those duties in their representations, communications and omissions to Plaintiffs with respect to the TIC transactions.

137.    Defendants intended that Plaintiffs would rely on the statements and Plaintiffs did, in fact, reasonably rely on the false statements and omissions in entering into transactions to purchase TIC shares in the Millcreek Properties.

138.    Plaintiffs reasonably relied on the statements by investing in the TIC shares in the Millcreek Properties.

139.     As a result of Defendants' conduct, misrepresentations, omissions and violations of duties, Plaintiffs have suffered damages in an amount to be proven at trial.

140.     Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy – Against All Defendants)

141.     Plaintiffs incorporate by reference all paragraphs and allegations asserted herein.

142.     Defendants Syndicate—a combination of numerous entities and individuals—conspired to defraud Plaintiffs and numerous other investors through the Colliers/Millcreek Scheme.

143.     As described herein, Defendants' Syndicate and Defendants' Agents had a series of common objectives to facilitate the Scheme including:

a.   Purchasing the Millcreek Properties at artificially created prices;

b.   Repackaging the Properties to be sold as TIC interests to Plaintiffs and other investors;

c.   Inflating the prices of those interests through misrepresentations regarding the security provided by the investment, the value of the property, the stability and presence of anchor tenants, the receipt of rents at the property, and the guaranteed returns associated with the investments; and

d.   Selling those TIC interests to Plaintiffs and other investors.

144.     Having made numerous misrepresentations, Defendants profited through earnings from inflated sales prices and commissions associated with each TIC purchase, and in doing so,

49

Defendants solicited more than $10 million in investments from Plaintiffs in relation to a properties that are worth only a small fraction of that total.

145.    Defendants' Syndicate and Defendants' Agents had an agreement and meeting of the minds with respect to each facet of the Scheme, and Defendants were involved from the initial purchase of the Properties to the final sale of the relevant TIC interests.

146.    Defendants' course of action involved numerous overt unlawful acts, including the various misrepresentations that serve as the basis of Defendants' fraud liability and violations of federal securities laws.

147.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial, and Defendants are jointly and severally liable for all damages incurred by Plaintiffs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

1.    An award of actual damages in an amount to be proven at trial, damages for pain and suffering, consequential damages, statutory damages, treble damages under applicable statutes, and punitive and exemplary damages, disgorgement of profits and fees, attorney fees and costs, plus interest.

2.    Pre-judgment interest, attorney fees, and costs of suit.

3.    If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance and/or tortious conduct.

4.    Such other relief as may be just and equitable.

RESPECTFULLY SUBMITTED this 15 day of October 2025

**/S/ BRETT N. ANDERSON**

**BLACKBURN & STOLL, LC**
Brett Anderson (11809)
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

**RIGBY SLACK, PLLC**
A. Lee Rigby (*pro hac vice*)
David C. Lawrence (*pro hac vice*)
William A. Duncan (*pro hac vice*)
Braden N. Anderson (*pro hac vice*)
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*