Brett Anderson (11809)
**Blackburn & Stoll, LC**
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

A. Lee Rigby
David C. Lawrence
William A. Duncan
Braden N. Anderson
**Rigby Slack, PLLC**
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHERYL TOMAC, an individual and trustee of the Tomac Trust, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>COLLIERS INTERNATIONAL GROUP, INC., et al.,<br><br>Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT KEVIN LONG'S MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00774-DBP |

Plaintiffs Cheryl Tomac, trustee of the Tomac Trust; Royal West Properties, LLC (Willard Malmstrom, manager); Colleen Overson, trustee of the Wayne B. Bulau Irrevocable Trust; James Herbert, trustee of the Revocable Trust Agreement of James A. Herbert; Janice Young; J. Lynne Kneedy, trustee of the J. Lynn Kneedy Trust; John Kurtz; Marjorie Reid, trustee of the Marjorie Ann Reid Trust; Glenwood Ventures LLC (Elizabeth Carlston and Benjamin Allen, managers);

1

JSGV Properties, LLC (Jennifer Smith, manager); MaxHan Holdings, LLC (Monika Hansen, manager); Ivan Warner, Windmill Properties II, LLC (Simon DeJong, manager); Green Cove Investments, LLC (James Tucker, manager); Quaking Aspen Properties, LLC (Gerald DelPriore and Marisa Fontaine, managers), and Joan Befort, trustee of the Joan Alice Befort Living Trust (collectively, "Plaintiffs"), through undersigned counsel and pursuant to Local Rule 7-1 DUCivR and Fed. R. Civ. P. 12(b), submit this response memorandum in opposition to Defendant Kevin Long's Motion to Dismiss with prejudice Plaintiffs' Second Amended Complaint [Dkt. 174] (the "Motion"). The Second Amended Complaint [Dkt. 173] shall be referred to as "SAC," and Defendant Kevin Long shall be referred to as "Long."

## INTRODUCTION AND BACKGROUND

Defendant Long's Motion rests on a fundamental mischaracterization of the SAC. The Motion asserts that Plaintiffs rely on impermissible group pleading and that they have failed to identify any actionable misstatements attributable to Long. To the contrary, the SAC does precisely what Rule 9(b) and the PSLRA require: it pleads, with particularity: (i) the specific statements Long personally made; (ii) the context, timing, and recipients of those statements; and (iii) the facts demonstrating not only why those statements were false, but also that Long knew each statement was false when he made it. Read as a whole—as the Tenth Circuit requires—the allegations easily satisfy the heightened pleading standards applicable to federal securities fraud claims. *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023).

The SAC alleged a coordinated scheme in which Defendants (including Long) marketed and sold overvalued TIC interests by fabricating the financial health and rent-paying status of NGX; concealing the true market value and acquisition price of the South Jordan property; inflating lease rates to justify an artificially high sales price; and disguising investor-funded

2

payments as legitimate tenant rent. Far from being a peripheral actor, Long was a direct and central participant. Long directly represented to Plaintiffs that NGX was paying rent, that the lease rate was "market," and that NextPain Care would "replace the rent NGX was paying"—all the while knowing that NGX never paid rent, that the lease rates were manipulated, and that investor funds were being recycled to create the illusion of tenant viability. *See e.g.*, Dkt. 173, ¶¶ 69–71, 78–81, 87.

The SAC further supports a strong inference of scienter by showing Long's access to (and actual knowledge of) contradictory information, his financial motives and his central role in orchestrating and perpetuating the investment scheme. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). The allegations further establish primary violations by the entity defendants, whose liability is imputed by Long's conduct as their founder, president, principal, and/or senior executive. *See Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974); *Smallen v. W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020). Further, as courts in this Circuit recognize, the SAC's allegations more than suffice with respect to "control" under Section 20(a), which is not subject to the PSLRA's heightened pleading requirements. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003).

