Brett Anderson (11809)
**Blackburn & Stoll, LC**
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

A. Lee Rigby
David C. Lawrence
William A. Duncan
Braden N. Anderson
**Rigby Slack, PLLC**
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHERYL TOMAC, an individual and trustee of the Tomac Trust, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>COLLIERS INTERNATIONAL GROUP, INC., et al.,<br><br>Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT JERALD ADAM LONG'S MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00774-RJS-DBP |

Plaintiffs Cheryl Tomac, trustee of the Tomac Trust; Royal West Properties, LLC (Willard Malmstrom, manager); Colleen Overson, trustee of the Wayne B. Bulau Irrevocable Trust; James Herbert, trustee of the Revocable Trust Agreement of James A. Herbert; Janice Young; J. Lynne Kneedy, trustee of the J. Lynn Kneedy Trust; John Kurtz; Marjorie Reid, trustee of the Marjorie Ann Reid Trust; Glenwood Ventures LLC (Elizabeth Carlston and Benjamin Allen, managers);

1

JSGV Properties, LLC (Jennifer Smith, manager); MaxHan Holdings, LLC (Monika Hansen, manager); Ivan Warner, Windmill Properties II, LLC (Simon DeJong, manager); Green Cove Investments, LLC (James Tucker, manager); Quaking Aspen Properties, LLC (Gerald DelPriore and Marisa Fontaine, managers), and Joan Befort, trustee of the Joan Alice Befort Living Trust (collectively, "Plaintiffs"), through undersigned counsel and pursuant to Local Rule 7-1 DUCivR and Fed. R. Civ. P. 12(b), submit this response memorandum in opposition to Defendant Jerald Adam Long's Motion to Dismiss with prejudice Plaintiffs' Second Amended Complaint [Dkt. 190] (the "Motion"). The Second Amended Complaint [Dkt. 173] shall be referred to as "SAC," and Defendant Jerald Adam Long shall be referred to as "Adam Long."

## INTRODUCTION AND BACKGROUND

First, Plaintiffs clarify that, *as to Defendant Adam Long alone*, Plaintiffs elect to proceed on the two claims that most directly correspond to his role in the scheme: (1) control-person liability under Section 20(a); and (2) Utah civil conspiracy. Plaintiffs do not pursue the remaining claims against Defendant Adam Long as those theories are not necessary to hold him liable for his conduct as pled and because the gravamen of his involvement is captured by the control and conspiracy-based allegations. This narrowing is a matter of litigation efficiency and judicial economy, not an endorsement of Adam Long's arguments. The two remaining claims are properly pled and well supported by the SAC.

Contrary to the Motion's framing, the SAC does not rely on impermissible group pleading or vague allegations untethered to specific actors. Instead, it pleads with particularity the who, what, when, where, and why of the misrepresentations attributable to each entity defendant, including the context, timing, recipients, and falsity of those statements. Read as a whole—as the Tenth Circuit requires—the allegations satisfy the heightened pleading standards applicable to

2

federal securities fraud claims. *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023).

The SAC alleges a unified scheme in which Defendants marketed and sold overvalued TIC interests by, among other wrongful acts: fabricating the financial health and rent-paying status of NGX; concealing the true market value and acquisition price of the South Jordan property; inflating lease rates to justify an artificially high sales price; and disguising investor-funded payments as legitimate tenant rent. For example, Kevin Long—Adam Long's father and a key individual whose statements and scienter are imputed to the entity defendants which Adam Long controlled—was a direct and central participant. Kevin Long directly represented to Plaintiffs that NGX was paying rent, that the lease rate was "market," and that NextPain Care would "replace the rent NGX was paying"—all the while knowing that NGX never paid rent, that the lease rates were manipulated, and that investor funds were being recycled to create the illusion of tenant viability. *See e.g.*, Dkt. 173, ¶¶ 69–71, 78–81, 87.