In short, Long's Motion does not identify any pleading deficiency. Rather, it simply asks the Court to ignore well-pled allegations or construe them in a light most favorable to Long—a request that Rule 12(b)(6) plainly does not permit. Because the SAC alleges with particularity Long's specific misrepresentations, his knowledge of their falsity and his control over the primary violators, the Motion should be denied.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the allegations in support contain factual content that allows the court to draw a reasonable inference that the defendants are liable for the misconduct alleged. *See Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F. 3d 1231, 1235 (10th Cir. 2013). The court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *See Albers v. Bd. Of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014). The court's function is "not to weight potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

## **ARGUMENT**

**I.    Plaintiffs have Plead Fraud Against Long with the Requisite Particularity.**

### a. Pleading Standards for Federal Securities Fraud Claims

Defendant Long argues that the SAC fails to allege fraud with the level of particularity required under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) states that "the circumstances constituting fraud" must be "state[d] with particularity," while "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the rule's heightened pleading standard, plaintiffs must "set forth the time, place and contents of the false

4

representation, the identity of the party making the false statements and the consequences thereof." *Combs v. SafeMoon, LLC*, Case No. 2:22-cv-642-DBB-JCB, 2024 WL 1347409, at *4 (D. Utah Mar. 29, 2024) (citing *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997)).

Rule 9(b) does not, however, demand plaintiffs actually prove their allegations in the complaint. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1313 (11th Cir. 2002); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009) ("To say that fraud has been pleaded with particularity is not to say that it has been proved (nor is proof part of the pleading requirement)"); *see also Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001); *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 50 (1st Cir. 2020) ("Rule 9(b) does not demand a blow-by-blow account"). Thus, even if not all of a fraud claim's allegations are pled with particularity, a complaint may still satisfy Rule 9(b) if the allegations "taken as a whole" are sufficiently particularized. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023).

With passage of the PSLRA, Congress further heighted the pleading standards for federal securities fraud claims. *See* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737. As such, the PSLRA requires further detail for two elements of a fraud claim. First, the PSLRA requires that:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

Second, the PSLRA increased the standard for pleading that the defendant acted with "scienter," mandating that the complaint "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1094–96 (10th Cir. 2003); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) ("Although pleading standards are heightened for securities fraud claims, 'we must be careful not to mistake heightened pleading standards for impossible ones.'").

### b. The SAC Identifies Specific Misrepresentations Attributable to Long.

Defendant Long's Motion complains that the SAC relies on impermissible "group pleading," and that it "fail[s] to allege well-pled facts to establish any violation by Long." Dkt. 174 at p. 6. Ignoring that group pleading <u>is</u> permissible when defendants conspire to defraud a plaintiff,[1] the SAC expressly identifies numerous specific misrepresentations made personally by Long:

<u>NGX Viability/Status</u>:

In October 2023, Long, Machlis and Wolocatuik acknowledged in writing that "[t]here is no chance that rent will magically appear before we make distributions to TIC owners," expressly recognizing that the NGX "ship was sinking." Dkt. 173, ¶ 79. Yet that very same month, on

---

[1] Plaintiffs were necessarily forced to use some degree of "group pleading" because Defendants deliberately intertwined their roles. As alleged, the Scheme involved a tightly interwoven syndicate of individuals and entities acting in concert—often with the same actors serving multiple roles and obscuring which entity they represented at any given time.
> "Group pleadings cannot logically be avoided if, in fact, a group worked together to defraud others: It is obvious that a plaintiff may not be privy to the workings of a group of defendants who have acted in concert to defraud him… Under Rule 9(b) the plaintiff cannot be required to allege with particularity the manner in which individual defendants acted in concert… Plaintiffs have alleged the individual defendants responsible for making certain oral public or written representations attributable to them. The remaining individuals are alleged to have acted in concert to defraud the plaintiffs though various statements and reports. Plaintiffs' allegations are sufficient to provide fair notice of the claims asserted and allow defendants to answer the complaint."

*DiTucci v. Ashby*, No. 2:19-cv-277-TC-PMW, 2020 U.S. Dist. LEXIS 34505, at 4 (D. Utah Feb. 27, 2020) (internal quotations omitted).

October 13, 2023, Long told Thom Belchak[2] that NGX was "paying rent and occupying the property." *Id.* at ¶ 81. On November 1, 2023, Long was "[c]opied to emails regarding Young's PSA premised on [an] OM with known uncorrected representations regarding NGX's tenancy and solvency status," but made no effort whatsoever to correct those misrepresentations. Dkt. 173, ¶ 81.