The SAC further supports a strong inference of scienter by showing Defendants' access to (and actual knowledge of) contradictory information, their financial motives and central roles in orchestrating and perpetuating the investment scheme. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). Though the SAC includes further factual support, these allegations alone establish primary violations by the entity Defendants, whose liability is imputed by, among others, Kevin Long's conduct as their founder, president, principal, and senior executive. *See Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974); *Smallen v. W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020).

The SAC also plausibly alleges Adam Long's control over the primary violators. The SAC pleads facts showing that Adam Long held ownership and management roles across the relevant

entities, participated in joint marketing and commission structures, and directly recruited and trained the agents who marketed and sold the TIC interests. Further, the SAC alleges that Kevin Long—Adam Long's father and a co-Defendant in this case—has previously testified to his son's ownership and "instrumental" role in the related real estate entities. These allegations support the reasonable inference that Adam Long possessed the power to influence the policies and practices through which the securities violations occurred—more than sufficient at this procedural state, particularly where control-person allegations are not subject to the PSLRA's heightened pleading standard. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003). Finally, these same allegations also satisfy the pleading standard necessary to allege a claim for civil conspiracy under Utah law.

In short, Adam Long's Motion mischaracterizes the SAC and improperly invites the Court to disregard well-pled allegations or construe them in his favor. Because the SAC pleads with particularity the primary violations by Millcreek, Millrock and Colliers, as well as Adam Long's control over, and participation in, the fraudulent scheme, the Motion should be denied.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the allegations in support contain factual content that allows the court to draw a reasonable inference that the defendants are liable for the misconduct alleged. *See Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F. 3d 1231, 1235 (10th Cir. 2013). The court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *See Albers v. Bd. Of Cty. Comm'rs of Jefferson*

*Cty.*, 771 F.3d 697, 700 (10th Cir. 2014). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

## ARGUMENT

**I.  The SAC Sufficiently Pleads Primary Securities-Law Violations by Millcreek, Millrock, and Colliers.**

In the Motion, Adam Long blanketly asserts that Plaintiffs have not pled a primary violation at all. In doing so, he overlooks the SAC's detailed allegations and forgets an important truth: <u>that entities act only through their employees and agents</u>. *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261 (D. Utah 2017) (citing *In re C.W. Mining Co.*, 636 F.3d 1257, 1266 (10th Cir. 2011)) (emphasis added). As detailed below, the SAC alleges a unified scheme in which Millrock acquired or held ownership interests in the underlying real-estate assets, Millcreek structured, packaged and sponsored the TIC offerings, and Colliers marketed and sold the TIC interests to investors through its brokers and personnel.

**a.  The SAC Identifies Specific Misrepresentations Attributable to Colliers.**

According to Adam Long, the SAC's allegations "do not support any violation of securities laws by Colliers." *See* Dkt. 190, p. 14. To the contrary, the SAC pleads precisely the opposite. Far from a peripheral participant, the SAC pleads that Colliers was a central architect and driver of the fraudulent scheme. "Colliers—with its extensive marketing department, resources and expertise—developed the marketing materials and website for Millcreek Properties." Dkt. 173, ¶ 43. Those materials contained numerous inaccuracies and omissions, including the failure to disclose the above-market rate artificially inflated by fraudulent long-term leases and that the purportedly "safe

5

and secure" income stream was anything but. Dkt. 173, ¶ 49. Colliers further sponsored and marketed South Jordan as "low-risk" and promised Plaintiffs "stable returns and a high quality tenant." Dkt. 173, ¶ 53. None of these representations were true.

These were not stray or unauthorized statements. Kevin Long, Senior Vice President of Colliers' Utah Division, knew these statements were false and either affirmatively made them anyway or failed to disclose the truth. Dkt. 173, ¶¶ 69–70, 72, 78–80. To be clear, his statements are alone sufficient to plead primary violations by Colliers. But the SAC does not rest on Kevin Long's conduct in isolation.