    Read together, these allegations clearly and specifically identify:

(i)     the misleading statements—namely, the representations that NGX was paying rent and remained a viable tenant;

(ii)     the time and place of the misrepresentation—October 13, 2023 and November 1, 2023, in the communications with Belchak and regarding Young's PSA;

(iii)     the identity of the responsible party—Long, who was copied on and participated in the communications; and

(iv)     the reason the statement was false—Long already knew, by virtue of (at a minimum) the October 2023 email, that NGX was not paying rent and was financially failing.

To the extent Long contends that Rule 9(b) or the PSLRA requires each individual paragraph of the SAC to independently contain all elements of fraud, Long does not offer, nor are Plaintiffs are aware, of a single authority imposing such a requirement. Instead, it is by reading the SAC as a whole that the pleading requirements are fulfilled. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023). As demonstrated below, this is merely one example.

    <u>"Fair" Market Rate</u>:

Throughout 2023, Long affirmatively represented to Tucker and other Plaintiffs that the lease rate at South Jordan was "market" and fair. 173, ¶ 78. That representation was plainly false as the lease rate was as much as three times the actual market rate—artificially inflated to justify

---

[2] Thom Belchak, trustee of the Jaybird Inter Vivos Revocable Trust was a former TIC owner. Plaintiff James Tucker is the assignee of all claims previously held by Belchak. *See* Dkt. 173, ¶ 18.

7

a fraudulent sales price. *Id.* at ¶¶ 1, 78. Long knew this because mere months before the TIC sales (which priced South Jordan at a total of $10,300,000), Long had participated in its purchase for a mere $3,500,000. *Id.* at ¶ 69.

Read together, Plaintiffs' SAC alleges with particularity that (i) Long represented the lease rate to be fair; (ii) the lease rate was in fact not fair as demonstrated by the gross disparity between the property's recent $3.5 million sales price and the $10.3 million valuation being pushed to investors; and (iii) that Long knew the statement was false because he personally participated in the earlier transaction—thus having direct knowledge of the true market value and the lease-rate manipulation.

### c. The SAC Adequately Pleads Long's Scienter.

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 USCS § 78u–4. Put differently, the PSLRA heightens the requirements when pleading "scienter." The Supreme Court defines "scienter" as the "mental state embracing an intent to deceive, manipulate, or defraud," and in the context of § 10(b), "knowing or intentional misconduct." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

In *Tellabs*, the Supreme Court gave guidance on what is required to sufficiently allege a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). There, the Supreme Court held that, on a motion to dismiss a securities fraud claim, courts must: (i) accept as true all factual allegations in the complaint; (ii) <u>consider the complaint in its entirety</u> along with all other sources incorporated in the complaint by reference; and (iii) consider whether "all of the facts alleged, <u>taken collectively</u>, give rise to a strong inference of scienter, not

8

whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. (emphasis added).

Here, the SAC satisfies this requirement and alleges numerous facts supporting a strong inference that Long acted with the scienter. In sum, the SAC alleges that Long knew:

(i) the TIC interests were being sold at prices far exceeding their true market value [Dkt. 173, ¶¶ 69–70];

(ii) that the leases with NGX were fictitious [Dkt. 173, ¶¶ 72, 78]; and

(iii) that NGX was in fact not paying rent, but rather it was investor funds that were used to create the illusion of NGX's viability [Dkt. 173, ¶¶ 79–80].

Here, unlike other securities cases where scienter may be more difficult to discern,[3] "[i]ntentional misconduct is easily identified since it encompasses deliberate illegal behavior." *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir.2000), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000)).

As discussed herein, Long made numerous, material false statements and omitted critical facts necessary to prevent misleading impressions. Long (i) represented NGX was paying rent; (ii) told Plaintiffs the lease rate was "fair" and "market"; and (iii) concealed the fact that NGX "rent" payments were investor funds. Each of these statements were capable of being verified. NGX was either paying rent or it was not. The lease rate was either market or it was not. The payments were

---

[3] *See e.g. City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245,1260 (10th Cir. 2001) ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price).... In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*.").

9

either from NGX for rent or they were not. Therefore, Long either intentionally misrepresented these facts or he knew or discovered that each were false. Dkt. 173, ¶¶ 69–70, 72, 78–80.