The SAC also pleads a coordinated sales and marketing operation wherein Colliers provided institutional support for acquisition activities, including the development of due-diligence packages, centralized oversight and "adult supervision" over Millcreek transactions, and direct training of the agents responsible for marketing and selling the TIC interests. Dkt. 173, ¶¶ 41, 46, 48. Those agents—including Brian Martinez, Scott Rutherford, Mike Bersie, Spencer Taylor, Ileana Stocco, Michael Cruz, Nicholas Ledbetter and Jamie Andersion—"ultimately sold the TIC interests based on information . . . provided by Kevin Long and [the Colliers team]." Dkt. 175, n.15.

Under settled Tenth Circuit law, an entity is liable for the fraud and misrepresentations of its agents acting within the scope of their authority or employment. *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974), *abrogated on other grounds by, Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Accordingly, Colliers is liable for the misrepresentations by its executives—including Kevin Long (Senior Vice President, Colliers Utah Division), Lew Cramer (CEO, Colliers Utah Division), and James Yeates (Vice President, Colliers

Utah Division)—as well as by the Colliers-trained agents acting under its instruction and supervision.

Undeniably, the SAC pleads numerous specific misrepresentations made by those agents in connection with the sale of the TIC interests including, but not limited to:

(i) January 25, 2023 – Martinez to Smith: representing NGX as the tenant despite the NGX lease never being signed; [Dkt. 173, ¶ 81]

(ii) February 2, 2023 – Martinez to Malstrom: attaching OM referencing NGX as the secured tenant despite no lease in place; [Dkt. 173, ¶ 81]

(iii) February 2, 2023 – Martinez to Hansen: representing three medical tenants currently occupying South Jordan despite NGX never occupying the space; [Dkt. 173, ¶ 74]

(iv) February 22, 2023 – Cruz to Carlston: representing that NGX signed the lease; [Dkt. 173, ¶ 81]

(v) March 4, 2023 – Martinez to Reid: representing total sales of $6M when only $3.3M had been sold; [Dkt. 173, ¶¶ 77, 81]

(vi) June 29, 2023 – Cruz to Tomaz: re-emphasizing "no vacancy factor" and representing that NGX was occupying the space, paying rent, and cash flow was "stable"; [Dkt. 173, ¶ 81]

(vii) August 29, 2023 – Bersie to Belchak: misrepresenting that the lease was approved by NGX; [Dkt. 173, ¶ 81].

These allegations are all in addition to those regarding the specific misrepresentations of Kevin Long (Senior Vice President, Colliers Utah Division) himself, including the representations that (i) NGX was paying rent; (ii) the lease rate was "fair" and "market"; and (iii) the income stream received was NGX "rent" payments rather than repurposed investor funds. *See, e.g.,* Dkt. 173 ¶¶ 78, 81.

Taken together, these allegations confirm that the misrepresentations at issue were not the aberrant acts of unsupervised agents, but the intended product of Colliers' centralized management, training and marketing apparatus. Colliers' liability is further reinforced by its

deliberate lending of institutional credibility to the offerings. Colliers' logo appeared on numerous offering memoranda and marketing materials, and investor communications were transmitted through Colliers' systems. Dkt. 173, ¶¶ 60–66. Aside from the above independently attributable misrepresentations made by its agents, Colliers—by permitting its name, logo, and internal platforms to be used in this manner—conveyed an unmistakable signal of legitimacy and institutional approval that materially assisted the scheme and helped conceal the true nature of the offerings from investors.

Against this backdrop, Adam Long's attempt to characterize Colliers as a non-participant fails at the threshold. The SAC clearly and plausibly alleges Colliers' primary liability under securities laws, and nothing in Adam Long's Motion undermines those allegations.