Such facts are precisely the sort to adequately support a strong inference of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105-06 (finding intent to deceive where complaint alleged company operation was losing money, that Defendant knew of the losses, but falsely reported a profit); *see also IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1259–61 (D. Kan. 2023), motion to certify appeal denied, 723 F. Supp. 3d 1053 (D. Kan. 2024) (holding "that access to contradictory information can sometimes contribute to a strong inference of scienter.").[4] Finally, the SAC alleges Long's financial incentive to deceive. Dkt. 173, ¶¶ 39, 42, 46-47, 78, 87. Such allegations only further bolster the inference of scienter. *Tellabs, Inc.*, 551 U.S. at 325 (finding that a defendant's personal financial gain is evidence weighing in favor of a scienter inference).

Taken together, the SAC's allegations more than satisfy the PSLRA's heightened pleading standard and give rise to a cogent and compelling inference that Long acted with the requisite scienter.

## II. The SAC Adequately Pleads Control Person Liability Against Long

Section 20(a) of the Securities Exchange Act imposes liability upon "every person who, directly or indirectly, controls any persona laible" for securities fraud. 15 U.S.C.A. § 78t. Therefore, to successfully state a claim for control person liability, a plaintiff must allege (1) a

---

[4] Notably, the complaint examined in *IBT* rested solely upon access to contradictory information. On that basis alone, the court held that such facts may weigh in favor but are not dispositive of scienter. In elaborating, that court held when access to contradictory information is the sole basis for scienter, "[a] plaintiff must allege facts with particularity showing not only the executive's access to contradictory information but also the executive's fraudulent intent or reckless disregard of accessible information." *IBT*, 706 F. Supp. 3d at 1260. Here, Long did not just have access to such information, but he had knowledge of the statements' falsity. Yet he made the representations anyways (and/or failed to disclose and correct).

primary violation of the securities laws and (2) control over the primary violator. 15 U.S.C.A. § 77o. As explained below, the SAC does both.

### a. The SAC Adequately Pleads Primary Violations by Millcreek, Millrock, and Colliers.

As explained *supra*, the SAC adequately pleads primary violations of Section 10(b) and Rule 10b-5 by Defendant Long. Nonetheless, Long's Motion maintains that the SAC fails to sufficiently allege any primary violation by the underlying entities: Millrock, Millcreek and Colliers. In doing so, Long forgets one simple, absolute truth: <u>entities act only through their employees and agents</u>. *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261 (D. Utah 2017) (citing *In re C.W. Mining Co.*, 636 F.3d 1257, 1266 (10th Cir. 2011)) (emphasis added).

<u>Colliers</u>

"Colliers—with its extensive marketing department, resources and expertise—developed the marketing materials and website for Millcreek Properties." Dkt. 173, ¶ 43. Those materials contained numerous inaccuracies and omissions, including the failure to disclose the above-market rate artificially inflated by fraudulent long-term leases and that the purportedly "safe and secure" income stream was anything but. Dkt. 173, ¶ 49. Colliers further sponsored and marketed South Jordan as "low-risk" and promised Plaintiffs "stable returns and a high quality tenant." Dkt. 173, ¶ 53. As shown, none of these representations were true.

Long, Senior Vice President of Colliers' Utah Division, knew these statements were false and either affirmatively made them anyway or failed to disclose the truth. Dkt. 173, ¶¶ 69–70, 72, 78–80. And even setting aside Long's independently actionable misstatements (which alone are sufficient to establish primary violations by Millcreek, Millrock, and Colliers), the SAC further pleads numerous misrepresentations by several other Colliers employees and agents, each attributable to Colliers under well-established law.

It is concretely held that an entity is liable for fraud and misrepresentations of its agents acting within the scope of their authority or employment. *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974), abrogated on other grounds by *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Clearly then, Colliers is liable for any misrepresentations by:

(i)  Kevin Long – Senior Vice President, Colliers Utah Division;

(ii)  Lew Cramer – CEO, Colliers Utah Division; and

(iii)  James Yeates – Vice President, Colliers Utah Division.

Moreover, Colliers is also liable for the statements of each individual acting—or purporting to act—under Colliers' guidance and authority. As pled, Colliers was far more than a mere broker. Instead, Colliers: (i) provided all standard support for acquisition activities, including the development of due-diligence packages [Dkt. 173, ¶ 46]; (ii) exercised critical oversight and "adult supervision" over all Millcreek deals [Dkt. 173, ¶ 48]; and, most importantly, (iii) <u>directly trained the agents responsible for marketing and selling the TIC interests</u>, including: Brian Martinez, Scott Rutherford, Mike Bersie, Spencer Taylor, Ileana Stocco, Michael Cruz, Nicholas Ledbetter, and Jamie Anderson. Dkt. 173, ¶ 41 (emphasis added).