### b. The SAC Identifies Specific Misrepresentations Attributable to Millcreek and Millrock.

The SAC pleads primary violations by Millcreek and Millrock independently as well as derivatively through the fraud and misrepresentations of its agents. As pled, Millrock acquired the underlying properties and provided the capital used to purchase them while Millcreek structured, packaged and sold the TIC offerings to Plaintiffs. Dkt. 173, ¶¶ 36–38, 42–47. Like Colliers, Millcreek is also liable for the misstatements and omissions of its agents. As noted in the SAC, Adam Long, Kevin Long (Adam Long's father), Cramer, Frugal, Yeates, Martinez and Rutherford were "close business associates" and engaged in "joint marketing, communications, social media and transactional commission payments." Dkt. 173, ¶ 39. From the outset, the scheme involved a "variety of intertwined players," with individuals often wearing more than one "hat" for more than one entity. Dkt. 173, ¶ 40. Rutherford, for example, expressly referenced his roles at both Millcreek and Equity Summit interchangeably, including in his email signature attached to his communications with Plaintiffs. Dkt. 173, ¶ 56. Indeed, the SAC lays out examples of Millcreek's

8

and Colliers' names and logos being used interchangeably by agents such that it appeared both were responsible for the materials and misrepresentations utilized to induce the TIC sales to Plaintiffs. *See, e.g.*, Dkt. 173, ¶¶ 62, 66, 75-76.

Accordingly, the SAC alleges that Millcreek and Millrock made, and caused to be made, material misrepresentations and omissions concerning the core features of the investments including:

(i) That the property was encumbered by long-term, executed leases with NGX;

(ii) That NGX occupied the property and was paying rent;

(iii) That the lease rates were "market" and supported the represented valuations; and

(iv) That the promised income stream was stable, secure and derived from tenant rent rather than investor capital.

*See* Dkt. 173, ¶¶ 49–50, 69–72, 74, 78–82.

Those representations were false. As the SAC pleads, NGX never paid rent, lease execution and approval were misrepresented, and investor funds were recycled to create the illusion of tenant performance and cash flow. Dkt. 173, ¶¶ 72, 78–80. Millcreek's and Millrock's misrepresentations were embedded in the offerings themselves and disseminated through the sale process they helped build and control. Moreover, Millcreek committed primary violations when it concealed the acquisition price of South Jordan from Plaintiffs, which would have revealed the inflated nature of the sales price if disclosed. Dkt. 173, ¶¶ 69–70.

Simply put, the SAC more than plausibly alleges primary violations by Millcreek, Millrock, and Colliers by identifying concrete misstatements, omissions and deceptive conduct that independently satisfy Section 10(b) and Rule 10b-5. Because these allegations establish actionable conduct by the entity defendants themselves, Adam Long's attempt to ignore these primary violations fails at the threshold and provides no basis for dismissal.

### c. The SAC Adequately Pleads Scienter Imputable to the Entity Defendants.

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 USCS § 78u–4. Put differently, the PSLRA heightens the requirements when pleading "scienter." The Supreme Court defines "scienter" as the "mental state embracing an intent to deceive, manipulate, or defraud," and in the context of § 10(b), "knowing or intentional misconduct." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

In *Tellabs*, the Supreme Court gave guidance on what is required to sufficiently allege a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). There, the Supreme Court held that, on a motion to dismiss a securities fraud claim, courts must: (i) accept as true all factual allegations in the complaint; (ii) <u>consider the complaint in its entirety</u> along with all other sources incorporated in the complaint by reference; and (iii) consider whether "all of the facts alleged, <u>taken collectively</u>, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. (emphasis added). Importantly, under Tenth Circuit authority, "<u>[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself</u>." *Smallen v. W. Union Co.*, 950 F.3d 1297,1312 (10th Cir. 2020) (emphasis added).

Here, the SAC pleads a strong inference of scienter based on facts known to Defendants at the time the TIC interests were marketed and sold. In particular, the SAC alleges facts showing that Kevin Long (among others)—whose scienter is imputable to Millcreek, Millrock and Colliers—knew that the core representations were false or misleading when made. For the avoidance of doubt, the SAC alleges that Kevin Long knew:

    (i)    the TIC interests were being sold at prices far exceeding their true market value [Dkt. 173, ¶¶ 69–70];

      (ii)      that the leases with NGX were fictitious [Dkt. 173, ¶¶ 72, 78]; and

      (iii)      that NGX was in fact not paying rent, but rather it was investor funds that were used to create the illusion of NGX's viability [Dkt. 173, ¶¶ 79–80].