By Cruz's own admission, he and the other Colliers-trained agents "ultimately sold the TIC interests based on information…provided by Kevin Long." Dkt. 175, fn. 15. Thus, Colliers is liable for each misrepresentation propounded by the selling agents—trained directly by Long, Cramer, and Fugal in their management capacities at Colliers[5]—including, but not limited to:

(i)  January 25, 2023 – Martinez to Smith: representing NGX as the tenant despite the NGX lease never being signed; [Dkt. 173, ¶ 81]

(ii)  February 2, 2023 – Martinez to Malstrom: attaching OM referencing NGX as the secured tenant despite no lease in place; [Dkt. 173, ¶ 81]

---

[5] Dkt. 173, ¶ 41.

(iii) February 2, 2023 – Martinez to Hansen: representing three medical tenants currently occupying South Jordan despite NGX never occupying the space; [Dkt. 173, ¶ 74]

(iv) February 22, 2023 – Cruz to Carlston: representing that NGX signed the lease; [Dkt. 173, ¶ 81]

(v) March 4, 2023 – Martinez to Reid: representing total sales of $6M when only $3.3M had been sold; [Dkt. 173, ¶¶ 77, 81]

(vi) June 29, 2023 – Cruz to Tomaz: re-emphasizing "no vacancy factor" and representing that NGX was occupying the space, paying rent, and cash flow was "stable"; [Dkt. 173, ¶ 81]

(vii) August 29, 2023 – Bersie to Belchak: misrepresenting that the lease was approved by NGX; [Dkt. 173, ¶ 81]

Taken together, these allegations confirm that the misrepresentations at issue were not the aberrant acts of unsupervised agents, but the deliberate product of Colliers' centralized management, training and marketing apparatus. The SAC also more than plausibly establishes that Long's scienter is imputed to Colliers. As Senior Vice President of Colliers' Utah Division, Long acted squarely within the scope of his authority when he trained, supervised, and directed the selling agents, who in turn disseminated the knowingly false information he supplied. Under Tenth Circuit authority, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself." *Smallen v. W. Union Co.*, 950 F.3d 1297,1312 (10th Cir. 2020). That principle, applied to the well-pleaded facts here (*see, e.g.*, Dkt. 173, ¶¶ 41, 43, 46, 48–50, 69–70, 72, 78–81), means Long's scienter is Colliers' scienter and supports Colliers' liability as a primary violator.

Though alone sufficient to defeat Long's Motion, the SAC's allegations regarding Colliers do not rest on the imputation of Long's conduct and scienter alone. The SAC also pleads Colliers' direct and independent knowledge of the falsity of key representations concerning tenant status, lease execution, occupancy, rental income, and deal structure. Dkt. 173, ¶¶ 72–73, 75–79, 83, 87.

13

These allegations establish that Colliers, through the processes and controls it implemented or participated in, was aware of the misleading nature of the statements yet continued to promote them—statements on which Plaintiffs directly relied in purchasing their TIC interests and as a result of which suffered significant damages when those interests proved to be worth only a paltry fraction of what was represented. Together, these well-pleaded facts sufficiently allege Colliers' primary liability.

<u>Millcreek and Millrock</u>

Notably, Long's actions are also indisputably imputed to Millcreek and Millrock for purposes of establishing primary violations. Contrary to his Motion, Long was not merely an owner and shareholder, he was the founder, President and Principal of both entities. Dkt. 173, ¶ 37. He was also the designated "President of Millcreek with Colliers." Dkt. 173, ¶ 38. As a result, Millcreek and Millrock are laible for of Long's misstatements and omissions. *See Kerbs*, 502 F.2d at 741 (holding defendant corporation liable for securities fraud because "its president, acting within the scope of his apparent authority as principal officer and agent of the corporation, engaged in conduct which violated provisions of § 10 of the Act and Rule 10b-5").