Notwithstanding that knowledge, Kevin Long (i) represented NGX was paying rent; (ii) told Plaintiffs the lease rate was "fair" and "market;" and (iii) concealed the fact that NGX "rent" payments were investor funds. *See, e.g.*, Dkt. 173 ¶¶ 78, 81. Each of these statements were capable of being verified. NGX was either paying rent or it was not. The lease rate was either market or it was not. The payments were either from NGX for rent or they were not. As such, Kevin Long either intentionally misrepresented these facts or he knew or discovered that each were false. Dkt. 173, ¶¶ 69–70, 72, 78–80.

    As (i) Senior Vice President of Colliers' Utah Division, (ii) owner, founder and agent of Millcreek, and (iii) shareholder, founder and principal of Millrock [*see, e.g.*, Dkt. 173, ¶¶ 23, 37], Kevin Long acted squarely within the scope of his authority when he trained, supervised, and directed the selling agents, who in turn disseminated the knowingly false information he supplied. As noted above, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself," *see Smallen*, 950 F.3d at 1312, and that principle, applied to the well-pleaded facts here (*see, e.g.*, Dkt. 173, ¶¶ 41, 43, 46, 48–50, 69–70, 72, 78–81), <u>means Kevin Long's scienter is Colliers', Millcreek's, and Millrock's scienter</u>. That alone supports liability as a primary violator for each of the entities at issue.

    Though alone sufficient to defeat the Motion, the SAC's allegations regarding scienter do not rest on the imputation of one agent's scienter alone. With respect to Colliers specifically, the SAC also pleads its direct and independent knowledge of the falsity of key representations concerning the property's value, tenant status, lease execution, occupancy, rental income, and deal

structure. Dkt. 173, ¶¶ 72–73, 75–79, 83, 87. Those allegations establish that Colliers, through the processes and controls it implemented or participated in, was aware of the misleading nature of the statements yet continued to promote them—statements on which Plaintiffs directly relied in purchasing their TIC interests and as a result of which suffered significant damages when those interests proved to be worth only a paltry fraction of what was represented. In addition, the SAC also alleges Defendants' financial incentive to deceive. Dkt. 173, ¶¶ 39, 42, 46–47, 78, 87. Such allegations only further bolster the inference of scienter. *Tellabs, Inc.*, 551 U.S. at 325 (finding that a defendant's personal financial gain is evidence weighing in favor of a scienter inference).

Such facts are precisely the sort to adequately support a strong inference of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105-06 (finding intent to deceive where complaint alleged company operation was losing money, that Defendant knew of the losses, but falsely reported a profit); *see also IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1259–61 (D. Kan. 2023), *motion to certify appeal denied*, 723 F. Supp. 3d 1053 (D. Kan. 2024) (holding "that access to contradictory information can sometimes contribute to a strong inference of scienter.").[1] Indeed, Defendants' (and their agents') intent to deceive throughout the scheme is perhaps best reflected by the fact that Millcreek *continued* to market NGX as a viable tenant on its website long after NGX had filed for bankruptcy. Dkt. 173, ¶ 86. Here, unlike other securities cases where scienter

---

[1] Notably, the complaint examined in *IBT* rested solely upon access to contradictory information. On that basis alone, the court held that such facts may weigh in favor but are not dispositive of scienter. In elaborating, that court held when access to contradictory information is the sole basis for scienter, "[a] plaintiff must allege facts with particularity showing not only the executive's access to contradictory information but also the executive's fraudulent intent or reckless disregard of accessible information." *IBT*, 706 F. Supp. 3d at 1260. Here, Defendants and their agents—including Kevin Long—did not just have access to such information, but also had knowledge of the statements' falsity. Yet they made the representations anyways (and/or failed to disclose and correct).

may be more difficult to discern,[2] "[i]ntentional misconduct is easily identified since it encompasses deliberate illegal behavior." *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000)).