Further, like Colliers, Millcreek is liable for the misstatements and omissions of various other individuals. As noted in the SAC, Long, Cramer, Frugal, Yeates, Martinez and Rutherford were "close business associates" and engaged in "joint marketing, communications, social media and transactional commission payments." Dkt. 173, ¶ 39. From the outset, the Scheme involved a "variety of intertwined players," with individuals often wearing more than one "hat" for more than one entity. Dkt. 173, ¶ 40. Rutherford, for example, expressly referenced his roles at both Millcreek and Equity Summit interchangeably, including in his email signature attached to his communications with Plaintiffs. Dkt. 173, ¶ 56.

Accordingly, Millcreek committed primary violations when it, through Long *and its other agents*, (i) represented NGX was paying rent; (ii) represented the lease rate as "fair"; and (iii) concealed that NGX's "rent" payments were actually investor funds. Dkt. 173, ¶¶ 69–70, 72, 74, 78–81. Moreover, Millcreek committed primary violations when it concealed the acquisition price of South Jordan from Plaintiffs, which would have revealed the inflated nature of the sales if disclosed. Dkt. 173, ¶¶ 69–70. As discussed above, Long's scienter is also imputed to Millcreek and Millrock. *Smallen*, 950 F.3d at 1312.

Simply put, the SAC more than plausibly alleges primary violations by Millcreek, Millrock, and Colliers. Through Long—whose actions, knowledge and scienter may be imputed to each entity, in addition to numerous other independent bases pled—the SAC identifies concrete misstatements, omissions and deceptive conduct that independently satisfy Section 10(b) and Rule 10b-5. Because these allegations establish actionable conduct by the entity defendants themselves, Long's attempt to ignore these primary violations fails at the threshold and provides no basis for dismissal.

### b. The SAC Adequately Pleads Long's Control.

Quite notably, allegations regarding control person liability pursuant to Section 20(a) of the Securities Exchange Act are not subject to the heightened pleading requirements of the PSLRA. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109. Instead, Plaintiffs' need only allege that Long had control over the primary violator. *Id*.

"Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Yellowdog Partners, LP v. Curo Group Holdings Corp.*, 426 F. Supp. 3d 864, 877; *Med Safe Northwest, Inc. v. Medvial, Inc.*, 1 Fed. Appx. 795, 805; *SEC v.*

*Goldstone*, 952 F. Supp. 2d 1060; *Maher v. Durango Metals*, 144 F.3d 1302.  The Tenth Circuit has clarified that this element requires only "<u>some indirect means of discipline or influence short of actual direction</u>." *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1208 (emphasis added). Courts in this jurisdiction have emphasized that determination of control is a factual question and is not ordinarily resolved at the motion to dismiss stage. *Yellowdog Partners, LP v. Curo Group Holdings Corp.*, 426 F. Supp. 3d 864, 877.

Here, Long argues that his status as an employee or agent of Colliers and as an owner and shareholder of Millcreek and Millrock is insufficient to establish control. However, the SAC alleges far more than mere employment or shareholder status. To be sure, the SAC plainly sets forth that Long was:

(i)   The founder, President and principal of both Millcreek and Millrock [Dkt. 173, ¶¶ 23, 37];

(ii)  The Senior Vice President of Colliers' Utah Division [Dkt. 173, ¶ 23];

(iii) The architect of the "perpetual standing listing agreement" between Colliers and Millcreek [Dkt. 173, ¶¶ 45–46]; and

(iv)  The leader of the team that trained and mentored the agents who marketed the TIC interests. [Dkt. 173, ¶¶ 41, 47, 52].

Contrary to Long's Motion, these allegations go well beyond mere employment and sufficiently establish that Long possessed the power to direct or cause the direction of management and policies of the primary violators. *See Yellowdog Partners, LP v. Curo Group Holdings Corp.*, 426 F. Supp. 3d 864, 877 (finding sufficient allegations of control liability when high-ranking officer personally made challenged statements, participated in earnings calls, and was involved in specific operation decisions related to the alleged fraud); *In re Oppenheimer Rochester Funds Group Sec. Litig.*, 838 F. Supp. 2d 1148 (officers who oversaw preparation and content of offering statements had sufficient indicia of control over the representations and disclosures at issue).

### III.     The Court Should Retain Jurisdiction Over State Law Claims

Long argues that if the federal securities claims are dismissed, the Court must decline supplemental jurisdiction over the remaining state-law claims. As shown above, the federal claims are adequately pled and should proceed. Thus, the state law claims should proceed under the Court's supplemental jurisdiction regardless.