Finally, Defendants' collective involvement in the prior purchase of the South Jordan property is particularly insightful with respect to the strong inference of scienter. As noted, Millrock provided the capital for Millcreek to acquire the property at the negotiated price of only $3,500,000.00. Dkt. 173, ¶ 69. Yet shortly thereafter, Defendants—through some of the same individuals and agents (including but not limited to Kevin Long)—marketed that same property to investors for the substantially inflated price of $10,300,000.00—justified by misrepresentations that the property was encumbered by stable, long-term leases with a viable tenant generating secure rental income. Dkt. 173, ¶¶ 49–50, 69–71. As pled, these inflated valuations were not the product of market appreciation or changed fundamentals, and instead, they were driven by lease terms and income assumptions that Defendants knew were untenable or false—including above-market lease rates, misrepresented lease execution, and fictitious rent payments. Dkt. 173, ¶¶ 72, 78–80. Because the agents of Millcreek, Millrock, and Colliers, including Kevin Long, were each directly involved in both the acquisition of the property and the subsequent structuring and sale of TIC

---

[2] *See e.g. City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245,1260 (10th Cir. 2001) ("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price) . . . . In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.*") (emphasis in original).

offerings to investors, it is simply implausible that they did not know that the claimed TIC values bore no reasonable relationship to the purchase price absent the misrepresented lease performance and income streams that were being advertised to Plaintiffs.

Taken together, the SAC's allegations more than satisfy the PSLRA's heightened pleading standard and give rise to a cogent and compelling inference that Colliers, Millcreek and Millrock—both alone and through their agents, including Kevin Long—acted with the requisite scienter, fulfilling the requirements of the PSLRA and undoubtedly establishing primary violations by the underlying entities.

## II. The SAC Adequately Pleads Adam Long's Control.

Section 20(a) of the Securities Exchange Act imposes liability upon "every person who, directly or indirectly, controls any persona liable" for securities fraud. 15 U.S.C.A. § 78t. Therefore, to successfully state a claim for control person liability, a plaintiff must allege (1) a primary violation of the securities laws and (2) control over the primary violator. 15 U.S.C.A. § 77o.

Importantly, allegations regarding control person liability pursuant to Section 20(a) of the Securities Exchange Act are not subject to the heightened pleading requirements of the PSLRA. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109. Instead, Plaintiffs' need only allege that Adam Long had control over the primary violator. *Id*.

"Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Yellowdog Partners, LP v. Curo Group Holdings Corp.*, 426 F. Supp. 3d 864, 877; *Med Safe Northwest, Inc. v. Medvial, Inc.*, 1 Fed. Appx. 795, 805; *SEC v. Goldstone*, 952 F. Supp. 2d 1060; *Maher v. Durango Metals*, 144 F.3d 1302. The Tenth Circuit

has clarified that this element requires only "<u>some indirect means of discipline or influence short of actual direction</u>." *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1208 (emphasis added). Courts in this jurisdiction have emphasized that determination of control is a factual question and is not ordinarily resolved at the motion to dismiss stage. *Yellowdog Partners, LP v. Curo Group Holdings Corp.*, 426 F. Supp. 3d 864, 877.

Here, Adam Long argues that Plaintiffs fail to allege control because his name appears only a limited number of times in the SAC. However, control-person liability turns on power and influence—not frequency of mention. Put simply, the SAC alleges several concrete bases from which control is demonstrated or may be inferred, including that Adam Long:

(i) was an owner, agent and Chief Operating Officer of Millcreek [Dkt. 173, ¶¶ 27, 39];

(ii) was an owner and shareholder of Millrock [Dkt. 173, ¶¶ 27, 39];

(iii) was employed by Colliers in a management role [Dkt. 173, ¶¶ 39];

(iv) was a close business associate of other Defendants and participated in joint marketing, communications, social media and transactional commission payments. [Dkt. 173, ¶ 39];

(v) directly recruited and trained the agents who marketed and sold the TIC interests, and supplied the information on which those agents ultimately relied on in selling the TIC interests [Dkt. 173, ¶ 41, 47; n.15];

(vi) even offered to employ those agents after their tenure with Millcreek was completed [Dkt. 173, ¶ 47]; and

(vii) was "instrumental" in running and operating the related real estate entities with his father, Kevin Long [Dkt. 173, n.14].