However, even if the Court were to dismisses the federal claims against Kevin Long, the Court may—and should—retain supplemental jurisdiction because the state claims "form part of the same case or controversy" as the federal securities allegations. 28 U.S.C. § 1367(a).

The Supreme Court has long held that supplemental jurisdiction exists where the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1996). Under § 1367(c), the decision whether to retain such claims after dismissal of some federal causes of action is discretionary and turns on four well-established factors: (i) judicial economy; (ii) convenience; (iii) fairness; and (iv) comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009) (district courts have discretion to retain or dismiss supplemental claims after federal claims are eliminated); *Gibbs*, 383 U.S. at 726.

Federal courts routinely apply these factors in complex statutory contexts even when the federal claims fall away. *See, e.g., Carlsbad Tech.*, 556 U.S. at 639–40 (district court has authority to retain state claims following dismissal of federal claims); *Morris v. City of Colorado Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012) (retention appropriate where substantial judicial resources have been expended and the claims are intertwined); *Sena v. Corr. Corp. of Am.*, 646 F. App'x 655, 659 (10th Cir. 2016) (same—affirming retention based on overlapping facts and the *Gibbs* factors).

Here, the applicable factors strongly support retention given that all of Plaintiffs' claims arise from a single alleged fraudulent scheme and depend on the same factual record, the § 1367

factors strongly support retention. *See, e.g., F5 Capital v. Pappas*, 856 F.3d 61, 77–78 (2d Cir. 2017) (affirming retention of state corporate-misconduct claims because they were intertwined with the federal allegations and dismissal would undermine efficiency and fairness). Importantly, the state law claims arise from the same fraudulent investment scheme, involve the same parties, and turn on the same misrepresentations, omissions, and transactional conduct underlying the federal securities claims. Moreover, various other Defendants (including Colliers) have <u>not</u> moved to dismiss the federal securities claims, and thus, those federal claims with respect to the fraudulent scheme are moving forward in this litigation. *See* Dkt. 184. The discovery, documents, witnesses and expert analysis relevant to the federal claims are identical to those required for the state law claims, and dismissal of the state law claims against only one Defendant would force the parties to litigate the same facts in two forums, duplicating effort, increasing cost and risking inconsistent judgments—results plainly contrary to *Gibbs* and progeny guidance.

Accordingly, even if the Court were to dismiss the federal securities claims against Long (which Plaintiffs believe is not warranted regardless), the Court should exercise supplemental jurisdiction over the remaining state law claims against Defendant Long. Judicial economy, convenience, and fairness to the parties overwhelmingly favor retaining the state law claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs Cheryl Tomac, trustee of the Tomac Trust; Royal West Properties, LLC (Willard Malmstrom, manager); Colleen Overson, trustee of the Wayne B. Bulau Irrevocable Trust; James Herbert, trustee of the Revocable Trust Agreement of James A. Herbert; Janice Young; J. Lynne Kneedy, trustee of the J. Lynn Kneedy Trust; John Kurtz; Marjorie Reid, trustee of the Marjorie Ann Reid Trust; Glenwood Ventures LLC (Elizabeth Carlston and Benjamin Allen, managers); JSGV Properties, LLC (Jennifer Smith, manager);

MaxHan Holdings, LLC (Monika Hansen, manager); Ivan Warner, Windmill Properties II, LLC (Simon DeJong, manager); Green Cove Investments, LLC (James Tucker, manager); Quaking Aspen Properties, LLC (Gerald DelPriore and Marisa Fontaine, managers), and Joan Befort, trustee of the Joan Alice Befort Living Trust respectfully request the Court deny Defendant Kevin Long's Motion to Dismiss.

RESPECTFULLY SUBMITTED this 1st day of December, 2025.

**BLACKBURN & STOLL, LC**
Brett Anderson (11809)
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

**RIGBY SLACK, PLLC**
A. Lee Rigby (*pro hac vice*)
David C. Lawrence (*pro hac vice*)
William A. Duncan (*pro hac vice*)
Braden N. Anderson (*pro hac vice*)
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

By my signature above, I hereby certify that on December 1, 2025, the foregoing was forwarded via the CM/ECF system to all parties entitled to notice of the same.

*/s/ Brett Anderson*