The SAC's allegations clearly establish Adam Long's authority over the primary channel through which the TIC securities were marketed and sold—supporting the inference of the ability to influence the conduct at issue. His direct involvement in the training of sales personnel (as well as his authority as a current or future employer able to affect livelihood) is a clear method of

15

influencing: (i) how the investments were described to investors; (ii) how offering materials were presented; (iii) what risks were to be emphasized or minimized; and (iv) how projected returns were framed. These are the precise areas in which the SAC alleges the primary violations occurred.

These allegations are not abstract. Together, they support a plausible inference that Adam Long possessed the power to direct or influence the polices and practices of the primary violators—exactly what Section 20(a) requires. *See Maher*, 144 F.3d at 1305; *see also First Interstate Bank of Denver v. Pring,* 969 F.2d 891, 897-98 (10th Cir.1992)*, rev'd on other ground bys, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994) (recognizing the derivative nature of § 20(a) liability and that personal or culpable participation in the primary violation is not required).

### III.     Plaintiffs Have Adequately Pled a Claim for Civil Conspiracy.

Adam Long contends that Plaintiffs' civil conspiracy claim fails for lack of an underlying tort, lack of agreement among participants, and lack of actionable conduct attributable to him. As explained herein, Utah law and the SAC's allegations foreclose those arguments.

In examining civil conspiracy, Utah courts apply the following five elements: (i) a combination of two or more persons; (ii) an object to be accomplished; (iii) a meeting of the minds on the object or course of action; (iv) one or more unlawful, overt acts; and (v) damages as a proximate result. *Peterson v. Delta Air Lines, Inc.*, 2002 UT App 56, ¶ 12, 42 P.3d 1253. In Utah, civil conspiracy is derivative meaning it "requires…an underlying tort." *Puttuck v. Gendron*, 2008 UT App 362, ¶ 21, 199 P.3d 971 (quoting *Coroles v. Sabey*, 2003 UT App 339, ¶ 36, 79 P.3d 974).

Importantly, Utah law does not require the underlying tort be committed by every conspirator—only that a tort occurred and that the defendant agreed to and participated in the plan to accomplish it. *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493; *see also Lawrence v.*

*Intermountain, Inc.*, 2010 UT App 313, n.4, 243 P.3d 508 (holding that though "conspiracy to defraud requires proof of the underlying fraud, it is not necessary that the underlying fraud have been actually committed by each member of the conspiracy.") (internal quotations and citations omitted); *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 794 (Utah Ct. App. 1987) (explaining the "purpose of a civil conspiracy action is to connect the participating members in a transaction who otherwise would not be liable to the plaintiff."). As detailed above, the SAC alleges underlying tortious conduct by, among others, Millcreek, Millrock, Colliers, Kevin Long, and the other agents who sold the TIC interests to Plaintiffs, including through misrepresentations regarding property stability, valuation, tenant quality and status, and the origins of "rent" payments. *See, e.g.,* Dkt. 173, ¶¶ 49, 69–70, 72, 78–80, 81. Together, these allegations more than support the underlying tort element.

Further, the SAC explicitly alleges a coordinated scheme through which Millrock, Millcreek, Colliers and the associated individuals acted purposefully and jointly to acquire properties, package TIC offerings, market them through brokers, and sell them using misleading descriptions and omissions. Specifically, the SAC pleads:

(i) <u>Combination/obfuscation</u>: multiple entities and individuals (including Adam Long) working together in the acquisition to marketing to sale pipeline [Dkt. 173, ¶¶ 36–52];

(ii) <u>Object to be accomplished</u>: to profit from the sale of TIC interests using misleading marketing and omissions [Dkt. 173, ¶¶ 39, 42, 53–90]; and

(iii) <u>Meeting of the minds</u>: coordinated roles, shared planning, cooperation and joint participation throughout the TIC sales structure [Dkt. 173, ¶¶ 1, 39–47].

These allegations satisfy the first three elements under Utah law. *Peterson*, 2002 UT App 56, ¶ 12. The SAC likewise identifies numerous overt acts in furtherance of the conspiracy including the preparation and dissemination of misleading offering materials, misleading broker-

level statements to investors, coordinated sales processes between Millcreek, Millrock, and Colliers, and the execution of the TIC sales transactions that resulted in Plaintiffs' losses. *See, e.g.*, Dkt. 173, ¶¶ 49–61, 81, 94–104, 146. Such fraudulent misrepresentations and omissions satisfy the "unlawful overt act." *See Pyper*, 2018 UT App at ¶ 16.

As previously mentioned, Utah law does not require that each conspirator commit every overt act. Rather, it only requires knowing participation in the scheme. Here, the SAC alleges that Adam Long (i) was an owner and Chief Operating Officer of Millcreek and shareholder of Millrock—entities that helped acquire, structure and sponsor the TIC offerings [Dkt. 173, ¶ 27]; (ii) held a management role at Colliers, the entity whose brokers directly marketed and sold the TIC interests [Dkt. 173, ¶¶ 39, 47]; (iii) was "instrumental" in the underlying real estate operations with his father, Kevin Long [Dkt. 173, ¶ 46 n.14]; and (iv) was personally involved in the training of the personnel involved in the TIC marketing process, who marketed the TIC interests directly to Plaintiffs based on the information they had been provided in training [Dkt. 173, ¶¶ 41, 52]. The SAC further alleges that these actions and roles were integrated into the coordinated scheme and structure implemented by Defendants [*see, e.g.*, Dkt. 173, ¶¶ 142–147].

Together, these allegations plausibly show that Adam Long knew of the conspiracy's objectives, contributed to its execution, and benefited from its success. Accordingly, the SAC satisfies Utah's participation standard, as well as the other pleading requirements necessary to assert a claim for civil conspiracy.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs Cheryl Tomac, trustee of the Tomac Trust; Royal West Properties, LLC (Willard Malmstrom, manager); Colleen Overson, trustee of the Wayne B. Bulau Irrevocable Trust; James Herbert, trustee of the Revocable Trust Agreement of James A.

Herbert; Janice Young; J. Lynne Kneedy, trustee of the J. Lynn Kneedy Trust; John Kurtz; Marjorie Reid, trustee of the Marjorie Ann Reid Trust; Glenwood Ventures LLC (Elizabeth Carlston and Benjamin Allen, managers); JSGV Properties, LLC (Jennifer Smith, manager); MaxHan Holdings, LLC (Monika Hansen, manager); Ivan Warner, Windmill Properties II, LLC (Simon DeJong, manager); Green Cove Investments, LLC (James Tucker, manager); Quaking Aspen Properties, LLC (Gerald DelPriore and Marisa Fontaine, managers), and Joan Befort, trustee of the Joan Alice Befort Living Trust respectfully request the Court deny Defendant Jerald Adam Long's Motion to Dismiss.

RESPECTFULLY SUBMITTED this 2nd day of January, 2026.

      /s/ A. Lee Rigby

**BLACKBURN & STOLL, LC**
Brett Anderson (11809)
257 East 200 South, #800
Salt Lake City, UT 84111
Telephone: 801-578-3540
bretta@blackburn-stoll.com

**RIGBY SLACK, PLLC**
A. Lee Rigby (*pro hac vice*)
David C. Lawrence (*pro hac vice*)
William A. Duncan (*pro hac vice*)
Braden N. Anderson (*pro hac vice*)
3500 Jefferson St., Suite 330
Austin, Texas 78731
Telephone: 512-782-2060
lrigby@rigbyslack.com
dlawrence@rigbyslack.com
wduncan@rigbyslack.com
banderson@rigbyslack.com

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

By my signature above, I hereby certify that on January 2, 2026, the foregoing was forwarded via the CM/ECF system to all parties entitled to notice of the same.

                                       */s/ A. Lee Rigby*
                                       A. Lee Rigby